# Exhibit A

Filed
D.C. Superior Court
02/04/2020 20:50PM
Clerk of the Court

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| GALLAUDET UNIVERSITY<br>800 Florida Avenue, N.E.<br>Washington, DC 20002,<br><br>    Plaintiff,<br><br>v.<br><br>JAMES G. DAVIS CONSTRUCTION<br>CORPORATION<br>12530 Parklawn Drive<br>Rockville, MD 20852<br><br><u>Serve</u>:<br>Registered Agent<br>CT Corporation System<br>4701 Cox Road, Suite 285<br>Glen Allen, VA 23060<br><br>    Defendant. | Civil Action No. ___2020 CA 005196 B___<br><br>Calendar _____<br><br>Judge _____ |

## **COMPLAINT**

Plaintiff Gallaudet University ("Gallaudet"), by and through its undersigned counsel, hereby states the following as its Complaint against Defendant James G. Davis Construction Corporation ("DAVIS"):

## **INTRODUCTION**

Gallaudet is a federally-chartered and federally-funded public university whose mission is to advance the lives and opportunities of deaf and hard-of-hearing people by providing a multicultural and multilingual community for its students. Gallaudet sought to enhance the community experience by constructing a new three-story, 70,000-square-foot, 158-bed student residence hall facility designed specifically to provide housing for deaf and hard-of-hearing

secondary school students enrolled at Gallaudet. Gallaudet hired DAVIS as its general contractor to provide pre-construction and construction services for this large-scale construction project, in part because DAVIS held itself out as a very qualified and professional construction firm with extensive experience building large and complex projects, including projects for universities and other educational institutions. In reality, however, DAVIS and its subcontractors misled and deceived Gallaudet and provided shoddy work that utterly failed to comply with plans and specifications, construction documents, basic industry standards (including local building codes), and its contractual obligations and legal duties to Gallaudet. The project now suffers from many serious, nonconforming conditions and construction deficiencies, which rendered the premises unfit for the intended purpose. Gallaudet has incurred and continues to incur millions of dollars in damages as it attempts to correct the deficiencies caused by DAVIS. DAVIS previously agreed to arbitrate disputes with Gallaudet, but now refuses to honor that agreement. Consequently, Gallaudet brings this suit to compel arbitration and, to the extent that any claims are deemed not arbitrable, to recover monetary damages, punitive damages, and other remedies as a result of DAVIS's negligence, fraud, and numerous breaches of the Parties' agreements.

## PARTIES AND JURISDICTION

1. Plaintiff Gallaudet is a federally-chartered public university that primarily serves deaf and hard-of-hearing students. It is organized under the laws of the District of Columbia with its principal place of business in the District of Columbia.

2. Defendant DAVIS is a Virginia corporation with its principal place of business in Rockville, Maryland. At all relevant times, DAVIS has been engaged in the business of providing general construction and contractor services.

3. Gallaudet and DAVIS both regularly do business in the District of Columbia.

4.     DAVIS is subject to personal jurisdiction in this Court pursuant to the District of Columbia Long Arm Statute, D.C. Code § 13-423, because DAVIS regularly does business in the District of Columbia, entered into contracts to do business with Gallaudet in the District of Columbia, and caused tortious injury to Gallaudet in the District of Columbia by acts or omissions committed in the District of Columbia.

5.     This Court has subject-matter jurisdiction over this case pursuant to D.C. Code § 11-921.

6.     Gallaudet and DAVIS entered into a certain partial settlement agreement, dated January 31, 2018 (the "Partial Settlement Agreement"), which established specific dispute resolution procedures relating to certain disputes. Specifically, the Parties agreed to make a good faith effort to resolve their disputes, including a principal-to-principal meeting and, if unsuccessful, to submit such disputes to binding arbitration. A true and correct copy of the Partial Settlement Agreement is attached as **__Exhibit A__**.

7.     Although the Partial Settlement Agreement is memorialized in an e-mail and other documents exchanged between the Parties, it constitutes a binding agreement by the Parties thereto and is supported by partial performance by DAVIS and the payment of substantial sums thereunder by Gallaudet as consideration. Further, and as more fully set forth below, DAVIS expressly acknowledged the validity and enforceability of the Partial Settlement Agreement.

8.     Acting in reliance on the Partial Settlement Agreement and DAVIS's conduct, Gallaudet did not implement the dispute resolution procedures under the Parties' prior contracts, and did not immediately commence action in this Court, but instead acted in conformity with the terms of the Partial Settlement Agreement, and attempted to engage DAVIS in good faith

negotiations and discussions to correct and rectify the problems it was beginning to experience at the project site.

9.     Now, two years later, DAVIS suddenly claims that the Partial Settlement Agreement never was "consummated," and that it has no obligations under that agreement.

10.     In filing this suit, Gallaudet does not waive its right to arbitrate the claims, but instead asks the Court to enforce the Parties' arbitration agreement by ordering the parties to arbitrate all issues between them that are arbitrable pursuant to the District of Columbia Revised Uniform Arbitration Act and the Federal Arbitration Act, and to resolve any issues that are not so arbitrable in this forum.

## FACTUAL BACKGROUND

11.     Gallaudet is the premier institution of learning, teaching, and research for deaf and hard-of-hearing students in the United States. For more than 150 years, Gallaudet has advanced the lives and opportunities of deaf and hard-of-hearing people, providing a multicultural and multilingual community that has increased national awareness about the rights of persons with disabilities.

12.     Gallaudet decided to enhance its student-community experience by constructing a new three-story, 70,000-square-foot, 158-bed residence hall facility known as the Model Secondary School for the Deaf (the "Project" or "MSSD") for high school students.

13.     At all relevant times, DAVIS held itself out to Gallaudet and the public as a large, competent and sophisticated general construction firm with extensive experience building large-scale projects in the greater Washington, D.C. area and constructing projects for universities and other educational institutions similar to the Project.  DAVIS represented to Gallaudet that it had the necessary skill, expertise, manpower, and all other capacities to successfully complete a project

that would be suitable for Gallaudet, deaf and hard-of-hearing students, and particularly those students for whom the Project was designed – minors with disabilities.  Those representations proved to be false and misleading.

14.     Gallaudet relied on DAVIS's representations regarding the quality of its work and the depth of its experience when Gallaudet asked DAVIS to review site conditions and to provide guidance with respect to Project design prior to construction and when Gallaudet ultimately decided to engage DAVIS to provide construction services at the Project.

### General Contract

15.     On September 17, 2015, Gallaudet and DAVIS entered into a certain AIA Document A102-2007 Standard Form of Agreement Between Owner and Contractor (the "General Contract," attached as **Exhibit B**), and AIA Document A201-2007 General Conditions of the Contract for Construction (the "General Conditions," attached as **Exhibit C**), pursuant to which DAVIS agreed to construct the Project (the "Work").

16.     Except to the extent modified by the Partial Settlement Agreement, the Parties' rights, obligations and remedies with respect to the Project and DAVIS's work are set forth in the General Contract, the General Conditions, and the Contract Documents enumerated in Article 1 of the General Contract and change orders thereto (collectively, the "Contract").

17.     Pursuant to the Contract, DAVIS agreed to perform its work for a lump sum consisting of costs of work and a contractor fee, subject to a guaranteed maximum price.

18.     Pursuant to the Contract, DAVIS accepted a "relationship of trust and confidence" with Gallaudet and agreed, *inter alia*, to exercise skill and judgment in furthering the interests of Gallaudet; to furnish efficient administration and supervision; and to furnish an adequate supply of skilled workers with sufficient experience and knowledge in their respective trades, and

materials to perform the Work in an expeditious and economical manner consistent with Gallaudet's interests.

19.     DAVIS further agreed to perform the Work in accordance with the Contract and industry standards, good and reasonable construction practices, as well as designs and specifications from the Project's architect.

20.     DAVIS also agreed to engage subcontractors for those portions of the Work that DAVIS did not customarily perform using its own employees. DAVIS agreed that it would be liable for the acts and omissions of its own employees, its subcontractors, and the agents and employees of its subcontractors.

21.     DAVIS further agreed to supervise and direct the Work, whether self-performed or performed by subcontractors.

22.     From the outset, DAVIS failed to provide sufficient skilled staffing and trade labor, supervision, failed to properly sequence the work, submitted untimely cost estimates, and committed errors in contract pricing, including obtaining incorrect pricing proposals from various trades involved in bidding on construction work, all of which contributed to significant scheduling delays and cost overruns, as well as work that was not in conformity with industry standards, quality workmanship or contract requirements, and contained multiple defects and deficiencies.

23.     As a consequence of DAVIS's mismanagement of the construction and its unjustifiable delays, Gallaudet had no choice but to execute certain change orders that increased the cost and duration of the construction, which Gallaudet agreed to do solely to get the Project back on track and avoid contentious disputes with DAVIS that could derail the Project completely. As a result, the Project did not reach substantial completion until long after the date set forth in the Contract causing Gallaudet to incur significant damages.

24.    Notwithstanding Gallaudet's willingness to agree to change orders providing DAVIS with more time and compensation to perform the Work than was originally agreed, DAVIS then proceeded to build the Project in a haphazard, shoddy, and unworkmanlike manner inconsistent with Contract specifications and requirements, inconsistent with industry standards, inconsistent with good building practices, and in violation of local building codes. In doing so, DAVIS knowingly disregarded its contractual obligations, industry standards, its duty to perform the Work in a workmanlike manner, and other duties imposed under the law, owed to, and for the benefit of, Gallaudet.

25.    Moreover, DAVIS fraudulently concealed the defective and non-conforming nature of its work by causing or allowing defects to be covered or buried under soil, concrete, brick, or drywall, so that they would not be observable to Gallaudet, and then submitting payment applications to Gallaudet wherein DAVIS falsely certified to Gallaudet that its completed work conformed with Contract plans and specifications when DAVIS knew that this was not true.

*Partial Settlement Agreement*

26.    Prior to the final close out of the Project, Gallaudet discovered certain latent, non-conforming and defective conditions at the Project. Thereafter, Gallaudet and DAVIS participated in negotiations to address those conditions. Those negotiations culminated in the Partial Settlement Agreement, dated January 31, 2018.

27.    During the negotiations, DAVIS's principal, Jim Davis, represented to Gallaudet that any problems at the Project caused by DAVIS would be corrected by DAVIS, which was false and misleading. Indeed, that representation by DAVIS formed a material part of the Partial Settlement Agreement because Gallaudet would not have otherwise entered into the agreement without such representation being made by the principal of DAVIS. The Partial Settlement

Agreement was entered into by Gallaudet with the understanding that Jim Davis would be true to his word and correct any problems caused by DAVIS, and that DAVIS had not materially misled Gallaudet when making representations about the completeness and quality of the work DAVIS had been paid for under the Contract.

28.     The Partial Settlement Agreement memorialized the material terms of the Parties' agreement to allow time to investigate certain issues and resolve any future claims relating to those issues known at that time, while preserving other claims including claims for then-unknown or undiscovered conditions. Ex. A, ¶ 12.

29.     Pursuant to the Partial Settlement Agreement, DAVIS agreed: (i) to correct certain "Warranty Completion List" items, and (ii) to review and respond in good faith to any deficiencies identified by an independent consultant retained by Gallaudet, Bowman, Foster & Associates ("BFA"), who was then in the process of preparing a report. Ex. A, ¶¶ 5, 6.

30.     In particular, the Parties acknowledged that BFA would address certain aspects of the Project and the design/construction thereof including, without limitation, (i) slope to drain issues in bathrooms; (ii) structural issues the Project was facing; (iii) building envelope issues (*i.e.*, issues associated with the brick façade and window placement and circumstances); and (iv) brick cracking/structural concerns. Ex. A, ¶ 6(ii).

31.     The Parties expressly agreed that if the deficiencies discussed by BFA were not addressed to the Parties' satisfaction, the principals of DAVIS and Gallaudet would meet to discuss potential resolution. If no resolution was reached, the Parties further agreed to submit to binding arbitration on terms to be agreed by the parties acting in good faith. *Id.*

32.     DAVIS has refused to meet with Gallaudet and contrary to its prior representations, DAVIS is now claiming that the Partial Settlement Agreement was never consummated.

*Defective and Nonconforming Conditions*

33.     BFA issued its report on July 26, 2018.  BFA noted numerous conditions that it attributed to defective construction, and for which it suggested remedial action to be taken by DAVIS. BFA also noted certain significant conditions that required further investigation before repairs could be recommended, including:

    i.    cracking through brick veneer;
    ii.   uneven floor heights and sagging/drooping floors; and
    iii.  cracking and rotating of exterior stairs, ramps, retaining walls and paved surfaces adjacent to the MSSD.

BFA attributed these conditions to apparent soil settlement, but stated that before any repairs occurred, "an evaluation of the settling must be done first" to ensure that there was no active settling, which could cause any subsequent repairs to fail.

34.     The BFA report was provided to DAVIS.

35.     In response to BFA's recommendations, Gallaudet engaged the construction consulting firm of David Pattillo & Associates ("DPA") to complete further evaluation and investigation.

36.     DPA coordinated substantial and thorough testing related to the conditions identified by BFA, including the uneven floor heights, cracking in the brick façade, exploration of poorly-laid gypcrete on the upper levels, failure to slope bathroom floors to drain and related issues. DAVIS was invited to participate in this investigation and testing, and participated in some but not all of the investigation and analysis.

37.     During the course of DPA's investigation, the problems with uneven floor heights rapidly worsened, with floor slabs in the MSSD heaving by as much as three inches or more in certain locations, creating trip and fall hazards for the high school students, and also crushing interior partitions and drywall, causing doors to bind, and rendering portions of the MSSD

9

unusable. These changed conditions still warranted further testing, including geotechnical evaluation.

38.     In the course of its investigation and testing, DPA also discovered many additional latent, defective conditions caused by DAVIS, that also were concealed by DAVIS's construction activities at the Project and hidden from plain view, including, but not limited to:

a.  the failure by DAVIS to connect lighting rods to ground (*i.e.,* to ground the building);

b.  the failure by DAVIS to run clothes dryer vents to the exterior of the building (a code violation and a fire hazard);

c.  the failure by DAVIS to build to plan covered high-voltage lines and conduits;

d.  the failure by DAVIS to install insulation behind drywall in many places despite charging for the insulation throughout;

e.  the failure by DAVIS to properly install windows and properly seal and frame the window installation, including, but not limited to, use of improper screws, fasteners, framing and other non-conforming and defective items allowing significant moisture penetration;

f.  the failure by DAVIS to properly install flashing and a "zip-system" required for waterproofing, thereby allowing water to penetrate the building structure; and

g.  DAVIS's use of inexpensive "junk fill" in place of specified engineered fill around the MSSD which allowed water penetration and despite the fact that DAVIS charged the federally-funded University for the more-expensive engineered (*i.e.*, filtered) fill.

39.     As a consequence of DAVIS covering up and building over these nonconforming and defective conditions, Gallaudet did not have the opportunity to observe or to discover the existence of these deficiencies until DPA performed its investigation, which included demolition

of the heaving floor slabs and excavation of subgrade material, as well as exploration behind drywall and related items.

40.     Gallaudet spent considerable time and substantial sums investigating these issues with multiple consultants and documented these conditions. Despite requesting assistance from DAVIS, DAVIS declined.

41.     As a proximate result of the acts and omissions of DAVIS in breach of its contractual obligations and other duties to Gallaudet, the Project suffers from numerous significant conditions that do not conform with Contract requirements or Gallaudet's reasonable contract expectations, requiring evacuation of the building (collectively, the "Conditions").

42.     The many significant Conditions at issue, include, without limitation:

   a.   DAVIS, in contradiction to the Contract, failed to properly and completely install a sub-floor drainage system beneath the interior floor slabs of the dormitory, leaving gaps in the drainage system and failing to slope as specified, which was only discovered by Gallaudet when slabs of concrete flooring were removed and fill dirt was removed from the exterior of the building (DAVIS failed to inquire of the architect of record as to proper means, methods and other design criteria with respect to this drainage system);

   b.   DAVIS further created and failed to seal off openings in the exterior foundation wall in the vicinity of the sub-grade drainage systems, which was only discovered by Gallaudet when the fill dirt adjacent to the foundation was removed;

   c.   DAVIS, in further violation of Contract specifications, failed to provide engineered fill around the dormitory, but instead used inexpensive "junk fill,"

which allowed water to penetrate more easily and which was only discovered by Gallaudet when the fill dirt adjacent to the building exterior was removed;

d.  DAVIS failed to properly grade the exterior soils near the MSSD, thereby allowing water to flow toward the building instead of away from it as a reasonable contractor would have done in conformity with good and standard industry practices;

e.  As a consequence of the events and items described in subparagraphs (a)-(d) above, the expansive clay subgrade beneath the concrete slab floors was infiltrated with water when it was not supposed to have been exposed to moisture at all, and therefore expanded so that the concrete floors within the north wing of the dormitory building heaved upwards, by as much as three inches in places, crushing interior partitions and drywall, jeopardizing conduits, impinging interior doors, creating uneven floors and tripping hazards, and rendering large portions of the structure completely unusable;

f.  DAVIS failed to build to plan high voltage lines beneath concrete slabs, creating a dangerous condition only discovered by Gallaudet when workers struck one of the unmarked lines during recent excavation and slabs of concrete flooring were removed;

g.  DAVIS failed to connect the lightning rods on the dormitory to ground, rendering them useless in protecting the structure and its occupants from lightning strikes, which was only discovered by Gallaudet as a result of DPA's investigation of other issues;

h.  DAVIS failed to connect the dryer vents in laundry rooms through the roof, instead allowing them to terminate in attic spaces, violating code and manufacturer's recommendations and creating a fire hazard, which was only discovered by Gallaudet when DPA opened portions of the ceiling to investigate other issues;

i.  DAVIS failed to slope second and third floor bathroom floors to floor drains and actually caused the slope to run away from the drains, thereby causing water to pool on the floors in those bathrooms and creating a dangerous risk of slip and fall;

j.  DAVIS improperly prepared, mixed and installed Gypcrete underlayment on the third floor of the structure, which underlayment subsequently failed, requiring replacement;

k.  DAVIS failed to properly and correctly install metal panel systems around exterior windows by failing to insulate pursuant to design and specifications, as modified; by failing to use specified fasteners and instead using drywall screws not intended for exterior use; by failing to properly fit the metal panels, leaving large gaps between panels, which DAVIS filled with excessive amounts of caulk; and by otherwise improperly installing the metal panel systems, resulting in ineffective insulation, an unaesthetic appearance, increased maintenance burdens, and premature failure of the metal panel systems;

l.  DAVIS improperly installed exterior concrete appurtenances, which are shifting and rotating away from the dormitory;

m. DAVIS failed to properly install and seal the windows by using improper screws, fasteners, framing, and other non-conforming and defective items, and in other ways, thereby causing water leaks, as well as improperly spacing the windows within the building structure;

n. DAVIS failed to properly install flashing and a "zip-system" required for waterproofing behind the brick façade, which was only discovered by Gallaudet when portions of the exterior finishes and bricks were removed, thereby allowing water to penetrate the building structure (DAVIS has strenuously objected to the removal of the bricks on the building, presumably in part due to concern over the further material defects in DAVIS's work that would be uncovered); and

o. DAVIS failed to install insulation behind drywall in many areas of the building, which was only discovered by Gallaudet when portions of the drywall were removed.

43.     The above-listed deficiencies and conditions were the proximate result of DAVIS's nonperformance or negligent performance of its obligations under the Contract, including, but not limited to, its obligations to perform the Work in compliance with the Contract design and specifications, its obligation to provide sufficiently skilled labor, its obligation to supervise the Work, and its duty to perform in a workmanlike manner and in accordance with basic industry standards (including complying with local building codes).

44.     As a further proximate result of DAVIS's acts and omissions, Gallaudet has suffered and will continue to suffer substantial damages, including, but not limited to, costs of investigating and remediating the above-listed deficiencies and conditions, the costs of having to

14

deconstruct portions of the building to reveal those above-listed deficiencies and conditions, the costs associated with having to relocate residents in various apartment buildings in the building and pay for their housing costs, the costs of repairing and replacing those items, and in numerous other ways. The amount of Gallaudet's damages will be proven at trial, but it is believed to exceed $30,000,000.

**COUNT I**
**Specific Performance of Agreement to Arbitrate**

45.    Gallaudet incorporates by reference each and every preceding allegation as if fully set forth herein.

46.    The Partial Settlement Agreement is a binding and enforceable contract setting forth the material terms of the Parties' agreement as to then-known disputes between them, including deficiencies discussed in the BFA report.

47.    The Partial Settlement Agreement imposed obligations on both parties and is supported by adequate consideration.

48.    As set forth above, the Partial Settlement Agreement, as well as DAVIS's oral statements surrounding it, contained definite and certain terms including a dispute resolution procedure that required the Parties to engage in good-faith efforts to resolve their disputes, including a principal-to-principal meeting followed by, if necessary, binding arbitration.

49.    Gallaudet performed all of its conditions precedent to allow it to demand binding arbitration, including making a substantial final payment to DAVIS under the Partial Settlement Agreement.

50.    DAVIS initially performed certain of its obligations under the Partial Settlement Agreement by correcting the Warranty Completion List items, and by later reviewing and responding to the BFA report on November 20, 2018.

51.     In its November 20, 2018 response to the BFA report, DAVIS acknowledged the existence of the Partial Settlement Agreement, which it termed a "global settlement":

> BFA's site visits occurred prior to DAVIS and Gallaudet's global settlement that occurred on January 23, 2018. As part of the global settlement, DAVIS and Gallaudet agreed on a list of specific items of corrective work to be performed by DAVIS. ***The global settlement agreement was memorialized in a written agreement dated January 31, 2018***.

*See* **Exhibit D**, p. 1 (emphasis added).

52.     Acting in reliance on the Partial Settlement Agreement, DAVIS's acknowledgement of such agreement, and DAVIS's conduct in partially performing the Partial Settlement Agreement, Gallaudet made substantial final payment to DAVIS and refrained from filing a lawsuit or otherwise implementing the dispute resolution procedures under the Parties' prior Contract while the further investigation the Parties agreed upon was completed.

53.     Acting in further reliance on the Partial Settlement Agreement and DAVIS's words and conduct, Gallaudet expended significant time and funds investigating the deficiencies identified by BFA and making repeated efforts to engage DAVIS to participate in that investigation and efforts to achieve a resolution.

54.     Gallaudet repeatedly has demanded that DAVIS honor its obligations to engage in a principal-to-principal meeting and attempt a good faith resolution. DAVIS unjustifiably refused to do so. Instead, DAVIS belatedly demanded and was given access to the Project and to other documents and information, but regardless of whatever was provided, DAVIS claimed to lack sufficient information or detail to engage in a principal-to-principal meeting.

55.     After stalling for months, on December 18, 2020, DAVIS's counsel sent a letter stating that, "DAVIS sat with Gallaudet repeatedly in 2017 and 2018 to reach an amicable Project close out. Although the Settlement Agreement *never was consummated*, in good faith DAVIS's (sic) performed the work as it agreed." *See* **Exhibit E**, p. 1 (emphasis added). In the same letter,

DAVIS also cited Gallaudet's alleged failure to comply with dispute resolution procedures in the Contract (the *general contract*).

56.     In short, DAVIS has now suddenly taken the position that, contrary to its prior representations and its conduct over the past two years, the Partial Settlement Agreement never was consummated and that DAVIS has no obligations to proceed under the dispute resolution procedures outlined therein, including any obligation to arbitrate.

57.     DAVIS's repudiation of the Partial Settlement Agreement and specifically its obligation to engage in binding arbitration is unjustified.

58.     A loss of Gallaudet's right to proceed in arbitration has no legal remedy.

59.     The Court has an obligation to enforce a valid, binding arbitration agreement pursuant to the District of Columbia Revised Uniform Arbitration Act and the Federal Arbitration Act.

60.     This Court, sitting in equity, should therefore enter an order for specific performance, compelling DAVIS to perform its agreement to arbitrate all claims subject to the Partial Settlement Agreement.

## COUNT II
### Estoppel

61.     Gallaudet incorporates by reference each and every preceding allegation as if fully set forth herein.

62.     Gallaudet reasonably relied on DAVIS's participation in drafting the Partial Settlement Agreement, DAVIS's past acknowledgement of binding and enforceable nature of the Partial Settlement Agreement, and DAVIS's partial performance of obligations and other conduct consistent with the Partial Settlement Agreement when it paid substantial sums to DAVIS and

refrained from implementing dispute resolution procedures under the prior Contract and refrained from sooner filing suit.

63.     DAVIS had actual or constructive knowledge that Gallaudet was relying on DAVIS's representations and conduct when Gallaudet tendered final payment and refrained from implementing dispute resolution procedures under the prior Contract and when Gallaudet refrained from sooner filing suit.

64.     DAVIS acted with actual intent to deceive Gallaudet by causing Gallaudet to enter into the Partial Settlement Agreement based on the false representation that DAVIS would correct any problems of its making, and by waiting two years to reveal its intention to unjustly challenge the consummation of the Partial Settlement Agreement.

65.     Should DAVIS be successful in now arguing, years later, that the Partial Settlement Agreement never was consummated and that the dispute resolution procedures of the prior Contract control, Gallaudet will suffer irreparable harm as it will not be able to proceed with the bargained-for arbitration.

66.     The Court should therefore enter an order estopping DAVIS from inappropriately and improperly denying or disputing the validity of the Partial Settlement Agreement.

**COUNT III**
**Breach of Contract**

67.     Gallaudet incorporates by reference each and every preceding allegation as if fully set forth herein.

68.     This Count III is addressed to all claims, if any, deemed not arbitrable.

69.     The Contract is a valid and binding contract between Gallaudet and DAVIS.

70.     The Partial Settlement Agreement is also a valid and binding contract between Gallaudet and DAVIS.

71.     Gallaudet satisfied any and all conditions precedent to DAVIS's obligations under the Contract and the Partial Settlement Agreement.

72.     Gallaudet performed or substantially performed its own obligations under the Contract and Partial Settlement Agreement, by, among other things, making all payments required thereunder, requesting a principal-to-principal meeting before filing this suit and making a Final Payment to DAVIS under the Contract, such that it was and remains entitled to full performance from DAVIS.

73.     DAVIS materially breached the Contract and Partial Settlement Agreement by failing to perform numerous obligations thereunder, as alleged herein.

74.     As a direct and proximate result of DAVIS's breaches, as alleged herein, Gallaudet has been and continues to be damaged in an amount to be proven at trial, which Gallaudet currently estimates, in aggregate, to be in excess of $30,000,000, together with pre-judgment and post-judgment interest at the maximum rate permitted by law, the costs of this lawsuit, attorneys' fees, and such other relief as the Court deems just and proper.

**COUNT IV**
**Negligence**

75.     Gallaudet incorporates by reference each and every preceding allegation as if fully set forth herein.

76.     This Count IV is addressed to all claims, if any, deemed not arbitrable.

77.     Gallaudet expressly relied on DAVIS's superior knowledge and skill for performance of the Work.

78.     DAVIS, in the performance of its services, owed Gallaudet a duty to exercise reasonable care and appropriate skill in the performance of the Work.

79.     DAVIS failed to exercise reasonable care in the performance of the Work, as

alleged herein.

80.     DAVIS knew or should have known that Gallaudet would suffer significant property damage, and that Gallaudet's high school students could be placed at risk of physical harm, if DAVIS failed to exercise reasonable care in the performance of the Work.

81.     As a direct and proximate result of DAVIS's negligence, as alleged herein, Gallaudet has been and continues to be damaged in an amount to be proven at trial, which Gallaudet currently estimates, in aggregate, to be in excess of $30,000,000, together with pre-judgment and post-judgment interest at the maximum rate permitted by law, the costs of this lawsuit, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT V
## Fraud

82.     Gallaudet incorporates by reference each and every preceding allegation as if fully set forth herein.

83.     This Count V is addressed to all claims, if any, deemed not arbitrable.

84.     As alleged herein, DAVIS fraudulently concealed its defective work by (i) causing or allowing such defective work to be covered, so that it could not be observed or discovered by Gallaudet; and (ii) by falsely representing to Gallaudet after the fact that DAVIS's work complied with plans and specifications when DAVIS knew that this was not true.

85.     DAVIS also fraudulently induced Gallaudet to make periodic payments to DAVIS. On a monthly basis, DAVIS submitted to Gallaudet an "Application and Certificate for Payment" for its performance of the Work, which included a monthly certification by Stephen Feight, on behalf of DAVIS, stating: "The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents."

86.     DAVIS submitted these payment applications to Gallaudet knowing that it had misrepresented to Gallaudet that its work had complied with plans and specifications, with the intent to induce Gallaudet to make each of these payments.

87.     If DAVIS did not know that its work failed to comply with plans and specifications, then DAVIS falsely and fraudulent misrepresented to Gallaudet that it had the requisite skill and knowledge to perform even basic construction services in the District of Columbia.

88.     Gallaudet was, in fact, induced and made periodic progress payments to DAVIS for the dollar amounts requested in DAVIS's payment applications during construction of the Project, even though DAVIS knew that its certified statement was not true.

89.     Gallaudet further agreed to make final payment to DAVIS, subject to the terms of the Partial Settlement Agreement, based on DAVIS's representation that all of the Work had been performed as specified by the Contract, when DAVIS knew that this was untrue and on the representation that DAVIS would correct any further problems, including those identified in the BFA report, if those were shown to be caused by DAVIS.

90.     Gallaudet reasonably relied on DAVIS's misrepresentations that all of the Work specified in the Contract was performed and in compliance with contractual documents when it issued all payments, including the final payment to DAVIS under the Contract, because DAVIS's misrepresentations regarding the Work were supported by notarized certifications from DAVIS.

91.     As a direct and proximate result of DAVIS's misrepresentations, as alleged herein, Gallaudet has been and continues to be damaged in an amount to be proven at trial, which Gallaudet currently estimates, in aggregate, to be in excess of $30,000,000, together with pre-judgment and post-judgment interest at the maximum rate permitted by law, the costs of this

lawsuit, punitive damages as permitted by law, attorneys' fees, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Gallaudet University respectfully requests that the Court enter judgment against Defendant James G. Davis Construction Corporation and in favor of Gallaudet, awarding specific performance and compelling Defendant to arbitrate claims subject to the Partial Settlement Agreement; declaring that Defendant is estopped from denying the validity and enforceability of the Partial Settlement Agreement; and, for all claims, if any, deemed not to be arbitrable, for damages in the amount proven at trial, which Plaintiff presently estimates to be in excess of $30,000,000, pre-judgment and post-judgment interest at the maximum rate permitted by law, the costs of this lawsuit, punitive damages as permitted by law, attorneys' fees, and such other relief as the Court deems just and proper.

Dated: December 30, 2020

Respectfully submitted,

NIXON PEABODY LLP

By: */s/Louis E. Dolan, Jr.*
Louis E. Dolan, Jr. (DC Bar No. 442881)
Brian P. Donnelly (DC Bar No. 1010522)
Jamie Lee (DC Bar No. 1643135)
799 Ninth Street, N.W.
Suite 500
Washington, D.C. 20001-4501
(202) 585-8000
(202) 585-8080 (fax)
ldolan@nixonpeabody.com
bdonnelly@nixonpeabody.com
jlee@nixonpeabody.com

*Counsel for Plaintiff Gallaudet University*

# EXHIBIT A

<u>**SETTLEMENT AGREEMENT**</u>

This Settlement Agreement ("Agreement") is made and entered into by and between Gallaudet University ("Gallaudet") and James G. Davis Construction Corporation ("DAVIS"), effective as of January 31, 2018.  Gallaudet and DAVIS may be referred to individually herein as a "Party" or collectively as the "Parties."

**RECITALS**

**WHEREAS**, the Parties entered into that certain Guaranteed Maximum Price Contract by and between Gallaudet and DAVIS dated as of September 17, 2015, composed of AIA Document A102-2007 and AIA Document A201-2007 (including any modifications or amendments thereto) and the other contract documents incorporated therein by reference (the "Contract");

**WHEREAS**, the Contract sets forth certain duties and obligations of the Parties concerning the construction of the MSSD Residence Hall at Gallaudet University in Washington, D.C. (the "Project");

**WHEREAS**, DAVIS has performed certain of its obligations under the Contract and Pre-Construction Services Agreement and Substantially Completed the Contract on December 10, 2017.  Nevertheless, certain disputes have arisen regarding DAVIS's performance including whether DAVIS has performed all of its obligations under the Contract and Gallaudet has performed certain of its obligations under the Contract and disputes have arisen regarding Gallaudet's performance, including whether Gallaudet has performed all of its obligations under the Contract; and

**WHEREAS**, the Parties wish to amicably settle certain claims, disputes, and causes of action they have and may have against the other related to the Contract and the Project in accordance with the terms and conditions hereof.

**AGREEMENT**

**NOW THEREFORE**, in consideration of the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties covenant and agree as follows:

1. <u>Incorporation of Recitals</u>.  The foregoing recitals are incorporated herein by this reference and made a part hereof.

2. <u>Final Payment</u>. The final payment amount under the Contract is $562,301.63. This amount is the final amount due under the Contract to be paid by Gallaudet to DAVIS and includes all contingency, retainage, and other amounts that may be due and owing under the Contract from Gallaudet to DAVIS ("Final Payment"). On or before January 31, 2018, DAVIS will provide an invoice for the Final Payment. Gallaudet shall make the Final Payment upon receipt of said invoice.  The parties acknowledge that this Final Payment has been made and received.

3. <u>Warranty Documents</u>. Certain warranty documents for the Project were received by Gallaudet on or about January 22, 2018. Those warranty documents have not yet been verified

by Gallaudet and Gallaudet will advise DAVIS of any incomplete or missing warranty documents, which DAVIS shall attempt to provide to Gallaudet, if any.

4.     DAVIS will provide additional warranties through December 10, 2018, for the Project's HVAC, plumbing, and mechanical system for labor only. DAVIS will deliver documentation of the extension of the warranties to Gallaudet promptly after the execution of this Agreement. The extended warranties will apply only to labor for issues reasonably attributable to DAVIS (*e.g.*, installation or repair issues) and will not apply to labor for wear and tear or other issues that are not reasonably attributable to DAVIS nor will they apply to manufacturer defects in equipment, which are covered by manufacturer's warranty only.

5.     <u>Warranty Completion List Items</u>. That certain MSSD Residence Hall – Warranty Completion List, dated as of January 22, 2018, a copy of which is attached hereto as **Exhibit A**, (the "Completion List") identifies a number of action items for the Project. On or about January 23, 2018, the Parties met and conferred regarding the Completion List and agreed to the following, which they hereby memorialize in writing:

    a.     The items coded "Open" (the "white" items), which are numbered 25, 14, 108, 111, 113, 114) will be completed by DAVIS at DAVIS's cost.[1]

    b.     Certain items that were coded "Closed by DAVIS" (the green items) will be completed as follows:

        i.     Nail Pops Unit 133 (DAVIS will complete at DAVIS's cost).

        ii.     Carpet in Unit 137 (DAVIS will complete at DAVIS's cost).

        iii.     Door Handles at N&S RE Room (DAVIS will repair at DAVIS's cost).

        iv.     Item 112 (Light) DAVIS will assist with locating replacement.[2]

        v.     27/70 Debris Field: DAVIS will re-pick field, aerate, and reseed when weather permits at DAVIS's cost. If this is not satisfactory, DAVIS will obtain bids for topsoil removal, filtering, replacement and reseeding with the cost to be split 30% DAVIS/70% Gallaudet if Gallaudet elects to proceed.

        vi.     For any items requiring Gallaudet sign off, sign off or additional direction/corrective action to be obtained by January 31, 2018.  Each item for which Gallaudet does not provide comment by January 31, 2018 is deemed accepted by Gallaudet.

---

[1]     Where matters are to be performed at DAVIS's cost, DAVIS will perform the work in accordance with the Notes for each item identified in **Exhibit A**, no additional compensation will be owed to DAVIS as a result, there will be no change order, and no draw on the contingency.

[2]     This item is green on the Completion List, but was recategorized at the January 23, 2018, meeting to "white".

c.      The items in blue will be completed as follows:

      i.      Item 115: Duress buttons are moved to the Open Items list (white) and a meeting will be set with DAVIS/OCMI/Cabling Systems/IST to resolve.

      ii.      Item 102: Staining on Concrete: DAVIS will not perform further work on this item.

      iii.      Item 103: Caulk Joints: Subject to BFA/Independent Consultant Report (as described in Item 6 below).

      iv.      Item 109: Cracks at Ramp: DAVIS will not perform further work on this item.

      v.      Item 20: Slope to Drain: Subject to BFA/Independent Consultant Report (as described in Item 6 below).

d.      The items coded "Requires Gallaudet Direction" (the yellow items) will be completed as follows:

      i.      Item 8: DAVIS located and will fix leak on January 26, 2018, at DAVIS's cost.

      ii.      Item 34: Cracking Stairwell Wall: Subject to BFA/Independent Consultant Report.

      iii.      Item 75: Complete landscaping: to be removed from list.

      iv.      Item 84:  Retaining Wall: Owner take back of work and receive $29,908.74 credit, which is reflected in the $562,301.63 final payment owed to DAVIS.

e.      In the event of any disagreement regarding the satisfactory completion by DAVIS of items identified in sub-paragraphs 5.a through 5.d herein, the parties agree to work cooperatively toward resolution, and if not resolved by Project personnel, meet in good faith with principals.  Absent resolution, the parties agree to submit to an expedited binding arbitration procedure the terms and conditions of which shall be agreed upon by the parties, acting in good faith.[3]

6.      BFA/Independent Consultant Report.

(i) Bowman, Foster & Associates ("BFA") is in the process of preparing a report that will address certain aspects of the Project and the design/construction thereof (the "BFA Report"). The Parties agree to review the BFA Report in good faith. DAVIS will review any alleged deficiencies in DAVIS's work identified in the BFA Report, investigate said

---

[3]    It is expressly agreed that the discoloration/staining of concrete and 7 metal panels on the building envelope are subject to the dispute resolution provision in accordance with this subparagraph.

4823-5599-9324.1

alleged deficiencies, and provide a written response. If the alleged deficiencies are not resolved to the satisfaction of both DAVIS and Gallaudet, the principals of DAVIS and Gallaudet will meet to discuss potential resolution. If no resolution of the alleged deficiencies is reached, the Parties agree to submit the resolution of said alleged deficiencies to an expedited binding arbitration procedure the terms and conditions of which shall be agreed upon by the parties, acting in good faith.  Nothing in this Agreement should be construed as a waiver of any claim or defense of the Parties with respect to the issues identified in the BFA/Independent Consultant Report and the Parties expressly reserve their rights to raise such claims or defenses.

(ii) The following items are expected to be the subject of the BFA/Independent Consultant report by an Independent Consultant to be commissioned and paid for by Gallaudet:

a.      Slope to Drain Issues in Bathrooms (item 20 of Completion List).

b.      Coaxial Cables.

c.      Structural issues.

d.      Building Envelope.
        i.      Size of Calk Joints (item 103 of the Completion List).
        ii.     Gaps in Door Framing.
        iii.    Other Issues.

e.      Brick Cracking/Structural Concerns (item 34 of the Completion List).

7.      <u>Approvals.</u> All approvals from Gallaudet regarding payment and the open items identified in Section 5 hereof will be obtained and provided to DAVIS by January 31, 2018.

8.      <u>Prior Agreement</u>. The Parties entered into agreements, the terms of which are summarized in certain emails dated October 4, 2017, at 4:59 pm and January 25, 2018 at 1:01 pm (the "Prior Agreements"). The Prior Agreements are incorporated herein by reference except to the extent this Agreement is in conflict with the Prior Agreements, then this Agreement is controlling.

9.      <u>Substantial Completion Date</u>. The Parties agree that the Project is deemed to have reached Substantial Completion on December 10, 2016. *See* Certificate of Substantial Completion, a copy of which is attached hereto as **<u>Exhibit B</u>**.

10.     <u>Release</u>. The parties hereby waive and release any claims they may have against one another to extended general conditions and/or liquidated damages.  All other claims and defenses of the Parties hereto, except as expressly addressed herein, are hereby preserved in accordance with the Contract and law.

11.     <u>Waiver of Contract Provisions</u>. The Parties hereby waive certain provisions of the Contract as follows:

4

a.  The Parties hereby waive the requirements of Section 15.1.2 of AIA Document A201-2007 of the Contract (requiring notice and initiation of claims within 21 days) only with respect to the open items discussed herein specifically including the BFA/Independent Consultant Report items.

b.  The Parties acknowledge that the Architect is no longer performing work in connection with the Project and hereby agree they have used and will continue to use their best efforts to move forward without input from the Architect in the course of performing under the Contract or this Agreement. This in no way modifies or relieves the Architect of and from its duties under the Contract or otherwise, and in no way impairs any claims that Gallaudet may have against the Architect or Engineers. Gallaudet expressly reserves the right to pursue its claims against the Architect related to the Project.

c.  Other Contract close out issues will be discussed between counsel for the Parties in good faith.

12.  <u>No General Release</u>. For the avoidance of doubt, the Parties acknowledge that this Agreement does not include a general release of claims between the Parties and only addresses and resolves the matters identified herein to the extent expressly stated herein. The Parties expressly reserve their rights to bring any claims and assert any defenses they may have related to the Contract, including but not limited to any claims related to matters addressed in the BFA/Independent Consultant Report.

13.  <u>Non-Assignment</u>. Gallaudet and DAVIS each represent and warrant that (a) they are the full owners of the rights and claims referenced, conferred, released, and compromised hereby; and (b) no interest in any of the rights or claims related to the Contract or this Agreement has been sold, assigned, substituted, pledged, hypothecated, subrogated, or otherwise transferred by such Party.

14.  <u>No Admission of Wrongdoing</u>.  This Agreement has been entered into by the Parties for the purposes of settling disputed claims without further legal proceedings and avoiding further expense and risk in litigation.  This Agreement is not intended to and will not be deemed an admission by any Party of the merit or lack of merit of their respective claims and defenses or an admission of wrongdoing or liability by any Party.

15.  <u>Binding Nature of Agreement</u>.  This Agreement is binding upon and inures to the benefit of the Parties hereto and to their respective beneficiaries, heirs, executors, successors, assigns and anyone claiming by or through any of them.

16.  <u>Non-Waiver</u>.  The waiver by any of the Parties hereto of any breach of any provision of this Agreement will not constitute or operate as a waiver of any other breach of such provision or of any other provision hereof, nor will any failure to enforce any provision hereof operate as a waiver at such time or at any future time of such provision or of any other provision hereof.

17.  <u>Taxes</u>.  Any federal, state or local income, personal property, excise or other taxes owed by any of the Parties hereto as a result of the payments, losses or benefits provided or realized

5

under the terms of this Agreement will be the sole responsibility of the individual Party hereto who receives such payments, losses, or benefits.

18.    Costs of Counsel.  The Parties have had the advice of independent counsel of their own choosing and each of the Parties will pay the costs and fees of their own respective counsel.

19.    Voluntary Agreement.  The Parties represent that they have entered into this Agreement freely and voluntarily, without any degree of duress or compulsion whatsoever and have fully read and understand the terms, conditions, and provisions of this Agreement, believe its terms to be fair, just, and reasonable, and have sought and received the advice of counsel before entering into the Agreement.

20.    Amendment in Writing. This Agreement may not be amended except by a writing executed by both Parties.

21.    Further Action.  The Parties agree to take such other action and to execute such other and further documents, in recordable form if necessary, as may be required to effectuate the provisions of this Agreement.

22.    Governing Law and Dispute Resolution.  This Agreement will be governed by and enforced in accordance with the laws of the District of Columbia without regard for its conflict of law rules.  Any dispute arising out of or relating to this Agreement (except with respect to the Warranty Completion List items and BFA/Independent Consultant Report) will only be resolved as follows: First, the principals of the Parties will meet to attempt to resolve any such dispute; in the event the dispute is not resolved, the Parties will endeavor to resolve their claims in mediation in the manner described in Section 15.3.2 and 15.3.3 of AIA Document A201-2007 of the Contract; in the event the dispute is not resolved, the dispute will be litigated in a court of competent jurisdiction in the manner described in Section 15.4.1 of AIA Document A201-2007 of the Contract and the Parties hereby waive any rights they may have to a trial by jury in any such dispute.

23.    Construction.  The Parties understand and agree that they were each represented by and had the opportunity to consult with counsel regarding the terms hereof and to participate in the drafting hereof and it is, therefore, understood and agreed that in interpreting this Agreement the principle of construing language against the drafting party will not apply.

24.    Severability.  If for any reason any provision of this Agreement is determined to be invalid or unenforceable, the remaining provisions of this Agreement will nevertheless be construed, performed, and enforced as if the invalidated or unenforceable provision had not been included in the text of the Agreement.

25.    Full Authority.  The Parties and the undersigned individuals each represent and warrant that the person signing this Agreement on behalf of each Party is duly authorized to do so and has the full right, power and authority to do so.

26.    Counterpart Signatures.  This Agreement may be executed in counterparts.  Each counterpart will be deemed to be an original instrument, but all counterparts taken together will constitute a single document.  Facsimile signatures and signatures transmitted via electronic means

4823-5599-9324.1

will be deemed originals. This Agreement will become effective only if executed by all of the Parties.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4823-5599-9324.1

**IN WITNESS WHEREOF**, the Parties hereto, Gallaudet University and James G. Davis Construction Corporation, have set their hand hereunto on the date indicated below.

_____

Gallaudet University

By:     _____

Title:  _____

Date:   _____

_____

James G. Davis Construction Corporation

By:     _____

Title:  _____

Date:   _____

4823-5599-9324.1

# EXHIBIT B

# AIA® Document A102™ – 2007

## Standard Form of Agreement Between Owner and Contractor
*where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price*

**AGREEMENT** made as of the 17 day of September in the year 2013
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name, legal status, address and other information)*

Gallaudet University
800 Florida Avenue
Washington, DC 20002

and the Contractor:
*(Name, legal status, address and other information)*

James G. Davis Construction Corporation
12530 Parklawn Drive
Rockville, Maryland 20852

for the following Project:
*(Name, location and detailed description)*

Gallaudet University
MSSD Residence Hall Project
800 Florida Avenue
Washington, DC 20002

The Architect:
*(Name, legal status, address and other information)*

Gaudreau, Inc.
810 Light Street
Baltimore, Maryland 21230

The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document
has added information
needed for its completion.
The author may also have
revised the text of the
original AIA standard form.
An Additions and Deletions
Report that notes added
information as well as
revisions to the standard
form text is available from
the author and should be
reviewed.

This document has important
legal consequences.
Consultation with an
attorney is encouraged with
respect to its completion
or modification.

This document is not
intended for use in
competitive bidding.

AIA Document A201™–2007,
General Conditions of the
Contract for Construction,
is adopted in this document
by reference. Do not use
with other general
conditions unless this
document is modified.

ELECTRONIC COPYING of any
portion of this AIA® Document
to another electronic file is
prohibited and constitutes a
violation of copyright laws
as set forth in the footer of
this document.

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 14:08:01 on 07/27/2013 under Order No. 8812474679 which expires on 07/26/2014, and is not for resale.
User Notes:                                                                                                          (1358A0N1P)

1

TABLE OF ARTICLES

1    THE CONTRACT DOCUMENTS

2    THE WORK OF THIS CONTRACT

3    RELATIONSHIP OF THE PARTIES

4    DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

5    CONTRACT SUM

6    CHANGES IN THE WORK

7    COSTS TO BE REIMBURSED

8    COSTS NOT TO BE REIMBURSED

9    DISCOUNTS, REBATES AND REFUNDS

10   SUBCONTRACTS AND OTHER AGREEMENTS

11   ACCOUNTING RECORDS

12   PAYMENTS

13   DISPUTE RESOLUTION

14   TERMINATION OR SUSPENSION

15   MISCELLANEOUS PROVISIONS

16   ENUMERATION OF CONTRACT DOCUMENTS

17   INSURANCE AND BONDS

### ARTICLE 1   THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. If anything in the other Contract Documents, other than a Modification, is inconsistent with this Agreement, this Agreement shall govern.

### ARTICLE 2   THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

### ARTICLE 3   RELATIONSHIP OF THE PARTIES

The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the


AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 07/23/2015 under Order No. 9312674670 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                              (3B9AGR19)

Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

## ARTICLE 4   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION
§ 4.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement, if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*

July 22, 2015 Commencement; July 1, 2016 Substantial Completion; August 1, 2016 Final Completion.

If, prior to commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:

N/A

§ 4.2 The Contract Time shall be measured from the date of commencement.

§ 4.3 The Contractor shall achieve Substantial Completion of the entire Work not later than «» ( «» ) days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)*

Defined in Section 4.1 above.

| Portion of Work | Substantial Completion date |
|---|---|
| N/A | N/A |

, subject to adjustments of this Contract Time as provided in the Contract Documents.

*(Insert provisions, if any, for liquidated damages relating to failure to achieve Substantial Completion on time, or for bonus payments for early completion of the Work.)*

*Liquidated Damages Provisions:*
In the event Contractor does not achieve Substantial Completion within the Contract Time, including approved extensions, the Contractor shall compensate the Owner for its delay damages, as liquidated damages and not as a penalty, the following sums for each day the actual time of performance exceeds the authorized Contract Time until Substantial Completion is achieved:
    Liquidated Damages:        $2500/day

*Acceleration Allowance & Bonus Incentive Provisions:*
1. An acceleration allowance, included in the GMP, in the amount of $500,000, for explicit use in accelerating key parts of work, and overcoming potential or realized delays, to meet the 1JUL16 substantial completion date.
    a. The University will work in good faith with Davis to allow work to proceed in advance of the formal proposal as not to limit progress. A ROM estimate of costs will be provided, for approval, to accelerate, including overtime and premium time work to substantiate the formal cost proposal. No reasonable use of the allowance shall be withheld.
    b. Use of the allowance requires daily collection of T&M tickets and a formal cost proposal.
    c. A narrative will accompany each acceleration claim, also noting activity ID's in the schedule that are affected.
    e. This allowance will not be used for delays that are otherwise compensable as a Change.
    f. Contractor will notify Owner of the Contractor's intent to use the acceleration allowance prior to its use.
    g. The remaining balance of the allowance will be returned to the University before final payment.
2. A $50,000 Substantial completion bonus incentive, shall be paid to Davis if substantial completion is achieved on 1JUL16. The established liquidated damages of $2500 per calendar day will reduce the bonus

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 07/27/2015 under Order No. 6812474670 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                                    (3B9ADA1F)

3

amount, day for day, until the bonus is exhausted after 20 calendar days. After the bonus is exhausted, Davis will be responsible for liquidated damages in the amount of $2500/day until substantial completion is achieved as defined by article 9.8.1.1. of the AIA 201 document.

## ARTICLE 5   CONTRACT SUM

§ 5.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum is the Cost of the Work as defined in Article 7 plus the Contractor's Fee.

§ 5.1.1 The Contractor's Fee:
*(State a lump sum, percentage of Cost of the Work or other provision for determining the Contractor's Fee.)*

Four Percent (4%) of the Cost of the Work

§ 5.1.2 The method of adjustment of the Contractor's Fee for changes in the Work:

Addressed in A201 Section 7.2.2

§ 5.1.3 Limitations, if any, on a Subcontractor's overhead and profit for increases in the cost of its portion of the Work:

Addressed in A201 Section 7.2.2

§ 5.1.4 Rental rates for Contractor-owned equipment shall not exceed «» percent ( «» %) of the standard rate paid at the place of the Project.

§ 5.1.5 Unit prices, if any:
*(Identify and state the unit price; state the quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price Per Unit ($0.00) |
|------|----------------------|------------------------|
| N/A  | N/A                  | N/A                    |

§ 5.1.6 **General Conditions Costs.** The Cost of the Work portion of the Guaranteed Maximum Price shall contain a line item entitled "General Conditions Costs." A breakdown of the items comprising the General Conditions Costs is set forth in Exhibit D, and this General Conditions amount shall be a fixed lump sum within the GMP. The Lump Sum General Conditions Costs is subject to increase by change order if the Work or the Contract Time is adjusted.

## § 5.2 GUARANTEED MAXIMUM PRICE

§ 5.2.1 The Contract Sum is guaranteed by the Contractor not to exceed «» ($ «» ), subject to additions and deductions by Change Order as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the Guaranteed Maximum Price. Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Contractor without reimbursement by the Owner. The GMP will be added to this Contract via a future amendment Change Order (the "GMP Amendment").
*(Insert specific provisions if the Contractor is to participate in any savings.)*

The Contract amount for the Project is guaranteed by the Contractor not to exceed the Guaranteed Maximum Price, as set forth in the Contract Documents. The Guaranteed Maximum Price is supported by a line item cost breakdown for each trade contractor, including contingency on overall Cost of the Work, and based on multiple subcontractor bids for each trade contract obtained. The Guaranteed Maximum Price shall be subject to additions and deductions by change order as provided in Article 6, Changes in the Work. If the Cost of the Work, together with the CM's fee, exceeds the Guaranteed Maximum Price, adjusted from time to time by change order, the Contractor shall pay the overrun without reimbursement by the Owner. If the actual Cost of the Work, plus the Contractor's fee, is less than the Guaranteed Maximum Price, adjusted from time to time by change order, then the Contractor shall pay the Owner the percentage of such cost savings as identified below, with the Owner benefiting by the remaining percentage thereof. Contractor agrees to use all reasonable efforts to maximize the cost savings for the mutual benefit of the parties.


AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:06:01 on 07/27/2015 under Order No. 8812476870 which expires on 07/28/2016, and is not for resale.
User Notes:                                                                                    (3698ADN1F)

4

If there are savings on the actual Cost of the Work, 70% of the shared savings shall be retained by the Owner, and 30% of the shared savings shall be retained by the Contractor.

**§ 5.2.2** The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*

**§ 5.2.3** Allowances included in the Guaranteed Maximum Price, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|------|-------|
|      |       |

**§ 5.2.4** Assumptions, if any, on which the Guaranteed Maximum Price is based:

**§ 5.2.5** To the extent that the Drawings and Specifications are anticipated to require further development by the Architect, the Contractor has provided in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

## ARTICLE 6   CHANGES IN THE WORK
**§ 6.1** Adjustments to the Guaranteed Maximum Price on account of changes in the Work may be determined by any of the methods listed in Section 7.3.3 of AIA Document A201–2007, General Conditions of the Contract for Construction.

**§ 6.2** In calculating adjustments to subcontracts (except those awarded with the Owner's prior consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Section 7.3.3.3 of AIA Document A201–2007 and the term "costs" as used in Section 7.3.7 of AIA Document A201–2007 shall have the meanings assigned to them in AIA Document A201–2007 and shall not be modified by Articles 5, 7 and 8 of this Agreement. Adjustments to subcontracts awarded with the Owner's prior consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

**§ 6.3** In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of AIA Document A201–2007 shall mean the Cost of the Work as defined in Article 7 of this Agreement and the term "fee" shall mean the Contractor's Fee as defined in Section 5.1.1 of this Agreement.

**§ 6.4** If no specific provision is made in Article 5 for adjustment of the Contractor's Fee in the case of changes in the Work, or if the extent of such changes is such, in the aggregate, that application of the adjustment provisions of Article 5 will cause substantial inequity to the Owner or Contractor, the Contractor's Fee shall be equitably adjusted on the same basis that was used to establish the Fee for the original Work, and the Guaranteed Maximum Price shall be adjusted accordingly.

**§ 6.5** Contingency
  a.   General Contractor's Contingency: The GMP shall include a Contractor-controlled construction contingency ("Contractor's Contingency") in an amount approved by the Owner, to protect the Contractor against the risks assumed in providing the GMP for the Project. The Owner and Contractor acknowledge that the Contractor's Contingency is included to adjust the estimate for eventualities which have not been taken into precise account in the establishment of the GMP, including but not limited to (1) scope gaps between trade contractors, (2) contract default by trade contractors, (3) costs of corrective work not provided for elsewhere, (4) scope gaps resulting from ambiguities or conflicts in drawings or


AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:04:01 on 07/23/2015 under Order No. 9812674670 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                    (1985868781)

specifications, and (5) expediting / accelerating of the work to meet scheduled completion dates (if required).

b.  The Contractor's Contingency is not allocated to any particular item of the Cost of the Work, and is established for the Contractor's use as may be required for increases in costs incurred in the Work from unforeseeable causes or details not capable of reasonable anticipation or the Contractor's ability to infer the work at the time of the Owner's approval of the GMP.  It is understood that the amount of the Contractor's Contingency is the maximum sum available to the Contractor to cover costs incurred as a result of such unanticipated causes or details beyond the Contractor's ability to infer the information from the documents, and that cost overruns in excess of the amount of the Contractor's Contingency will be borne by the Contractor.

c.  The Contractor's Contingency may be applied to any items within the Cost of the Work without the necessity of a change order, without constituting a change in the Work, and without resulting in any change in the GMP. The Contractor will notify the Owner of the Contractor's intent to apply any part of the Contractor's Contingency to any item within the Cost of the Work prior to any such application for Owner approval and this approval shall not be unreasonably withheld. Contractor shall also provide a monthly accounting of the Contractor's Contingency usage/balance.

d.  As the actual Cost of the Work is determined, change orders shall be issued, as appropriate, to transfer funds with the Owner's review and sign-off between the estimated Cost of the Work and the Contractor's Contingency components of the GMP without affecting a net change to the sum of the GMP. Contractor markup shall not be included as part of the actual cost of said Work.

e.  The amount of the Contractor's Contingency is to be as quoted by the Contractor in its GMP Proposal to the Owner. The Owner retains the right to specifically request revisions to the amount of the Contractor's Contingency prior to the Owner's acceptance and approval of the GMP. All contingency amounts remaining at the end of the project will be subject to the 70/30 split per Section 5.2.1.

## ARTICLE 7   COSTS TO BE REIMBURSED
### § 7.1 COST OF THE WORK
§ 7.1.1 The term Cost of the Work shall mean costs necessarily incurred by the Contractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the place of the Project except with prior consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 7.

§ 7.1.2 Where any cost is subject to the Owner's prior approval, the Contractor shall obtain this approval prior to incurring the cost. The parties shall endeavor to identify any such costs prior to executing this Agreement.

### § 7.2 LABOR COSTS
§ 7.2.1 Wages of construction workers directly employed by the Contractor to perform the construction of the Work at the site or, with the Owner's prior approval, at off-site workshops.

§ 7.2.2 Wages or salaries of the Contractor's supervisory and administrative personnel when stationed at the site or at the Contractor's home office with the Owner's prior approval in accordance with Exhibit D (Lump Sum General Conditions Costs).
 (If it is intended that the wages or salaries of certain personnel stationed at the Contractor's principal office or other offices shall be included in the Cost of the Work, identify in Article 15, the personnel to be included, whether for all or only part of their time, and the rates at which their time will be charged to the Work.)

§ 7.2.3 Wages and salaries of the Contractor's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

§ 7.2.4 Costs paid or incurred by the Contractor for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Sections 7.2.1 through 7.2.3.

§ 7.2.5 Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Contractor or paid to any Subcontractor or vendor, with the Owner's prior approval.


AIA Document A121™ – 2007 (formerly A511™ – 1987). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 07/27/2013 under Order No. 8812474470 which expires on 07/26/2014, and is not for resale.
User Notes:                                                                                (3B9ADN1F)

6

## § 7.3 SUBCONTRACT COSTS

Payments made by the Contractor to Subcontractors in accordance with the requirements of the subcontracts.

## § 7.4 COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION
**§ 7.4.1** Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

**§ 7.4.2** Costs of materials described in the preceding Section 7.4.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Contractor. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

## § 7.5 COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS
**§ 7.5.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Contractor shall mean fair market value.

**§ 7.5.2** Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Contractor at the site and costs of transportation, installation, minor repairs, dismantling and removal. The total rental cost of any Contractor-owned item may not exceed the purchase price of any comparable item. Rates of Contractor-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

**§ 7.5.3** Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ 7.5.4** Costs of document reproductions, facsimile transmissions and long-distance telephone calls, postage and parcel delivery charges, telephone service at the site and reasonable petty cash expenses of the site office.

**§ 7.5.5** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, subject to the Owner's prior approval.

## § 7.6 MISCELLANEOUS COSTS
**§ 7.6.1** Premiums for that portion of insurance and bonds required by the Contract Documents that can be directly attributed to this Contract. Self-insurance for either full or partial amounts of the coverages required by the Contract Documents, with the Owner's prior approval.

**§ 7.6.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Contractor is liable.

**§ 7.6.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Contractor is required by the Contract Documents to pay.

**§ 7.6.4** Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 13.5.3 of AIA Document A201–2007 or by other provisions of the Contract Documents, and which do not fall within the scope of Section 7.7.3.

**§ 7.6.5** Royalties and license fees paid for the use of a particular design, process or product required by the Contract Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Contract Documents; and payments made in accordance with legal judgments against the Contractor resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Contractor's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the last sentence of Section 3.17 of AIA Document A201–2007 or other provisions of the Contract Documents, then they shall not be included in the Cost of the Work.

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 03/27/2015 under Order No. 8912478470 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                    (1839ADA13)

§ 7.6.6 Costs for electronic equipment and software, directly related to the Work with the Owner's prior approval.

§ 7.6.7 Deposits lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility in the Contract Documents.

§ 7.6.8 Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Contractor, reasonably incurred by the Contractor after the execution of this Agreement in the performance of the Work and with the Owner's prior approval, which shall not be unreasonably withheld.

§ 7.6.9 Subject to the Owner's prior approval, expenses incurred in accordance with the Contractor's standard written personnel policy for relocation and temporary living allowances of the Contractor's personnel required for the Work.

§ 7.6.10 That portion of the reasonable expenses of the Contractor's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work.

## § 7.7 OTHER COSTS AND EMERGENCIES
§ 7.7.1 Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

§ 7.7.2 Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Section 10.4 of AIA Document A201–2007.

§ 7.7.3 Costs of repairing or correcting damaged or nonconforming Work executed by the Contractor, Subcontractors or suppliers, provided, however, that correction costs relating to damaged or nonconforming Work that was caused by the negligence or failure to fulfill a specific responsibility of the Contractor shall be Costs of the Work but shall not be a basis for an increase in the GMP.

## § 7.8 RELATED PARTY TRANSACTIONS
§ 7.8.1 For purposes of Section 7.8, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Contractor; any entity in which any stockholder in, or management employee of, the Contractor owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Contractor. The term "related party" includes any member of the immediate family of any person identified above.

§ 7.8.2 If any of the costs to be reimbursed arise from a transaction between the Contractor and a related party, the Contractor shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Contractor shall procure the Work, equipment, goods or service from the related party, as a Subcontractor, according to the terms of Article 10. If the Owner fails to authorize the transaction, the Contractor shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Article 10.

## ARTICLE 8   COSTS NOT TO BE REIMBURSED
§ 8.1 The Cost of the Work shall not include the items listed below:

   .1   Salaries and other compensation of the Contractor's personnel stationed at the Contractor's principal office or offices other than the site office, except as specifically provided in Section 7.2, or as may be provided in Article 15;

   .2   Expenses of the Contractor's principal office and offices other than the site office;

   .3   Overhead and general expenses, except as may be expressly included in Article 7;

   .4   The Contractor's capital expenses, including interest on the Contractor's capital employed for the Work;

   .5   Except as provided in Section 7.7.3 of this Agreement, costs due to the negligence or failure of the Contractor, Subcontractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;

   .6   Any cost not specifically and expressly described in Article 7; and


AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 13:08:01 on 07/27/2015 under Order No. 8812476870 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                                (3B9ADA1F)

.7   Costs, other than costs included in Change Orders approved by the Owner, that would cause the
Guaranteed Maximum Price to be exceeded.

## ARTICLE 9   DISCOUNTS, REBATES AND REFUNDS
§ 9.1 Cash discounts obtained on payments made by the Contractor shall accrue to the Owner if (1) before making
the payment, the Contractor included them in an Application for Payment and received payment from the Owner, or
(2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, cash discounts
shall accrue to the Contractor. Trade discounts, rebates, refunds and amounts received from sales of surplus
materials and equipment shall accrue to the Owner, and the Contractor shall make provisions so that they can be
obtained.

§ 9.2 Amounts that accrue to the Owner in accordance with the provisions of Section 9.1 shall be credited to the
Owner as a deduction from the Cost of the Work.

## ARTICLE 10   SUBCONTRACTS AND OTHER AGREEMENTS
§ 10.1 Those portions of the Work that the Contractor does not customarily perform with the Contractor's own
personnel shall be performed under subcontracts or by other appropriate agreements with the Contractor. The Owner
may designate specific persons from whom, or entities from which, the Contractor shall obtain bids. The Contractor
shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated especially for the
Work and shall deliver such bids to the Architect. The Owner shall then determine, with the advice of the Contractor
and the Architect, which bids will be accepted. The Contractor shall not be required to contract with anyone to
whom the Contractor has reasonable objection.

§ 10.2 When a specific bidder (1) is recommended to the Owner by the Contractor; (2) is qualified to perform that
portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Contract Documents
without reservations or exceptions, but the Owner requires that another bid be accepted, then the Contractor may
require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of
the person or entity recommended to the Owner by the Contractor and the amount of the subcontract or other
agreement actually signed with the person or entity designated by the Owner.

§ 10.3 Subcontracts or other agreements shall conform to the applicable payment provisions of this Agreement, and
shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If the Subcontract is
awarded on a cost-plus a fee basis, the Contractor shall provide in the Subcontract for the Owner to receive the same
audit rights with regard to the Subcontractor as the Owner receives with regard to the Contractor in Article 11,
below.

## ARTICLE 11   ACCOUNTING RECORDS
The contracting parties shall be subject to examination and audit by the Owner at any time during construction and
for a period of three (3) years after final payment of the Contract. Such examination and audit shall include access to
the Contractor and the subcontractor records as delineated in the following:
(1) The Contractor's records which shall include but not be limited to accounting records (hard copy, as
well as computer readable data if it can be made available), written policies and procedures; subcontractor
files (including proposals of successful and unsuccessful bidders, bid recaps, etc.), original estimates;
estimating worksheets; correspondence; change order files (including documentation covering negotiated
settlements); back charge logs and supporting documentation; general ledger entries detailing cash and
trade discounts earned, insurance rebates and dividends; and any other supporting evidence deemed
necessary by the Owner/Auditor to substantiate charges related to this Contract (all foregoing hereinafter
referred to as "records") and shall be open to inspection and subject to audit and/or reproduction to
adequately permit evaluation and verification of (a) the Contractor's compliance with Contract
requirements and (b) compliance with provisions for pricing change orders, payments or claims submitted
by the Contractor or any of his payees. The Contractor is required to have as part of the records the
following reports: a detailed cost ledger reflecting total charges against the Project which present an
itemization by invoice and labor costs by cost codes; a summary report identifying total Project costs by
cost codes; and a subcontractor history report including each subcontract amount and change orders issued
thereto.
(2) Inspection and copying from time to time and at reasonable times and places any and all information,
materials and data of every kind and character, including but not limited to records, books, papers,
documents, subscriptions, recordings, agreements, purchase orders, leases, contracts, commitments,

AIA Document A302™ – 2007 (formerly A311™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:33:41 on 07/27/2015 under Order No. 9812474670 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                                         (1988A0214)

arrangements, notes, daily diaries, superintendent reports, drawings, receipts, vouchers and memoranda, and any and all other agreements, sources of information and matters that may have any bearing on or pertain to any matters, rights, duties or obligations under or covered by any Contract Document. Such records subject to audit shall also include, but not be limited to, those records necessary to evaluate and verify direct and indirect costs, (including overhead allocations) as they may apply to costs associated with this Contract.

(3) The Contractor shall require all subcontractors, and material suppliers (payees) to comply with the provisions of this Article by insertion of the requirements hereof in a written agreement between the Contractor and payee. Such requirements will also apply to subcontractors and subcontractors, etc. The Contractor will cooperate fully and will cause all related parties and all of the Contractor's subcontractors (including those entering into lump sum subcontracts) to cooperate fully in furnishing or in making available to Owner/Auditor from time to time whenever requested in an expeditious manner any and all such information, materials and data.

(4) The Owner/Auditor shall have access to the Contractor's facilities, shall have access to all necessary records, and shall be provided adequate and appropriate Work space, in order to conduct audits in compliance with this article.

(5) If an audit inspection or examination in accordance with this article, discloses overcharges (of any nature) by the Contractor to the Owner, the actual cost of the overcharges shall be reimbursed to the Owner by the Contractor. Any adjustments and/or payments which must be made as a result of any such audit or inspection of the Contractor's invoices and/or records shall be made within a reasonable amount of time (not to exceed 90 Days) from presentation of the Owner/Auditor findings to Contractor.

(6) If an audit discloses overcharges on change orders, where a Contractor has submitted costs and has received payment of costs for a subcontractor's Work, but has not passed on such payment to the subcontractor (including mark-up charged), and the Contractor's records do not reflect offsetting back charges, the Contractor shall reimburse the Owner for such overcharges upon receipt of a request from the Owner.

]
## ARTICLE 12   PAYMENTS
### § 12.1 PROGRESS PAYMENTS
§ 12.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

§ 12.1.2 The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

No Change

§ 12.1.3 Provided that an Application for Payment is received by the Architect not later than the 30th day of a month, and approved by the Architect and the Owner's Representative, the Owner shall make payment of the certified amount to the Contractor not later than the 30th day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than thirty (30) days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

§ 12.1.4 With each Application for Payment, the Contractor shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or Architect to demonstrate that cash disbursements already made by the Contractor on account of the Cost of the Work equal or exceed (1) progress payments already received by the Contractor; less (2) that portion of those payments attributable to the Contractor's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

§ 12.1.5 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Contractor's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

AIA Document A102™ - 2007 (formerly A111™ - 1987). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:00:01 on 07/27/2016 under Order No. 8812476870 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                    (3B9ADB1F)



§ 12.1.6 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense that has actually been incurred by the Contractor on account of that portion of the Work for which the Contractor has made or intends to make actual payment prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

§ 12.1.7 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

    .1   Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage of completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values. Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Section 7.3.9 of AIA Document A201--2007;

    .2   Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work, or if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing;

    .3   Add the Contractor's Fee, less retainage of ten percent ( 10 %).The Contractor's Fee shall be computed upon the Cost of the Work at the rate stated in Section 5.1.1 or, if the Contractor's Fee is stated as a fixed sum in that Section, shall be an amount that bears the same ratio to that fixed-sum fee as the Cost of the Work bears to a reasonable estimate of the probable Cost of the Work upon its completion;

    .4   Subtract retainage of ten percent ( 10 %) from that portion of the Work that the Contractor self-performs;

    .5   Subtract the aggregate of previous payments made by the Owner;

    .6   Subtract the shortfall, if any, indicated by the Contractor in the documentation required by Section 12.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's auditors in such documentation; and

    .7   Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201--2007.

§ 12.1.8 The Owner and the Contractor shall agree upon a (1) mutually acceptable procedure for review and approval of payments to Subcontractors and (2) the percentage of retainage held on Subcontracts, and the Contractor shall execute subcontracts in accordance with those agreements.

§ 12.1.9 In taking action on the Contractor's Applications for Payment, the Architect shall be entitled to rely on the accuracy and completeness of the information furnished by the Contractor and shall not be deemed to represent that the Architect has made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Section 12.1.4 or other supporting data; that the Architect has made exhaustive or continuous on-site inspections; or that the Architect has made examinations to ascertain how or for what purposes the Contractor has used amounts previously paid on account of the Contract. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

§ 12.1.10 Upon Substantial Completion of the Work, the Contractor shall provide to the Owner two (2) copies of the blue prints showing "as built" construction of the Work; and all other  documents and paperwork required by the Contract Documents or reasonably requested by Owner.

## § 12.2 FINAL PAYMENT
§ 12.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when

    .1   the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Section 12.2.2 of AIA Document A201--2007, and to satisfy other requirements, if any, which extend beyond final payment;

    .2   the Contractor has submitted a final accounting for the Cost of the Work and a final Application for Payment; and

    .3   a final Certificate for Payment has been issued by the Architect.

AIA Document A102™ – 2007 (formerly A111™ – 1997)  Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1987 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 03/27/2015 under Order No. 8812476879 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                                      (1389364197)

§ 12.2.2 The Owner's auditors will review and report in writing on the Contractor's final accounting within 30 days after delivery of the final accounting to the Architect by the Contractor. Based upon such Cost of the Work as the Owner's auditors report to be substantiated by the Contractor's final accounting, and provided the other conditions of Section 12.2.1 have been met, the Architect will, within seven days after receipt of the written report of the Owner's auditors, either issue to the Owner a final Certificate for Payment with a copy to the Contractor, or notify the Contractor and Owner in writing of the Architect's reasons for withholding a certificate as provided in Section 9.5.1 of the AIA Document A201–2007. The time periods stated in this Section 12.2.2 supersede those stated in Section 9.4.1 of the AIA Document A201–2007. The Architect is not responsible for verifying the accuracy of the Contractor's final accounting.

§ 12.2.3 If the Owner's auditors report the Cost of the Work as substantiated by the Contractor's final accounting to be less than claimed by the Contractor, the Contractor shall be entitled to request mediation of the disputed amount without seeking an initial decision pursuant to Section 15.2 of A201–2007. A request for mediation shall be made by the Contractor within 30 days after the Contractor's receipt of a copy of the Architect's final Certificate for Payment. Failure to request mediation within this 30-day period shall result in the substantiated amount reported by the Owner's auditors becoming binding on the Contractor. Pending a final resolution of the disputed amount, the Owner shall pay the Contractor the amount certified in the Architect's final Certificate for Payment.

§ 12.2.4 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

No Change

§ 12.2.5 If, subsequent to final payment and at the Owner's request, the Contractor incurs costs described in Article 7 and not excluded by Article 8 to correct defective or nonconforming Work, the Owner shall reimburse the Contractor such costs and the Contractor's Fee applicable thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Contractor has participated in savings as provided in Section 5.2, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Contractor.

## ARTICLE 13   DISPUTE RESOLUTION
### § 13.1 INITIAL DECISION MAKER
The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the parties appoint below another individual, not a party to the Agreement, to serve as Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

Tom Strandberg
O'Connor Construction Management, Inc.
1712 I Street NW Suite 300
Washington, DC 20006

### § 13.2 BINDING DISPUTE RESOLUTION
For any Claim subject to, but not resolved by mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[  ]   Arbitration pursuant to Section 15.4 of AIA Document A201–2007

[  ]   Litigation in a court of competent jurisdiction

[ X ]   Other (Specify)


Notwithstanding anything in the General Conditions to the contrary, all Claims and other disputes

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 07/27/2013 under Order No. 8612474670 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                                      (1039443F)



between the parties, if not settled by mediation, shall not be subject to arbitration, but rather shall be litigated in a court of competent jurisdiction. THE OWNER AND THE CONTRACTOR SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS OR STATUTORY CLAIM, COUNTERCLAIM OR CROSSCLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THE PROJECT OR THIS CONTRACT BECAUSE THE PARTIES HERETO, BOTH OF WHICH ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE

## ARTICLE 14    TERMINATION OR SUSPENSION

§ 14.1 Subject to the provisions of Section 14.2 below, the Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201–2007.

§ 14.2 If the Owner terminates the Contract for cause as provided in Article 14 of AIA Document A201–2007, the amount, if any, to be paid to the Contractor under Section 14.2.4 of AIA Document A201–2007 shall not cause the Guaranteed Maximum Price to be exceeded, nor shall it exceed an amount calculated as follows:

 .1   Take the Cost of the Work incurred by the Contractor to the date of termination;
 .2   Add the Contractor's Fee computed upon the Cost of the Work to the date of termination at the rate stated in Section 5.1.1 or, if the Contractor's Fee is stated as a fixed sum in that Section, an amount that bears the same ratio to that fixed-sum Fee as the Cost of the Work at the time of termination bears to a reasonable estimate of the probable Cost of the Work upon its completion; and
 .3   Subtract the aggregate of previous payments made by the Owner.

§ 14.3 The Owner shall also pay the Contractor fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Contractor that the Owner elects to retain and that is not otherwise included in the Cost of the Work under Section 14.2.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Contractor shall, as a condition of receiving the payments referred to in this Article 14, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Contractor, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Contractor under such subcontracts or purchase orders.

§ 14.4 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007; in such case, the Guaranteed Maximum Price and Contract Time shall be increased as provided in Section 14.3.2 of AIA Document A201–2007, except that the term "profit" shall be understood to mean the Contractor's Fee as described in Sections 5.1.1 and Section 6.4 of this Agreement.

## ARTICLE 15    MISCELLANEOUS PROVISIONS

§ 15.1 Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 15.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

0 %

§ 15.3 This Contract is subject to Davis Bacon Act Wage Rates. See attached Exhibit "C", General Decision Number DC150002 dated July 17, 2015. The parties acknowledge that the wage rates that shall be included in the GMP set forth in the GMP Amendment are those wage rates set forth in General Decision Number DC140002 dated

AIA Document A101™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 07/27/2015 under Order No. 8812674970 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                                          (1366ADA1F)

July 4, 2014, and that a separate change order will be issued to incorporate into the Contract Sum any cost impacts related to the wage rates stated in Exhibit C, General Decision Number DC150002.

**§ 15.3** The Owner's representative:
*(Name, address and other information)*

Tom Strandberg
O'Connor Construction Management, Inc.
1712 I Street NW Suite 300
Washington, DC 20006

**§ 15.4** The Contractor's representative:
*(Name, address and other information)*

Matthew N. Weirich
James G. Davis Construction Corporation
12530 Parklawn Drive
Rockville, Maryland 20852

**§ 15.5** Neither the Owner's nor the Contractor's representative shall be changed without ten days' written notice to the other party.

**§ 15.6** Other provisions:

**§ 15.6.1** This Contract is subject to Davis Bacon Act Wage Rates. See attached Exhibit "C".

## ARTICLE 16   ENUMERATION OF CONTRACT DOCUMENTS
**§ 16.1** The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

**§ 16.1.1** The Agreement is this executed AIA Document A102–2007, Standard Form of Agreement Between Owner and Contractor.

**§ 16.1.2** The General Conditions are AIA Document A201–2007, General Conditions of the Contract for Construction.

**§ 16.1.3** The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|---|---|---|---|
| | | | |

**§ 16.1.4** The Specifications:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*
Exhibit "B" Contract Documents List

| Section | Title | Date | Pages |
|---|---|---|---|
| | | | |

**§ 16.1.5** The Drawings:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*
Exhibit "B" Contract Documents List

| Number | Title | Date |
|---|---|---|
| | | |

**§ 16.1.6** The Addenda, if any:

AIA Document A102™ – 2007 (formerly A111™ – 1997)  Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:41 on 07/27/2015 under Order No. 6812474676 which expires on 07/24/2016, and is not for resale.
User Notes:                                                                (3B9ADA1F)



14

| Number | Date | Pages |
|---|---|---|
| Exhibit "D" Contract Documents List | | |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 16.

§ 16.1.7 Additional documents, if any, forming part of the Contract Documents:

.1   AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:

AIA A201 2007

.2   Other documents, if any, listed below:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201–2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

AIA A201 2007

## ARTICLE 17   INSURANCE AND BONDS
The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201–2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

| Type of insurance or bond | Limit of liability or bond amount ($0.00) |
|---|---|
| Type as stated in Article 11 | Limits as stated in Article 11 |

This Agreement entered into as of the day and year first written above.

OWNER *(Signature)*

Gary Aller, Gallaudet University
*(Printed name and title)*

CONTRACTOR *(Signature)*

Matthew N. Weirich, Vice President
*(Printed name and title)*

AIA Document A102™ – 2007 (formerly A111™ – 1997). Copyright © 1920, 1925, 1951, 1958, 1961, 1963, 1967, 1974, 1978, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 12:08:01 on 07/23/2015 under Order No. 6812474670 which expires on 07/26/2016, and is not for resale.
User Notes:                                                                                              (3B9ADA1F)

# Exhibit A

## Guaranteed Maximum Price Amendment

**for the following PROJECT:**
*(Name and address or location)*

Gallaudet University - MSSD
800 Florida Avenue, NE
Washington, DC 20002

**THE OWNER:**
*(Name, legal status and address)*

Gallaudet University
800 Florida Avenue, NE
Washington, DC 20002

**THE CONTRACTOR:**
*(Name, legal status and address)*

James G. Davis Construction Corporation
12530 Parklawn Drive
Rockville, MD 20852

**ARTICLE 1**
**§ 1.1 Guaranteed Maximum Price**
Pursuant to Section 5.2.1 of the Agreement, the Owner and Contractor hereby amend the Agreement to establish a Guaranteed Maximum Price. As agreed by the Owner and Contractor, the Guaranteed Maximum Price is an amount that the Contract Sum shall not exceed. The Contract Sum consists of the Construction Manager's Fee plus the Cost of the Work, as that term is defined in Article 7 of the Agreement.

**§ 1.1.1** The Contract Sum is guaranteed by the Construction Manager not to exceed Twenty-Six Million Seven Hundred Seventy-Five Thousand One Hundred Eighteen Dollars ($ 26,775,118), subject to additions and deductions by Change Order as provided in the Contract Documents.

**§ 1.1.2 Itemized Statement of the Guaranteed Maximum Price.** Provided below is an itemized statement of the Guaranteed Maximum Price organized by trade categories, allowances, contingencies, alternates, the Construction Manager's Fee, and other items that comprise the Guaranteed Maximum Price.
*(Provide below or reference an attachment.)*

See attached GMP binder dated September 3, 2015, with a revised GMP Summary Sheet dated September 10, 2015.

**§ 1.1.3** The Guaranteed Maximum Price is based on the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If the Contract Documents permit the Owner to accept other alternates subsequent to the execution of this Amendment, attach a schedule of such other alternates showing the amount for each and the date when the amount expires.)*

N/A

**§ 1.1.4** Allowances included in the Guaranteed Maximum Price, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price ($0.00) |
|------|---------------|
| See attached GMP binder dated 9/3/15 | |

§ 1.1.5 Assumptions, if any, on which the Guaranteed Maximum Price is based:

See attached GMP binder dated 9/3/15

§ 1.1.6 The Guaranteed Maximum Price is based upon the following Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|----------|-------|------|-------|
| | | | |

§ 1.1.7 The Guaranteed Maximum Price is based upon the following Specifications:
*(Either list the Specifications here, or refer to an exhibit attached to this Agreement.)*
See Exhibit B – Document List, per the executed AIA 102 contract

| Section | Title | Date | Pages |
|---------|-------|------|-------|
| | | | |

§ 1.1.8 The Guaranteed Maximum Price is based upon the following Drawings:
*(Either list the Drawings here, or refer to an exhibit attached to this Agreement.)*
See Exhibit B – Document List, per the executed AIA 102 contract

| Number | Title | Date |
|--------|-------|------|
| | | |

§ 1.1.9 The Guaranteed Maximum Price is based upon the following other documents and information:
*(List any other documents or information here, or refer to an exhibit attached to this Agreement.)*

See Exhibit B – Document List, per the executed AIA 102 contract

**ARTICLE 2**
§ 2.1 The anticipated date of Substantial Completion established by this Amendment:

The following dates replace the dates set forth in Section 3.1 of the Agreement; the date of Substantial Completion shall be September 30, 2016, and the date of Final Completion shall be October 28, 2016.

OWNER *(Signature)*                                        CONSTRUCTION MANAGER *(Signature)*

*(Printed name and title)*        Matthew N. Welrich - Vice President
                                  *(Printed name and title)*

# EXHIBIT C



# ▲AIA® Document A201™ – 2007

## General Conditions of the Contract for Construction

for the following PROJECT:
*(Name and location or address)*
Gallaudet University – MSSD Residence Hall
800 Florida Avenue
Washington, DC 20002

**THE OWNER:**
*(Name, legal status and address)*
Gallaudet University
800 Florida Avenue, NE
Washington, DC 20002

**THE ARCHITECT:**
*(Name, legal status and address)*
Gaudreau, Inc.
810 Light Street
Baltimore, Maryland 21230

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    OWNER

3    CONTRACTOR

4    ARCHITECT

5    SUBCONTRACTORS

6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7    CHANGES IN THE WORK

8    TIME

9    PAYMENTS AND COMPLETION

10   PROTECTION OF PERSONS AND PROPERTY

11   INSURANCE AND BONDS

12   UNCOVERING AND CORRECTION OF WORK

13   MISCELLANEOUS PROVISIONS

14   TERMINATION OR SUSPENSION OF THE CONTRACT

15   CLAIMS AND DISPUTES

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:46 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                    (725119337)

1

## INDEX
(Topics and numbers in bold are section headings.)

**Acceptance of Nonconforming Work**
9.6.6, 9.9.3, **12.3**
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
**Access to Work**
**3.16**, 6.2.1, 12.1
Accident Prevention
10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 8.3.1, 9.5.1, 10.2.5, 10.2.8, 13.4.2, 13.7, 14.1, 15.2
Addenda
1.1.1, 3.11
Additional Costs, Claims for
3.7.4, 3.7.5, 6.1.1, 7.3.7.5, 10.3, 15.1.4
**Additional Inspections and Testing**
9.4.2, 9.8.3, 12.2.1, **13.5**
Additional Insured
11.1.4
**Additional Time, Claims for**
3.2.4, 3.7.4, 3.7.5, 3.10.2, 8.3.2, **15.1.5**
**Administration of the Contract**
3.1.3, **4.2**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13
**Allowances**
**3.8**, 7.3.8
All-risk Insurance
11.3.1, 11.3.1.1
**Applications for Payment**
4.2.5, 7.3.9, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7, 9.10, 11.1.3
Approvals
2.1.1, 2.2.2, 2.4, 3.1.3, 3.10.2, 3.12.8, 3.12.9, 3.12.10, 4.2.7, 9.3.2, 13.5.1
**Arbitration**
8.3.1, 11.3.10, 13.1, 15.3.2, **15.4**
**ARCHITECT**
**4**
**Architect, Definition of**
**4.1.1**
Architect, Extent of Authority
2.4, 3.12.7, 4.1, 4.2, 5.2, 6.3, 7.1.2, 7.3.7, 7.4, 9.2, 9.3.1, 9.4, 9.5, 9.6.3, 9.8, 9.10.1, 9.10.3, 12.1, 12.2.1, 13.5.1, 13.5.2, 14.2.2, 14.2.4, 15.1.3, 15.2.1
Architect, Limitations of Authority and Responsibility
2.1.1, 3.12.4, 3.12.8, 3.12.10, 4.1.2, 4.2.1, 4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10, 4.2.12, 4.2.13, 5.2.1, 7.4, 9.4.2, 9.5.3, 9.6.4, 15.1.3, 15.2

Architect's Additional Services and Expenses
2.4, 11.3.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
Architect's Administration of the Contract
3.1.3, 4.2, 3.7.4, 15.2, 9.4.1, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.1.7, 1.5
Architect's Decisions
3.7.4, 4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.2.14, 6.3, 7.3.7, 7.3.9, 8.1.3, 8.3.1, 9.2, 9.4.1, 9.5, 9.8.4, 9.9.1, 13.5.2, 15.2, 15.3
Architect's Inspections
3.7.4, 4.2.2, 4.2.9, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 13.5
Architect's Instructions
3.2.4, 3.3.1, 4.2.6, 4.2.7, 13.5.2
Architect's Interpretations
4.2.11, 4.2.12
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.5, 3.1.3, 3.2.2, 3.2.3, 3.2.4, 3.3.1, 3.4.2, 3.5, 3.7.4, 3.7.5, 3.9.2, 3.9.3, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.2, 4.1.3, 4.2, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3.7, 12, 13.4.2, 13.5, 15.2
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4, 11.3.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
3.7.4, 4.2.2, 4.2.9, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
**Award of Subcontracts and Other Contracts for Portions of the Work**
**5.2**
**Basic Definitions**
**1.1**
Bidding Requirements
1.1.1, 5.2.1, 11.4.1
Binding Dispute Resolution
9.7, 11.3.9, 11.3.10, 13.1, 15.2.5, 15.2.6.1, 15.3.1, 15.3.2, 15.4.1
**Boiler and Machinery Insurance**
**11.3.2**
Bonds, Lien
7.3.7.4, 9.10.2, 9.10.3
**Bonds, Performance, and Payment**
7.3.7.4, 9.6.7, 9.10.3, 11.3.9, **11.4**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                           (725119337)

Init.

2

Building Permit
3.7.1
**Capitalization**
**1.3**
Certificate of Substantial Completion
9.8.3, 9.8.4, 9.8.5
**Certificates for Payment**
4.2.1, 4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7,
9.10.1, 9.10.3, 14.1.1.3, 14.2.4, 15.1.3
Certificates of Inspection, Testing or Approval
13.5.4
Certificates of Insurance
9.10.2, 11.1.3
**Change Orders**
1.1.1, 2.4, 3.4.2, 3.7.4, 3.8.2.3, 3.11, 3.12.8, 4.2.8,
5.2.3, 7.1.2, 7.1.3, **7.2**, 7.3.2, 7.3.6, 7.3.9, 7.3.10,
8.3.1, 9.3.1.1, 9.10.3, 10.3.2, 11.3.1.2, 11.3.4, 11.3.9,
12.1.2, 15.1.3
**Change Orders, Definition of**
**7.2.1**
**CHANGES IN THE WORK**
2.2.1, 3.11, 4.2.8, **7**, 7.2.1, 7.3.1, 7.4, 8.3.1, 9.3.1.1,
11.3.9
Claims, Definition of
**15.1.1**
**CLAIMS AND DISPUTES**
3.2.4, 6.1.1, 6.3, 7.3.9, 9.3.3, 9.10.4, 10.3.3, **15**, 15.4
Claims and Timely Assertion of Claims
15.4.1
**Claims for Additional Cost**
3.2.4, 3.7.4, 6.1.1, 7.3.9, 10.3.2, **15.1.4**
**Claims for Additional Time**
3.2.4, 3.7.4, 6.1.1, 8.3.2, 10.3.2, **15.1.5**
**Concealed or Unknown Conditions, Claims for**
**3.7.4**
Claims for Damages
3.2.4, 3.18, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1,
11.3.5, 11.3.7, 14.1.3, 14.2.4, 15.1.6
Claims Subject to Arbitration
15.3.1, 15.4.1
**Cleaning Up**
**3.15**, 6.3
Commencement of the Work, Conditions Relating to
2.2.1, 3.2.2, 3.4.1, 3.7.1, 3.10.1, 3.12.6, 5.2.1, 5.2.3,
6.2.2, 8.1.2, 8.2.2, 8.3.1, 11.1, 11.3.1, 11.3.6, 11.4.1,
15.1.4
**Commencement of the Work, Definition of**
**8.1.2**
**Communications Facilitating Contract**
**Administration**
3.9.1, **4.2.4**
Completion, Conditions Relating to
3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2, 9.4.2, 9.8, 9.9.1,
9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
**9**

Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1, 9.10.3,
12.2, 13.7
Compliance with Laws
1.6, 3.2.3, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 9.6.4, 10.2.2,
11.1, 11.3, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14.1.1,
14.2.1.3, 15.2.8, 15.4.2, 15.4.3
Concealed or Unknown Conditions
3.7.4, 4.2.8, 8.3.1, 10.3
Conditions of the Contract
1.1.1, 6.1.1, 6.1.4
Consent, Written
3.4.2, 3.7.4, 3.12.8, 3.14.2, 4.1.2, 9.3.2, 9.8.5, 9.9.1,
9.10.2, 9.10.3, 11.3.1, 13.2, 13.4.2, 15.4.4.2
**Consolidation or Joinder**
**15.4.4**
**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
1.1.4, 6
**Construction Change Directive, Definition of**
**7.3.1**
**Construction Change Directives**
1.1.1, 3.4.2, 3.12.8, 4.2.8, 7.1.1, 7.1.2, 7.1.3, **7.3**,
9.3.1.1
Construction Schedules, Contractor's
3.10, 3.12.1, 3.12.2, 6.1.3, 15.1.5.2
**Contingent Assignment of Subcontracts**
**5.4**, 14.2.2.2
**Continuing Contract Performance**
**15.1.3**
Contract, Definition of
**1.1.2**
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
5.4.1.1, 11.3.9, **14**
Contract Administration
3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions Relating
to
3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.3.6, 11.4.1
Contract Documents, Copies Furnished and Use of
1.5.2, 2.2.5, 5.3
**Contract Documents, Definition of**
**1.1.1**
**Contract Sum**
3.7.4, 3.8, 5.2.3, 7.2, 7.3, 7.4, **9.1**, 9.4.2, 9.5.1.4,
9.6.7, 9.7, 10.3.2, 11.3.1, 14.2.4, 14.3.2, 15.1.4,
15.2.5
Contract Sum, Definition of
**9.1**
Contract Time
3.7.4, 3.7.5, 3.10.2, 5.2.3, 7.2.1.3, 7.3.1, 7.3.5, 7.4,
8.1.1, 8.2.1, 8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1, 14.3.2,
15.1.5.1, 15.2.5
**Contract Time, Definition of**
**8.1.1**

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318989754_1 which
expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                                (725119337)

3

**CONTRACTOR**
3
**Contractor**, Definition of
**3.1, 6.1.2**
**Contractor's Construction Schedules**
**3.10**, 3.12.1, 3.12.2, 6.1.3, 15.1.5.2
Contractor's Employees
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.3.7, 14.1, 14.2.1.1
**Contractor's Liability Insurance**
**11.1**
Contractor's Relationship with Separate Contractors and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.3.7, 12.1.2, 12.2.4
Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7, 9.10.2, 11.3.1.2, 11.3.7, 11.3.8
Contractor's Relationship with the Architect
1.1.2, 1.5, 3.1.3, 3.2.2, 3.2.3, 3.2.4, 3.3.1, 3.4.2, 3.5, 3.7.4, 3.10, 3.11, 3.12, 3.16, 3.18, 4.1.3, 4.2, 5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, 9.9, 10.2.6, 10.3, 11.3.7, 12, 13.5, 15.1.2, 15.2.1
Contractor's Representations
3.2.1, 3.2.2, 3.5, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.8.2
Contractor's Responsibility for Those Performing the Work
3.3.2, 3.18, 5.3, 6.1.3, 6.2, 9.5.1, 10.2.8
Contractor's Review of Contract Documents
3.2
Contractor's Right to Stop the Work
9.7
Contractor's Right to Terminate the Contract
14.1, 15.1.6
Contractor's Submittals
3.10, 3.11, 3.12.4, 4.2.7, 5.2.1, 5.2.3, 9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3, 11.1.3, 11.4.2
Contractor's Superintendent
3.9, 10.2.6
Contractor's Supervision and Construction Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 6.1.3, 6.2.4, 7.1.3, 7.3.5, 7.3.7, 8.2, 10, 12, 14, 15.1.3
Contractual Liability Insurance
11.1.1.8, 11.2
Coordination and Correlation
1.2, 3.2.1, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and Specifications
1.5, 2.2.5, 3.11
Copyrights
1.5, **3.17**
Correction of Work
2.3, 2.4, 3.7.3, 9.4.2, 9.8.2, 9.8.3, 9.9.1, 12.1.2, **12.2**
**Correlation and Intent of the Contract Documents**
**1.2**
Cost, Definition of
7.3.7

Costs
2.4, 3.2.4, 3.7.3, 3.8.2, 3.15.2, 5.4.2, 6.1.1, 6.2.3, 7.3.3.3, 7.3.7, 7.3.8, 7.3.9, 9.10.2, 10.3.2, 10.3.6, 11.3, 12.1.2, 12.1.2, 12.2.4, 13.5, 14
**Cutting and Patching**
**3.14**, 6.2.5
Damage to Construction of Owner or Separate Contractors
3.14.2, 6.2.4, 10.2.1.2, 10.2.5, 10.4, 11.1.1, 11.3, 12.2.4
Damage to the Work
3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.4, 11.3.1, 12.2.4
Damages, Claims for
3.2.4, 3.18, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.3.5, 11.3.7, 14.1.3, 14.2.4, 15.1.6
Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2
**Date of Commencement of the Work**, Definition of
**8.1.2**
**Date of Substantial Completion**, Definition of
**8.1.3**
**Day**, Definition of
**8.1.4**
Decisions of the Architect
3.7.4, 4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 15.2, 6.3, 7.3.7, 7.3.9, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4, 15.1, 15.2
**Decisions to Withhold Certification**
9.4.1, **9.5**, 9.7, 14.1.1.3
Defective or Nonconforming Work, Acceptance, Rejection and Correction of
2.3, 2.4, 3.5, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1
Definitions
1.1, 2.1.1, 3.1.1, 3.5, 3.12.1, 3.12.2, 3.12.3, 4.1.1, 15.1.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 8.1, 9.1, 9.8.1
**Delays and Extensions of Time**
3.2, 3.7.4, 5.2.3, 7.2.1, 7.3.1, 7.4, **8.3**, 9.5.1, 9.7, 10.3.2, 10.4, 14.3.2, 15.1.5, 15.2.5
Disputes
6.3, 7.3.9, 15.1, 15.2
**Documents and Samples at the Site**
**3.11**
**Drawings**, Definition of
**1.1.5**
Drawings and Specifications, Use and Ownership of
3.11
Effective Date of Insurance
8.2.2, 11.1.2
**Emergencies**
**10.4**, 14.1.1.2, 15.1.4
Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3.3, 11.1.1, 11.3.7, 14.1, 14.2.1.1

Init.

/ssssss

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2016 under Order No.9318980781_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                              (725119337)

Equipment, Labor, Materials or
1.1.3, 1.1.6, 3.4, 3.5, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1,
4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.7, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.1, 14.2.1.2
Execution and Progress of the Work
1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3.1, 3.4.1, 3.5,
3.7.1, 3.10.1, 3.12, 3.14, 4.2, 6.2.2, 7.1.3, 7.3.5, 8.2,
9.5.1, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3.1, 15.1.3
Extensions of Time
3.2.4, 3.7.4, 5.2.3, 7.2.1, 7.3, 7.4, 9.5.1, 9.7, 10.3.2,
10.4, 14.3, 15.1.5, 15.2.5
**Failure of Payment**
9.5.1.3, **9.7**, 9.10.2, 13.6, 14.1.1.3, 14.2.1.2
Faulty Work
(See Defective or Nonconforming Work)
**Final Completion and Final Payment**
4.2.1, 4.2.9, 9.8.2, **9.10**, 11.1.2, 11.1.3, 11.3.1, 11.3.5,
12.3, 14.2.4, 14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.4
Fire and Extended Coverage Insurance
11.3.1.1
**GENERAL PROVISIONS**
**1**
**Governing Law**
**13.1**
Guarantees (See Warranty)
**Hazardous Materials**
10.2.4, **10.3**
Identification of Subcontractors and Suppliers
5.2.1
**Indemnification**
3.17, **3.18**, 9.10.2, 10.3.3, 10.3.5, 10.3.6, 11.3.1.2,
11.3.7
**Information and Services Required of the Owner**
2.1.2, **2.2**, 3.2.2, 3.12.4, 3.12.10, 6.1.3, 6.1.4, 6.2.5,
9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1,
13.5.2, 14.1.1.4, 14.1.4, 15.1.3
**Initial Decision**
**15.2**
**Initial Decision Maker, Definition of**
1.1.8
Initial Decision Maker, Decisions
14.2.2, 14.2.4, 15.2.1, 15.2.2, 15.2.3, 15.2.4, 15.2.5
Initial Decision Maker, Extent of Authority
14.2.2, 14.2.4, 15.1.3, 15.2.1, 15.2.2, 15.2.3, 15.2.4,
15.2.5
**Injury or Damage to Person or Property**
**10.2.8**, 10.4
Inspections
3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3,
9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
1.1.1
Instructions to the Contractor
3.2.4, 3.3.1, 3.8.1, 5.2.1, 7, 8.2.2, 12, 13.5.2

**Instruments of Service**, Definition of
**1.1.7**
Insurance
3.18.1, 6.1.1, 7.3.7, 9.3.2, 9.8.4, 9.9.1, 9.10.2, **11**
**Insurance, Boiler and Machinery**
**11.3.2**
**Insurance, Contractor's Liability**
**11.1**
Insurance, Effective Date of
8.2.2, 11.1.2
**Insurance, Loss of Use**
**11.3.3**
**Insurance, Owner's Liability**
**11.2**
**Insurance, Property**
10.2.5, **11.3**
Insurance, Stored Materials
9.3.2
**INSURANCE AND BONDS**
**11**
Insurance Companies, Consent to Partial Occupancy
9.9.1
Intent of the Contract Documents
1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
Interest
13.6
Interpretation
1.2.3, **1.4**, 4.1.1, 5.1, 6.1.2, 15.1.1
Interpretations, Written
4.2.11, 4.2.12, 15.1.4
Judgment on Final Award
15.4.2
**Labor and Materials, Equipment**
1.1.3, 1.1.6, **3.4**, 3.5, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1,
4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.7, 9.3.2, 9.3.3, 9.5.1.3,
9.10.2, 10.2.1, 10.2.4, 14.2.1.1, 14.2.1.2
Labor Disputes
8.3.1
Laws and Regulations
1.5, 3.2.3, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 9.6.4, 9.9.1,
10.2.2, 11.1.1, 11.3, 13.1, 13.4, 13.5.1, 13.5.2, 13.6,
14, 15.2.8, 15.4
Liens
2.1.2, 9.3.3, 9.10.2, 9.10.4, 15.2.8
Limitations, Statutes of
12.2.5, 13.7, 15.4.1.1
Limitations of Liability
2.3, 3.2.2, 3.5, 3.12.10, 3.17, 3.18.1, 4.2.6, 4.2.7,
4.2.12, 6.2.2, 9.4.2, 9.6.4, 9.6.7, 10.2.5, 10.3.3,
11.1.2, 11.2, 11.3.7, 12.2.5, 13.4.2
Limitations of Time
2.1.2, 2.2, 2.4, 3.2.2, 3.10, 3.11, 3.12.5, 3.15.1, 4.2.7,
5.2, 5.3, 5.4.1, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3,
9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 11.3.1.5,
11.3.6, 11.3.10, 12.2, 13.5, 13.7, 14, 15
**Loss of Use Insurance**
**11.3.3**


AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which
expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                         (725119337)

Init.

5

Material Suppliers
1.5, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2, 9.6, 9.10.5
**Materials, Hazardous**
10.2.4, **10.3**
Materials, Labor, Equipment and
1.1.3, 1.1.6, 1.5.1, 3.4.1, 3.5, 3.8.2, 3.8.3, 3.12, 3.13,
3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.7, 9.3.2, 9.3.3,
9.5.1.3, 9.10.2, 10.2.1.2, 10.2.4, 14.2.1.1, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
2.1.2, 15.2.8
**Mediation**
8.3.1, 10.3.5, 10.3.6, 15.2.1, 15.2.5, 15.2.6, **15.3**,
15.4.1
**Minor Changes in the Work**
1.1.1, 3.12.8, 4.2.8, 7.1, **7.4**
**MISCELLANEOUS PROVISIONS**
**13**
**Modifications**, Definition of
**1.1.1**
Modifications to the Contract
1.1.1, 1.1.2, 3.11, 4.1.2, 4.2.1, 5.2.3, 7, 8.3.1, 9.7,
10.3.2, 11.3.1
**Mutual Responsibility**
**6.2**
**Nonconforming Work, Acceptance of**
9.6.6, 9.9.3, **12.3**
Nonconforming Work, Rejection and Correction of
2.3, 2.4, 3.5, 4.2.6, 6.2.4, 9.5.1, 9.8.2, 9.9.3, 9.10.4,
12.2.1
Notice
2.2.1, 2.3, 2.4, 3.2.4, 3.3.1, 3.7.2, 3.12.9, 5.2.1, 9.7,
9.10, 10.2.2, 11.1.3, 12.2.2.1, 13.3, 13.5.1, 13.5.2,
14.1, 14.2, 15.2.8, 15.4.1
**Notice, Written**
2.3, 2.4, 3.3.1, 3.9.2, 3.12.9, 3.12.10, 5.2.1, 9.7, 9.10,
10.2.2, 10.3, 11.1.3, 11.3.6, 12.2.2.1, **13.3**, 14, 15.2.8,
15.4.1
**Notice of Claims**
3.7.4, 10.2.8, **15.1.2**, 15.4
Notice of Testing and Inspections
13.5.1, 13.5.2
Observations, Contractor's
3.2, 3.7.4
Occupancy
2.2.2, 9.6.6, 9.8, 11.3.1.5
Orders, Written
1.1.1, 2.3, 3.9.2, 7, 8.2.2, 11.3.9, 12.1, 12.2.2.1,
13.5.2, 14.3.1
**OWNER**
**2**
Owner, Definition of
**2.1.1**

Owner, Information and Services Required of the
2.1.2, **2.2**, 3.2.2, 3.12.10, 6.1.3, 6.1.4, 6.2.5, 9.3.2,
9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.3, 13.5.1,
13.5.2, 14.1.1.4, 14.1.4, 15.1.3
Owner's Authority
1.5, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10, 3.14.2, 4.1.2,
4.1.3, 4.2.4, 4.2.9, 5.2.1, 5.2.4, 5.4.1, 6.1, 6.3, 7.2.1,
7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1, 9.6.4, 9.9.1,
9.10.2, 10.3.2, 11.1.3, 11.3.3, 11.3.10, 12.2.2, 12.3,
13.2.2, 14.3, 14.4, 15.2.7
Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.4
**Owner's Liability Insurance**
**11.2**
Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2
**Owner's Right to Carry Out the Work**
**2.4**, 14.2.2
**Owner's Right to Clean Up**
**6.3**
**Owner's Right to Perform Construction and to**
**Award Separate Contracts**
**6.1**
**Owner's Right to Stop the Work**
**2.3**
Owner's Right to Suspend the Work
14.3
Owner's Right to Terminate the Contract
14.2
**Ownership and Use of Drawings, Specifications**
**and Other Instruments of Service**
1.1.1, 1.1.6, 1.1.7, **1.5**, 2.2.5, 3.2.2, 3.11, 3.17, 4.2.12,
5.3
**Partial Occupancy or Use**
9.6.6, 9.9, 11.3.1.5
**Patching, Cutting and**
**3.14**, 6.2.5
Patents
3.17
**Payment, Applications for**
4.2.5, 7.3.9, 9.2, **9.3**, 9.4, 9.5, 9.6.3, 9.7, 9.8.5, 9.10.1,
14.2.3, 14.2.4, 14.4.3
**Payment, Certificates for**
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6, 9.7, 9.10.1,
9.10.3, 13.7, 14.1.1.3, 14.2.4
**Payment, Failure of**
9.5.1.3, **9.7**, 9.10.2, 13.6, 14.1.1.3, 14.2.1.2
Payment, Final
4.2.1, 4.2.9, 9.8.2, 9.10, 11.1.2, 11.1.3, 11.4.1, 12.3,
13.7, 14.2.4, 14.4.3
**Payment Bond, Performance Bond and**
7.3.7.4, 9.6.7, 9.10.3, **11.4**
**Payments, Progress**
9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3, 15.1.3
**PAYMENTS AND COMPLETION**
**9**

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318980751_1 which expires on 07/13/2016, and is not for resale.
User Notes: (725419337)

Init.

6

Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7, 14.2.1.2
PCB
10.3.1
**Performance Bond and Payment Bond**
7.3.7.4, 9.6.7, 9.10.3, **11.4**
**Permits, Fees, Notices and Compliance with Laws**
2.2.2, **3.7**, 3.13, 7.3.7.4, 10.2.2
PERSONS AND PROPERTY, PROTECTION
OF
**10**
Polychlorinated Biphenyl
10.3.1
**Product Data**, Definition of
**3.12.2**
**Product Data and Samples, Shop Drawings**
3.11, **3.12**, 4.2.7
**Progress and Completion**
4.2.2, **8.2**, 9.8, 9.9.1, 14.1.4, 15.1.3
**Progress Payments**
9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3, 15.1.3
**Project**, Definition of
**1.1.4**
Project Representatives
4.2.10
**Property Insurance**
10.2.5, **11.3**
PROTECTION OF PERSONS AND PROPERTY
**10**
Regulations and Laws
1.5, 3.2.3, 3.6, 3.7, 3.12.10, 3.13, 4.1.1, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4, 13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14, 15.2.8, 15.4
Rejection of Work
3.5, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
3.2.1, 3.5, 3.12.6, 6.2.2, 8.2.1, 9.3.3, 9.4.2, 9.5.1, 9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.2, 4.2.10, 5.1.1, 5.1.2, 13.2.1
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 5.3, 6.1.3, 6.2, 6.3, 9.5.1, 10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
**Review of Contract Documents and Field**
**Conditions by Contractor**
**3.2**, 3.12.7, 6.1.3
Review of Contractor's Submittals by Owner and
Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3, 9.2, 9.8.2
Review of Shop Drawings, Product Data and
Samples by Contractor
3.12

**Rights and Remedies**
1.1.2, 2.3, 2.4, 3.5, 3.7.4, 3.15.2, 4.2.6, 5.3, 5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1, 9.7, 10.2.5, 10.3, 12.2.2, 12.2.4, **13.4**, 14, 15.4
**Royalties, Patents and Copyrights**
**3.17**
Rules and Notices for Arbitration
15.4.1
**Safety of Persons and Property**
**10.2**, 10.4
**Safety Precautions and Programs**
3.3.1, 4.2.2, 4.2.7, 5.3, **10.1**, 10.2, 10.4
**Samples**, Definition of
**3.12.3**
**Samples, Shop Drawings, Product Data and**
3.11, **3.12**, 4.2.7
**Samples at the Site, Documents and**
**3.11**
**Schedule of Values**
9.2, 9.3.1
Schedules, Construction
3.10, 3.12.1, 3.12.2, 6.1.3, 15.1.5.2
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 6, 8.3.1, 12.1.2
**Shop Drawings**, Definition of
**3.12.1**
**Shop Drawings, Product Data and Samples**
3.11, **3.12**, 4.2.7
**Site, Use of**
**3.13**, 6.1.1, 6.2.1
Site Inspections
3.2.2, 3.3.3, 3.7.1, 3.7.4, 4.2, 9.4.2, 9.10.1, 13.5
Site Visits, Architect's
3.7.4, 4.2.2, 4.2.9, 9.4.2, 9.5.1, 9.9.2, 9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
**Specifications**, Definition of
**1.1.6**
**Specifications**
1.1.1, **1.1.6**, 1.2.2, 1.5, 3.11, 3.12.10, 3.17, 4.2.14
Statute of Limitations
13.7, 15.4.1.1
Stopping the Work
2.3, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4
**Subcontractor**, Definition of
**5.1.1**
SUBCONTRACTORS
5
Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4, 9.3.1.2, 9.6.7
**Subcontractual Relations**
5.3, 5.4, 9.3.1.2, 9.6, 9.10, 10.2.1, 14.1, 14.2.1

Init.

/signature/

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9316960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                          (725119337)

Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.7, 9.2, 9.3, 9.8, 9.9.1, 9.10.2, 9.10.3, 11.1.3

Submittal Schedule
3.10.2, 3.12.5, 4.2.7

**Subrogation, Waivers of**
6.1.1, **11.3.7**

**Substantial Completion**
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1, 9.10.3, 12.2, 13.7

**Substantial Completion, Definition of**
**9.8.1**

Substitution of Subcontractors
5.2.3, 5.2.4

Substitution of Architect
4.1.3

Substitutions of Materials
3.4.2, 3.5, 7.3.8

**Sub-subcontractor, Definition of**
**5.1.2**

Subsurface Conditions
3.7.4

**Successors and Assigns**
**13.2**

**Superintendent**
**3.9**, 10.2.6

**Supervision and Construction Procedures**
1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 6.1.3, 6.2.4, 7.1.3, 7.3.7, 8.2, 8.3.1, 9.4.2, 10, 12, 14, 15.1.3

Surety
5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2, 15.2.7

Surety, Consent of
9.10.2, 9.10.3

Surveys
2.2.3

**Suspension by the Owner for Convenience**
**14.3**

Suspension of the Work
5.4.2, 14.3

Suspension or Termination of the Contract
5.4.1.1, 14

**Taxes**
3.6, 3.8.2.1, 7.3.7.4

**Termination by the Contractor**
**14.1**, 15.1.6

**Termination by the Owner for Cause**
5.4.1.1, **14.2**, 15.1.6

**Termination by the Owner for Convenience**
**14.4**

Termination of the Architect
4.1.3

Termination of the Contractor
14.2.2

**TERMINATION OR SUSPENSION OF THE CONTRACT**
**14**

Tests and Inspections
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3, 9.9.2, 9.10.1, 10.3.2, 11.4.1, 12.2.1, **13.5**

TIME
8

**Time, Delays and Extensions of**
3.2.4, 3.7.4, 5.2.3, 7.2.1, 7.3.1, 7.4, **8.3**, 9.5.1, 9.7, 10.3.2, 10.4, 14.3.2, 15.1.5, 15.2.5

Time Limits
2.1.2, 2.2, 2.4, 3.2.2, 3.10, 3.11, 3.12.5, 3.15.1, 4.2, 5.2, 5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1, 9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10, 11.1.3, 12.2, 13.5, 13.7, 14, 15.1.2, 15.4

**Time Limits on Claims**
3.7.4, 10.2.8, **13.7**, 15.1.2

Title to Work
9.3.2, 9.3.3

**Transmission of Data in Digital Form**
**1.6**

UNCOVERING AND CORRECTION OF WORK
12

**Uncovering of Work**
**12.1**

Unforeseen Conditions, Concealed or Unknown
3.7.4, 8.3.1, 10.3

Unit Prices
7.3.3.2, 7.3.4

Use of Documents
1.1.1, 1.5, 2.2.5, 3.12.6, 5.3

**Use of Site**
**3.13**, 6.1.1, 6.2.1

**Values, Schedule of**
**9.2**, 9.3.1

Waiver of Claims by the Architect
13.4.2

Waiver of Claims by the Contractor
9.10.5, 13.4.2, 15.1.6

Waiver of Claims by the Owner
9.9.3, 9.10.3, 9.10.4, 12.2.2.1, 13.4.2, 14.2.4, 15.1.6

Waiver of Consequential Damages
14.2.4, 15.1.6

Waiver of Liens
9.10.2, 9.10.4

**Waivers of Subrogation**
6.1.1, **11.3.7**

**Warranty**
3.5, 4.2.9, 9.3.3, 9.8.4, 9.9.1, 9.10.4, 12.2.2, 13.7

Weather Delays
15.1.5.2

**Work, Definition of**
**1.1.3**

Written Consent
1.5.2, 3.4.2, 3.7.4, 3.12.8, 3.14.2, 4.1.2, 9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1, 13.2, 13.4.2, 15.4.4.2

Written Interpretations
4.2.11, 4.2.12

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:26:48 on 09/14/2015 under Order No.9318980751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                              (725119337)

Written Notice
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 5.2.1, 8.2.2, 9.7,
9.10, 10.2.2, 10.3, 11.1.3, 12.2.2, 12.2.4, 13.3, 14,
15.4.1

Written Orders
1.1.1, 2.3, 3.9, 7, 8.2.2, 12.1, 12.2, 13.5.2, 14.3.1,
15.1.2

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to
the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which
expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                      (725119337)

9

ARTICLE 1   GENERAL PROVISIONS
§ 1.1 BASIC DEFINITIONS
§ 1.1.1 THE CONTRACT DOCUMENTS
The Contract Documents are enumerated in the Agreement between the Owner and Contractor (hereinafter the Agreement) and consist of the Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement, the Contract Documents do not include the advertisement or invitation to bid, Instructions to Bidders, sample forms, other information furnished by the Owner in anticipation of receiving bids or proposals, the Contractor's bid or proposal, or portions of Addenda relating to bidding requirements.

§ 1.1.2 THE CONTRACT
The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Contractor and the Architect or the Architect's consultants, (2) between the Owner and a Subcontractor or a Sub-subcontractor, (3) between the Owner and the Architect or the Architect's consultants or (4) between any persons or entities other than the Owner and the Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

§ 1.1.3 THE WORK
The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

§ 1.1.4 THE PROJECT
The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner and by separate contractors.

§ 1.1.5 THE DRAWINGS
The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

§ 1.1.6 THE SPECIFICATIONS
The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

§ 1.1.7 INSTRUMENTS OF SERVICE
Instruments of Service are representations, in any medium of expression now known or later developed, of the tangible and intangible creative work performed by the Architect and the Architect's consultants under their respective professional services agreements. Instruments of Service may include, without limitation, studies, surveys, models, sketches, drawings, specifications, and other similar materials.

§ 1.1.8 INITIAL DECISION MAKER
The Initial Decision Maker is the person identified in the Agreement to render initial decisions on Claims in accordance with Section 15.2 and certify termination of the Agreement under Section 14.2.2.

§ 1.2 CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS
§ 1.2.1 The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318980751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                (725119337)

§ 1.2.2 Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

§ 1.2.3 Unless otherwise stated in the Contract Documents, words that have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

§ 1.3 CAPITALIZATION
Terms capitalized in these General Conditions include those that are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

§ 1.4 INTERPRETATION
In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

§ 1.5 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
§ 1.5.1 The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications, and will retain all common law, statutory and other reserved rights, including copyrights. The Contractor, Subcontractors, Sub-subcontractors, and material or equipment suppliers shall not own or claim a copyright in the Instruments of Service. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' reserved rights.

§ 1.5.2 The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce the Instruments of Service provided to them solely and exclusively for execution of the Work. All copies made under this authorization shall bear the copyright notice, if any, shown on the Instruments of Service. The Contractor, Subcontractors, Sub-subcontractors, and material or equipment suppliers may not use the Instruments of Service on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants.

§ 1.6 TRANSMISSION OF DATA IN DIGITAL FORM
If the parties intend to transmit Instruments of Service or any other information or documentation in digital form, they shall endeavor to establish necessary protocols governing such transmissions, unless otherwise already provided in the Agreement or the Contract Documents.

ARTICLE 2   OWNER
§ 2.1 GENERAL
§ 2.1.1 The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Section 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

§ 2.1.2 The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

§ 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
§ 2.2.1 Prior to commencement of the Work, the Contractor may request in writing that the Owner provide reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Contract. Thereafter, the Contractor may only request such evidence if (1) the Owner fails to make payments to the Contractor as the Contract Documents require; (2) a change in the Work materially changes the Contract Sum; or (3) the Contractor identifies in writing a reasonable concern regarding the Owner's ability to make payment when due. The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:46 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                              (725119337)

the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

§ 2.2.2 Except for permits and fees that are the responsibility of the Contractor under the Contract Documents, including those required under Section 3.7.1, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

§ 2.2.4 The Owner shall furnish information or services required of the Owner by the Contract Documents with reasonable promptness. The Owner shall also furnish any other information or services under the Owner's control and relevant to the Contractor's performance of the Work with reasonable promptness after receiving the Contractor's written request for such information or services.

§ 2.2.5 Unless otherwise provided in the Contract Documents, the Owner shall furnish to the Contractor one copy of the Contract Documents for purposes of making reproductions pursuant to Section 1.5.2.

§ 2.3 OWNER'S RIGHT TO STOP THE WORK
If the Contractor fails to correct Work that is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or repeatedly fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3.

§ 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a ten-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

ARTICLE 3   CONTRACTOR
§ 3.1 GENERAL
§ 3.1.1 The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Contractor shall be lawfully licensed, if required in the jurisdiction where the Project is located. The Contractor shall designate in writing a representative who shall have express authority to bind the Contractor with respect to all matters under this Contract. The term "Contractor" means the Contractor or the Contractor's authorized representative.

§ 3.1.2 The Contractor shall perform the Work in accordance with the Contract Documents.

§ 3.1.3 The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons or entities other than the Contractor.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9818960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                  (735119337)

## § 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

§ 3.2.1 Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

§ 3.2.2 Because the Contract Documents are complementary, the Contractor shall, before starting each portion of the Work, carefully study and compare the various Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work, and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating coordination and construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, the Contractor shall promptly report to the Architect any errors, inconsistencies or omissions discovered by or made known to the Contractor as a request for information in such form as the Architect may require. It is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional, unless otherwise specifically provided in the Contract Documents.

§ 3.2.3 The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, but the Contractor shall promptly report to the Architect any nonconformity discovered by or made known to the Contractor as a request for information in such form as the Architect may require.

§ 3.2.4 If the Contractor believes that additional cost or time is involved because of clarifications or instructions the Architect issues in response to the Contractor's notices or requests for information pursuant to Sections 3.2.2 or 3.2.3, the Contractor shall make Claims as provided in Article 15. If the Contractor fails to perform the obligations of Sections 3.2.2 or 3.2.3, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. If the Contractor performs those obligations, the Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents, for differences between field measurements or conditions and the Contract Documents, or for nonconformities of the Contract Documents to applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities. *The Contractor will make every effort to notify the owner within 10 working days (two weeks) that additional cost is required due to an RFI response.*

## § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

§ 3.3.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any loss or damage arising solely from those Owner-required means, methods, techniques, sequences or procedures.

§ 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for, or on behalf of, the Contractor or any of its Subcontractors.

§ 3.3.3 The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## § 3.4 LABOR AND MATERIALS

§ 3.4.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960791_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                    (725119337)

13

facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

§ 3.4.2 Except in the case of minor changes in the Work authorized by the Architect in accordance with Sections 3.12.8 or 7.4, the Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order or Construction Change Directive.

§ 3.4.3 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Work. The Contractor shall not permit employment of unfit persons or persons not properly skilled in tasks assigned to them.

§ 3.4.4 A wage scale prepared by the U.S. Department of Labor pursuant to the provision of the Davis-Bacon Act is included in the Contract Documents. This wage scale represents the minimum wages that must be paid in each category of labor on the project. The requirements and responsibilities within the Davis-Bacon Act apply to this project and are included in Exhibit "C" of this Contract.

## § 3.5 WARRANTY
The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless the Contract Documents require or permit otherwise. The Contractor further warrants that the Work will conform to the requirements of the Contract Documents and will be free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit. Work, materials, or equipment not conforming to these requirements may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## § 3.6 TAXES
The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor that are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 3.7 PERMITS, FEES, NOTICES AND COMPLIANCE WITH LAWS
§ 3.7.1 Unless otherwise provided in the Contract Documents, the Owner shall secure and pay for the building permit and the Contractor shall secure and pay for   trade permits, fees, licenses, and inspections by government agencies necessary for proper execution and completion of the Work that are customarily secured after execution of the Contract and legally required at the time bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 If the Contractor performs Work knowing it to be contrary to applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

§ 3.7.4 **Concealed or Unknown Conditions.** If the Contractor encounters conditions at the site that are (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, the Contractor shall promptly provide notice to the Owner and the Architect before conditions are disturbed and in no event later than *10 working days (two weeks)* after first observance of the conditions. The Architect will promptly investigate such conditions and, if the Architect determines that they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall promptly notify the Owner and Contractor in

Init.

/

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING:** This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                                        (725119337)

14

writing, stating the reasons. If either party disputes the Architect's determination or recommendation, that party may proceed as provided in Article 15.

§ 3.7.5 If, in the course of the Work, the Contractor encounters human remains or recognizes the existence of burial markers, archaeological sites or wetlands not indicated in the Contract Documents, the Contractor shall immediately suspend any operations that would affect them and shall notify the Owner and Architect. Upon receipt of such notice, the Owner shall promptly take any action necessary to obtain governmental authorization required to resume the operations. The Contractor shall continue to suspend such operations until otherwise instructed by the Owner but shall continue with all other operations that do not affect those remains or features. Requests for adjustments in the Contract Sum and Contract Time arising from the existence of such remains or features may be made as provided in Article 15.

## § 3.8 ALLOWANCES

§ 3.8.1 The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents *and as listed in paragraph 4.4*. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

§ 3.8.2 Unless otherwise provided in the Contract Documents,

.1    Allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

.2    Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances; and

.3    Whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's costs under Section 3.8.2.2.

§ 3.8.3 Materials and equipment under an allowance shall be selected by the Owner with reasonable promptness.

## § 3.9 SUPERINTENDENT

§ 3.9.1 The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor.

§ 3.9.2 The Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the name and qualifications of a proposed superintendent. The Architect may reply within 14 days to the Contractor in writing stating (1) whether the Owner or the Architect has reasonable objection to the proposed superintendent or (2) that the Architect requires additional time to review. Failure of the Architect to reply within the 14 day period shall constitute notice of no reasonable objection.

§ 3.9.3 The Contractor shall not employ a proposed superintendent to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not change the superintendent without the Owner's consent, which shall not unreasonably be withheld or delayed.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES

§ 3.10.1 The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

§ 3.10.2 The Contractor shall prepare a submittal schedule, promptly after being awarded the Contract and thereafter as necessary to maintain a current submittal schedule, and shall submit the schedule(s) for the Architect's approval. The Architect's approval shall not unreasonably be delayed or withheld. The submittal schedule shall (1) be coordinated with the Contractor's construction schedule, and (2) allow the Architect reasonable time to review



Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:48 on 09/14/2015 under Order No.3316880751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                       (725119337)

submittals. If the Contractor fails to submit a submittal schedule, the Contractor shall not be entitled to any increase in Contract Sum or extension of Contract Time based on the time required for review of submittals.

§ **3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect.

§ **3.11 DOCUMENTS AND SAMPLES AT THE SITE**
The Contractor shall maintain at the site for the Owner one copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to indicate field changes and selections made during construction, and one copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work as a record of the Work as constructed.

§ **3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES**
§ **3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

§ **3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

§ **3.12.3** Samples are physical examples that illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

§ **3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. Their purpose is to demonstrate the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents for those portions of the Work for which the Contract Documents require submittals. Review by the Architect is subject to the limitations of Section 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals that are not required by the Contract Documents may be returned by the Architect without action.

§ **3.12.5** The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents in accordance with the submittal schedule approved by the Architect or, in the absence of an approved submittal schedule, with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors.

§ **3.12.6** By submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents to the Owner and Architect that the Contractor has (1) reviewed and approved them, (2) determined and verified materials, field measurements and field construction criteria related thereto, or will do so and (3) checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

§ **3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

§ **3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13.24:46 on 09/14/2016 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                        (725119337)

16

§ 3.12.9 The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice, the Architect's approval of a resubmission shall not apply to such revisions.

§ 3.12.10 The Contractor shall not be required to provide professional services that constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications and approvals performed or provided by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance and design criteria specified in the Contract Documents.

## § 3.13 USE OF SITE
The Contractor shall confine operations at the site to areas permitted by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

## § 3.14 CUTTING AND PATCHING
§ 3.14.1 The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly. All areas requiring cutting, fitting and patching shall be restored to the condition existing prior to the cutting, fitting and patching, unless otherwise required by the Contract Documents.

§ 3.14.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

## § 3.15 CLEANING UP
§ 3.15.1 The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials from and about the Project.

§ 3.15.2 If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and Owner shall be entitled to reimbursement from the Contractor.

## § 3.16 ACCESS TO WORK
The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

## § 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:46 on 06/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes: (725119337)

shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents, or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

## § 3.18 INDEMNIFICATION
§ 3.18.1 To the fullest extent permitted by law the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity that would otherwise exist as to a party or person described in this Section 3.18.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 4    ARCHITECT
## § 4.1 GENERAL
§ 4.1.1 The Owner shall retain an architect lawfully licensed to practice architecture or an entity lawfully practicing architecture in the jurisdiction where the Project is located. That person or entity is identified as the Architect in the Agreement and is referred to throughout the Contract Documents as if singular in number.

§ 4.1.2 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

§ 4.1.3 If the employment of the Architect is terminated, the Owner shall employ a successor architect as to whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the Architect.

## § 4.2 ADMINISTRATION OF THE CONTRACT
§ 4.2.1 The Architect will provide administration of the Contract as described in the Contract Documents and will be an Owner's representative during construction until the date the Architect issues the final Certificate for Payment. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents.

§ 4.2.2 The Architect will visit the site at intervals appropriate to the stage of construction, or as otherwise agreed with the Owner, to become generally familiar with the progress and quality of the portion of the Work completed, and to determine in general if the Work observed is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not have control over, charge of, or responsibility for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

§ 4.2.3 On the basis of the site visits, the Architect will keep the Owner reasonably informed about the progress and quality of the portion of the Work completed, and report to the Owner (1) known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor, and (2) defects and

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                    (725119337)

deficiencies observed in the Work. The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

### § 4.2.4 COMMUNICATIONS FACILITATING CONTRACT ADMINISTRATION
Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

§ 4.2.5 Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

§ 4.2.6 The Architect has authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

§ 4.2.7 The Architect will review and approve, or take other appropriate action upon, the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken in accordance with the submittal schedule approved by the Architect or, in the absence of an approved submittal schedule, with reasonable promptness while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 4.2.8 The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4. The Architect will investigate and make determinations and recommendations regarding concealed and unknown conditions as provided in Section 3.7.4.

§ 4.2.9 The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion; issue Certificates of Substantial Completion pursuant to Section 9.8; receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor pursuant to Section 9.10; and issue a final Certificate for Payment pursuant to Section 9.10.

§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

§ 4.2.11 The Architect will interpret and decide matters concerning performance under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

§ 4.2.12 Interpretations and decisions of the Architect will be consistent with the intent of, and reasonably inferable from, the Contract Documents and will be in writing or in the form of drawings. When making such interpretations

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2016 under Order No.9318980751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                          (725119337)

and decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions rendered in good faith.

§ 4.2.13 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

§ 4.2.14 The Architect will review and respond to requests for information about the Contract Documents. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If appropriate, the Architect will prepare and issue supplemental Drawings and Specifications in response to the requests for information.

## ARTICLE 5   SUBCONTRACTORS
### § 5.1 DEFINITIONS
§ 5.1.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

§ 5.1.2 A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK
§ 5.2.1 Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect may reply within 14 days to the Contractor in writing stating (1) whether the Owner or the Architect has reasonable objection to any such proposed person or entity or (2) that the Architect requires additional time for review. Failure of the Owner or Architect to reply within the 14-day period shall constitute notice of no reasonable objection.

§ 5.2.2 The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

§ 5.2.3 If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

§ 5.2.4 The Contractor shall not substitute a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitution.

### § 5.3 SUBCONTRACTUAL RELATIONS
By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:46 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                      (725119337)

Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement that may be at variance with the Contract Documents. Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

§ 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS
§ 5.4.1 Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner, provided that

.1   assignment is effective only after termination of the Contract by the Owner for cause pursuant to Section 14.2 and only for those subcontract agreements that the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2   assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

When the Owner accepts the assignment of a subcontract agreement, the Owner assumes the Contractor's rights and obligations under the subcontract.

§ 5.4.2 Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

§ 5.4.3 Upon such assignment to the Owner under this Section 5.4, the Owner may further assign the subcontract to a successor contractor or other entity. If the Owner assigns the subcontract to a successor contractor or other entity, the Owner shall nevertheless remain legally responsible for all of the successor contractor's obligations under the subcontract.

ARTICLE 6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS
§ 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS
§ 6.1.1 The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these including those portions related to insurance and waiver of subrogation. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Article 15.

§ 6.1.2 When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

§ 6.1.3 The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Owner until subsequently revised.

§ 6.1.4 Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights that apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

§ 6.2 MUTUAL RESPONSIBILITY
§ 6.2.1 The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.


Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318060753_1 which expires on 07/18/2016, and is not for resale.
User Notes:                                                                                     (725119337)

§ 6.2.2 If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgement that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

§ 6.2.3 The Contractor shall reimburse the Owner for costs the Owner incurs that are payable to a separate contractor because of the Contractor's delays, improperly timed activities or defective construction. The Owner shall be responsible to the Contractor for costs the Contractor incurs because of a separate contractor's delays, improperly timed activities, damage to the Work or defective construction.

§ 6.2.4 The Contractor shall promptly remedy damage the Contractor wrongfully causes to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

§ 6.2.5 The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Section 3.14.

## § 6.3 OWNER'S RIGHT TO CLEAN UP
If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Architect will allocate the cost among those responsible.

## ARTICLE 7   CHANGES IN THE WORK
### § 7.1 GENERAL
§ 7.1.1 Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

§ 7.1.2 A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.

§ 7.1.3 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

### § 7.2 CHANGE ORDERS
§ 7.2.1 A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect stating their agreement upon all of the following:
    .1    The change in the Work;
    .2    The amount of the adjustment, if any, in the Contract Sum; and
    .3    The extent of the adjustment, if any, in the Contract Time.

§ 7.2.2 The allowance for combined overhead and profit included in the total cost to the Owner for any Change Order shall be based on the following:
    .1    For the General Contractor: 5% of the cost of the changed work;
    .2    For Subcontractors: (a) when directly performing the work, 10% for overhead and 5% for profit; and (b) when the work is performed by a lower-tier subcontractor, 5% mark-up for the Subcontractor; and
    .3    For work performed by lower-tier subcontractors: 10% for overhead and 5% for profit.

### § 7.3 CONSTRUCTION CHANGE DIRECTIVES
§ 7.3.1 A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
**User Notes:**                                                                                     (725419337)

*All change proposals to be submitted to the owner within 15 working days (3-weeks) of receipt of the directive or request to perform minor changes in the work. All change proposals must include subcontractor and vendor labor and material cost breakdowns with detailed description of cost sufficient for the Owner and Architect to review for approval of cost adjustments.*

**§ 7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**§ 7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:

    .1    Mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

    .2    Unit prices stated in the Contract Documents or subsequently agreed upon;

    .3    Cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or

    .4    As provided in Section 7.3.7.

**§ 7.3.4** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

**§ 7.3.5** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**§ 7.3.6** A Construction Change Directive signed by the Contractor indicates the Contractor's agreement therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 7.3.7** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the Architect shall determine the method and the adjustment on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, an amount for overhead and profit as set forth in the Agreement, or if no such amount is set forth in the Agreement, a reasonable amount. In such case, and also under Section 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Section 7.3.7 shall be limited to the following:

    .1    Costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

    .2    Costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

    .3    Rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

    .4    Costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

    .5    Additional costs of supervision and field office personnel directly attributable to the change.

**§ 7.3.8** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change that results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 7.3.9** Pending final determination of the total cost of a Construction Change Directive to the Owner, the Contractor may request payment for Work completed under the Construction Change Directive in Applications for Payment.

**Init.**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318860751_1 which expires on 07/13/2016, and is not for resale.

User Notes: (725119337)

The Architect will make an interim determination for purposes of monthly certification for payment for those costs and certify for payment the amount that the Architect determines, in the Architect's professional judgment, to be reasonably justified. The Architect's interim determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a Claim in accordance with Article 15.

§ 7.3.10 When the Owner and Contractor agree with a determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and the Architect will prepare a Change Order. Change Orders may be issued for all or any part of a Construction Change Directive.

§ 7.4 MINOR CHANGES IN THE WORK
The Architect has authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes will be effected by written order signed by the Architect and shall be binding on the Owner and Contractor.

ARTICLE 8   TIME
§ 8.1 DEFINITIONS
§ 8.1.1 Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

§ 8.1.2 The date of commencement of the Work is the date established in the Agreement.

§ 8.1.3 The date of Substantial Completion is the date certified by the Architect in accordance with Section 9.8.

§ 8.1.4 The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

§ 8.2 PROGRESS AND COMPLETION
§ 8.2.1 Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

§ 8.2.2 The Contractor shall not knowingly, except by agreement or instruction of the Owner in writing, prematurely commence operations on the site or elsewhere prior to the effective date of insurance required by Article 11 to be furnished by the Contractor and Owner. The date of commencement of the Work shall not be changed by the effective date of such insurance.

§ 8.2.3 The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

§ 8.3 DELAYS AND EXTENSIONS OF TIME
§ 8.3.1 If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner; or by changes ordered in the Work; or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control; or by delay authorized by the Owner pending mediation and arbitration; or by other causes that the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

§ 8.3.2 Claims relating to time shall be made in accordance with applicable provisions of Article 15.

§ 8.3.3 This Section 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

ARTICLE 9   PAYMENTS AND COMPLETION
§ 9.1 CONTRACT SUM
The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318980751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                        (725119337)

## § 9.2 SCHEDULE OF VALUES

Where the Contract is based on a stipulated sum or Guaranteed Maximum Price, the Contractor shall submit to the Architect, before the first Application for Payment, a schedule of values allocating the entire Contract Sum to the various portions of the Work and prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

## § 9.3 APPLICATIONS FOR PAYMENT

§ 9.3.1 At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment prepared in accordance with the schedule of values, if required under Section 9.2, for completed portions of the Work. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and shall reflect retainage if provided for in the Contract Documents.

§ 9.3.1.1 As provided in Section 7.3.9, such applications may include requests for payment on account of changes in the Work that have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

§ 9.3.1.2 Applications for Payment shall not include requests for payment for portions of the Work for which the Contractor does not intend to pay a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

§ 9.3.2 Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

§ 9.3.3 The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## § 9.4 CERTIFICATES FOR PAYMENT

§ 9.4.1 The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

§ 9.4.2 The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that, to the best of the Architect's knowledge, information and belief, the Work has progressed to the point indicated and that the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                    (725119337)

examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## § 9.5 DECISIONS TO WITHHOLD CERTIFICATION

§ 9.5.1 The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Section 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Section 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Section 3.3.2, because of

.1    defective Work not remedied;

.2    third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3    failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.4    reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5    damage to the Owner or a separate contractor;

.6    reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7    repeated failure to carry out the Work in accordance with the Contract Documents.

§ 9.5.2 When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

§ 9.5.3 If the Architect withholds certification for payment under Section 9.5.1.3, the Owner may, at its sole option, issue joint checks to the Contractor and to any Subcontractor or material or equipment suppliers to whom the Contractor failed to make payment for Work properly performed or material or equipment suitably delivered. If the Owner makes payments by joint check, the Owner shall notify the Architect and the Architect will reflect such payment on the next Certificate for Payment.

## § 9.6 PROGRESS PAYMENTS

§ 9.6.1 After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

§ 9.6.2 The Contractor shall pay each Subcontractor no later than seven days after receipt of payment from the Owner the amount to which the Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of the Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

§ 9.6.3 The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

§ 9.6.4 The Owner has the right to request written evidence from the Contractor that the Contractor has properly paid Subcontractors and material and equipment suppliers amounts paid by the Owner to the Contractor for subcontracted Work. If the Contractor fails to furnish such evidence within seven days, the Owner shall have the right to contact Subcontractors to ascertain whether they have been properly paid. Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor, except as may otherwise be required by law.

§ 9.6.5 Contractor payments to material and equipment suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                                          (725119337)

§ 9.6.6 A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

§ 9.6.7 Unless the Contractor provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

§ 9.7 FAILURE OF PAYMENT
If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by binding dispute resolution, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

§ 9.8 SUBSTANTIAL COMPLETION
§ 9.8.1 Definition

9.8.1.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

9.8.1.2 The authority having jurisdiction has issued a certificate of occupancy.

9.8.1.3 A temporary certificate of occupancy fulfills this requirement.

§ 9.8.2 When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

§ 9.8.3 Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

§ 9.8.4 When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion that shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and insurance, and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

§ 9.8.5 The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of surety, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318069751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                    (725119337)

27

## § 9.9 PARTIAL OCCUPANCY OR USE

§ 9.9.1 The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the insurer as required under Section 11.3.1.5 and authorized by public authorities having jurisdiction over the Project. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Section 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

§ 9.9.2 Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

§ 9.9.3 Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## § 9.10 FINAL COMPLETION AND FINAL PAYMENT

§ 9.10.1 Upon receipt of the Contractor's written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Section 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

§ 9.10.2 Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a bond satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

§ 9.10.3 If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

§ 9.10.4 The making of final payment shall constitute a waiver of Claims by the Owner except those arising from

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                (725119337)

.1      liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
.2      failure of the Work to comply with the requirements of the Contract Documents; or
.3      terms of special warranties required by the Contract Documents.

**§ 9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY
### § 10.1 SAFETY PRECAUTIONS AND PROGRAMS
The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### § 10.2 SAFETY OF PERSONS AND PROPERTY
**§ 10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to

.1      employees on the Work and other persons who may be affected thereby;
.2      the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
.3      other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**§ 10.2.2** The Contractor shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**§ 10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**§ 10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**§ 10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Sections 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

**§ 10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**§ 10.2.7** The Contractor shall not permit any part of the construction or site to be loaded so as to cause damage or create an unsafe condition.

### § 10.2.8 INJURY OR DAMAGE TO PERSON OR PROPERTY
If either party suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

Init.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318980781_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                               (725119337)

## § 10.3 HAZARDOUS MATERIALS

**§ 10.3.1** The Contractor is responsible for compliance with any requirements included in the Contract Documents regarding hazardous materials. If the Contractor encounters a hazardous material or substance not addressed in the Contract Documents and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

**§ 10.3.2** Upon receipt of the Contractor's written notice, the Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to cause it to be rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. By Change Order, the Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up.

**§ 10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), except to the extent that such damage, loss or expense is due to the fault or negligence of the party seeking indemnity.

**§ 10.3.4** The Owner shall not be responsible under this Section 10.3 for materials or substances the Contractor brings to the site unless such materials or substances are required by the Contract Documents. The Owner shall be responsible for materials or substances required by the Contract Documents, except to the extent of the Contractor's fault or negligence in the use and handling of such materials or substances.

**§ 10.3.5** The Contractor shall indemnify the Owner for the cost and expense the Owner incurs (1) for remediation of a material or substance the Contractor brings to the site and negligently handles, or (2) where the Contractor fails to perform its obligations under Section 10.3.1, except to the extent that the cost and expense are due to the Owner's fault or negligence.

**§ 10.3.6** If, without negligence on the part of the Contractor, the Contractor is held liable by a government agency for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## § 10.4 EMERGENCIES

In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Article 15 and Article 7.

## ARTICLE 11   INSURANCE AND BONDS
### 11.1 General.

Until the Project has been completed in accordance with the approved plans and specifications and accepted by the Owner, the Contractor and all Subcontractors shall, at their own expense, maintain insurance on all operations under the Agreement, whether such operations are undertaken by Contractor, or by any Subcontractor, or by anyone

Init.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
**User Notes:**                                                                                                  (725119337)

directly or indirectly employed by any of them, or for whose acts any of the foregoing entities may be liable, in full compliance with all of the provisions of this section. Insurance coverages shall be placed with companies acceptable to Owner, with a minimum "A.M. Best's" Rating of A-VII, and authorized to do business in the jurisdiction where the Project is located. In the event the Contractor sublets or subcontracts any part of the Work herein described, the Subcontractor shall be bound by the same terms and conditions concerning insurance as outlined herein and this section will be made a part of any such subcontract agreement, except that Contractor shall have the responsibility to establish limits of insurance for each Subcontractor commensurate with each Subcontractor's respective risk.

All Contractor's insurance coverages (other than professional liability) must waive subrogation against the Owner, Project Manager, and at the request of the Owner, any separate contractor performing at the site.

All Subcontractor's insurance coverages must waive subrogation against the Owner, Project Manager, and the Contractor and, at the request of the Owner, any separate contractor performing Work at the Site.

All insurance coverages shall be endorsed to state that the right of cancellation or material change in coverage by the insurance carrier is waived, unless thirty (30) days prior notice is furnished by registered mail to the Owner. In the event an insurance carrier is unable to accommodate this requirement, then the policy holder (Contractor or Subcontractor) must notify Owner in writing with at least thirty (30) days advance written notice of any cancellation of coverage, except ten (10) days for non-payment of premium.

All insurance coverages shall (i) list the Owner, the Owner's lender (if required), the Project Manager, the Architect, and each of their respective directors, officers, agents and employees, and any others (including separate contractors) reasonably requested by the Owner, as additional insureds for ongoing and completed operations, (ii) be endorsed to specify that any insurance or self-insurance maintained by Owner shall not contribute with it, and (iii) be issued by insurers approved by the Owner in its reasonable discretion. However, nothing in this Section shall require Contractor or its Subcontractors to provide insurance for the Architect for allegation of their professional negligence.

If the Contractor desires to have limits in excess of those required or furnished by the Owner, or desires to carry additional coverages for its own protection, the arrangements therefore and the cost thereof shall be the sole responsibility of the Contractor.

Nothing contained in these insurance requirements is to be construed as limiting the extent of the Contractor's responsibility for payment of damages resulting from Contractor's operations under the Agreement.

**11.2 Casualty Insurance.**

**11.2.1 Workers' Compensation and Employer's Liability Insurance.**

Contractor shall carry Workers' Compensation and Employer's Liability Insurance as required by applicable Codes. Employers Liability Insurance shall be in an amount no less than $2,000,000 each accident for bodily injury, $2,000,000 policy limit for bodily injury by disease and $2,000,000 each employee for bodily injury or disease. These policies will contain waivers of the insured's subrogation rights against Owner and Project Manager.

**11.2.2 Commercial General Liability and Commercial Automobile Insurance.**

(a) Coverage.   Contractor shall carry Occurrence Form per project (not claims made) Commercial General Liability and Commercial Automobile Liability Insurance covering all operations by or on behalf of Contractor providing insurance for bodily injury liability and property damage liability, with at least the limits of liability stated below. Coverage shall be at least as broad as that coverage provided in "Insurance Services Office Form CG0001" or equivalent and shall include coverage for (i) premises and operations; (ii) products and completed operations; (iii) contractual liability and automobile contractual liability insuring the obligations assumed by Contractor in this Contract; (iv) broad form property damage (including products and completed operations coverage); (v) explosion, collapse and underground hazards; (vi) personal injury liability; (vii) owned, hired and non-owned automobiles; and (viii) employees covered as insureds; and shall contain a "Cross Liability" or "Severability of Interest" clause.


Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 08/14/2015 under Order No.9318866751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                          (725119337)

(b) **Limits of Liability.** The limits of liability shall not be less than:

(i) Commercial General Liability Insurance with a minimum $10,000,000 limit of liability for each of the following:

(A) Per occurrence and per project, bodily injury and property damage (broad form)

(B) Per occurrence and per project, personal injury and advertising injury

(C) General aggregate other than Products & Completed Operations Aggregate

(D) Products & Completed Operations Aggregate.

(ii) Commercial Automobile Liability Insurance applicable to all owned, non-owned and hired vehicles, trucks, trailers and semi-trailers, including but not limited to machinery or apparatus attached thereto, with a minimum limit of $10,000,000 for bodily injury and property damage combined single limit per occurrence/annual aggregate. If Contractor or its Subcontractors haul Hazardous Materials, they must carry Automobile Liability insurance with $5,000,000 combined single limit per occurrence for bodily injury and property damage applicable to all Hazardous Materials hauling vehicles and include MCS 90 or CA 9948, or equivalent. Owner and Project Manager must be named as additional insureds on this coverage.

(c) Products & Competed Operations Insurance shall be maintained for a minimum period of ten (10) years after Final Completion, and Contractor shall continue to furnish evidence of such coverage to Owner on an annual basis during the aforementioned period.

(d) Coverage is to be written to cover all occurrences during the term of this Agreement or out of any work performed pursuant to the Agreement, regardless of when such claim shall be first made against Owner and/or Contractor.

(e) Owner, Owner's lender (if required) and Project Manager and each of their respective directors, officers, agents and employees are to be named as additional insureds for Commercial General Liability and Products and Completed Operations using Insurance Services Office (ISO) Forms CG2010 0413 and CG2037 0413 or the equivalent endorsements. Such additional insured status shall not include any special limitations on the scope of protection afforded to Owner or any of the other additional insureds.

(f) The Owner shall be notified when and if fifty (50%) percent of any aggregate limits is eroded.

(g) **Other Requirements.** The policies shall provide that the insurance afforded the additional insureds is primary and that any insurances, deductibles or self-insurance carried by the additional insureds will be excess only and will not contribute to the insurance afforded by the policy.

**11.2.3 Fidelity Coverage.**

Fidelity coverage naming Owner as obligee, insuring loss(es) due to the dishonest acts of Contractor's employees with limits of at least $1,000,000.

**11.2.4 Contractor's Pollution Liability** covering claims for bodily injury, property damage, clean-up costs and legal defense costs resulting from the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, mold, fungus, spores or other microbial matter, or any Hazardous Materials in connection with Contractor's operations or the operations of any party for whom Contractor is legally liable. Coverage shall include the following:

(a) Limit of not less than $5,000,000 per claim and an aggregate limit of not less than $5,000,000;

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                    (725119337)

(b) The policy shall include Owner, Owner's lender (if required) and Project Manager and each of their respective directors, officers, agents and employees as an additional insureds and provide coverage for claims arising out of completed operations; and

(c) Coverage shall be maintained for the statutory period applying to claims arising out of the Work and, at a minimum, a period of ten (10) years after Final Completion.

**11.2.5 Evidence of Insurance.**

Certificates of Insurance evidencing the Insurance required by this Article 11, shall be furnished by Contractor to Owner and Project Manager before any Work is commenced by Contractor and within five (5) business days of the Commencement Date. The Certificates of Insurance shall provide that there will be no cancellation or reduction of coverage without thirty (30) days prior written notice to Owner, and Project Manager. All limiting endorsements of the policies must be declared by carrier/broker on the issued Certificates of Insurance. Failure to so provide such certificates shall be cause for the Owner to terminate the Agreement.

If any insurance coverage is required by this Agreement to remain in force after Final Completion, an additional Certificate of Insurance evidencing continuation of such coverage shall be submitted as a precondition of Final Payment.

**11.2.6 General Insurance Requirements.** Owner may take such steps as are necessary to assure Contractor's compliance with its obligations under this Article 11. If Contractor fails to maintain any required insurance coverage, Owner may provide such coverage and charge the cost thereof to Contractor or terminate the Agreement.

The required insurance (including any deductible amounts or self-insured retention) shall be subject to the written approval of Owner, but Owner's non-acceptance of any Certificate of Insurance, shall in no way limit or relieve Contractor of its duties and responsibilities under this Article 11.

Compliance of the Contractor with the herein insurance requirements shall not relieve it of liability under any indemnity or other agreement set forth in the Agreement. None of the requirements contained herein as to types or limits of coverage to be maintained by Contractor are intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by Contractor under this Agreement. Contractor may, unless otherwise specified in the Contract Documents, and subject to the review and approval of Owner, utilize reasonable deductibles or self-insured retention in relation to its size and financial stability. Contractor shall be responsible to pay any loss amount which lies within its deductible up to the maximum amount of the deductible or self-insured retention. Entire amount of any Deductibles and/or Self Insured Retentions under any policy required of, or carried by, Subcontractors shall be the responsibility of, and paid for by, Subcontractors.

**11.3 Subcontractors' Insurance.**

The Contractor shall require each of its Subcontractors to procure and maintain, until the satisfactory completion of that Subcontractor's work, insurances as set forth in Contractor's Subcontract. Policies carried by Subcontractors must provide the following:

(i) Name Owner, Project Manager and each of their respective directors, officers, agents and employees as additional insureds (except for Worker's Compensation policy).

(ii) Provide Subcontractor's insurance policies are primary and non-contributory with respect to any coverage maintained by Owner, Project Manager or other additional insureds.

(iii) Provide coverage on an Occurrence Form. Claims Made Forms are not acceptable.

(iv) Provide Waiver of Subrogation endorsements in favor of Owner, Project Manager and their respective directors, officers, agents and employees.

**11.4 Property Insurance.**

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9319280781_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                          (725119337)

Init.

33

The Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance in the amount of the initial GMP, plus value of subsequent modifications to the GMP and the cost of Materials supplied or installed by others, comprising total value for the entire Project at the Site on a replacement cost basis. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until Final Payment has been made as provided or until no person or entity other than the Owner has an insurable interest in the property to be covered, whichever is later. Coverage shall be written in the name of the Owner as first named insured, and shall add the Contractor and Subcontractors as additional named insureds.

Property insurance shall be provided by the Insurance Services Office Forms CP 00 20 "Builders Risk Form" and/or CP 10 30 "Causes of Loss – Special Form," or equivalent form, and shall include without limitation, insurance against the perils of fire (with extended coverage) and direct physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, water damage, collapse, windstorm, falsework, testing and startup, ensuing losses due to design errors or defective work, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's, Contractor's and Subcontractors' Services and extra and expediting expenses required as a result of such insured loss. At the Owner's option, coverage may extend to damage caused by earthquake, other earth movement, terrorism or flood; however, in the event Owner chooses not to purchase coverage for damage caused by earthquake or flood, Contractor shall not be required to rebuild the Project at Contractor's expense.

This property insurance shall cover portions of the Work stored off the site (sublimit of $500,000), and also portions of the Work in transit (sublimit of $500,000). If the Owner provides Materials, furnishings or fixtures to be installed by the Contractor, the builders risk insurance shall be endorsed to provide coverage for such Owner furnished Materials, furnishings or fixtures.

If the property insurance requires deductibles or sub-limits, the Owner shall pay costs not covered because of such deductibles or sub-limits, unless the claim is caused by the negligence of the Contractor or a Subcontractor, or any of their agents, employees or anyone under their control or direction, in which case the deductible shall be paid by the Contractor.

Partial occupancy or use shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until Final Completion; this insurance shall include interests of the Owner, Contractor and Subcontractors in the Work, and the Owner and Contractor shall be named insureds.

The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other perils. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property caused by such perils, including consequential losses, to the extent covered by Property or Builder's Risk Insurance obtained pursuant to this Agreement and to the extent not caused by the negligence or willful misconduct of the Contractor, or any Subcontractor, their agents, employees or anyone under their control or direction.

If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the Site by property insurance under policies separate from those insuring the Project, or if after Final Payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the

Init.

/ **AIA** /

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9348880781_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                               (725419337)

Project during the construction period, the Owner shall waive all rights for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise. If Owner endorses its own property insurance policy to provide coverage for the Project at any point when Contractor has construction activities continuing pursuant to this Agreement, Owner shall cause the policy to have Contractor listed as insured with the above noted waiver of subrogation endorsement.

The Owner, Contractor and Subcontractors of every tier shall waive all rights against each other for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4, or other property insurance applicable to the Work. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

The Owner shall provide to the Contractor a copy of each policy that includes insurance coverages required by this Section 11.4, if requested in writing. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Owner shall notify Contractor in writing with at least thirty (30) days advance written notice of any cancellation of coverage, except ten (10) days for non-payment of premium.

Notwithstanding any Builder's Risk Insurance provided by Owner, Contractor shall secure, pay for, and maintain Property Insurance for protection against loss of owned, borrowed, or rented capital equipment and tools, including any tools owned by employees, and all tools, equipment, stating, temporary office trailers, scaffolding and forms owned, borrowed or rented by the Contractor. The requirement to secure and maintain such insurance is solely for the benefit of the Contractor. Failure of the Contractor to secure such insurance or to maintain adequate level of coverage shall not obligate the Owner, or the Project Manager, for any losses, and the Owner and Project Manager shall have no such liability. The insurance policy for such Contractor Insurance shall include a waiver of subrogation as follows: "It is agreed that in no event shall this insurance Company have any right of recovery against Owner or Project Manager."

A loss insured under Owner's property insurance shall be adjusted by the Owner as policy holder and made payable to the Owner as policy holder for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

The Owner as policy holder shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved in the manner outlined in Section 15 hereof.

*(Paragraphs deleted)*
### § 11.4 PERFORMANCE BOND AND PAYMENT BOND
§ 11.4.1 Contractor may elect to provide Subcontractor Default Insurance (SDI) for some or all of the subcontractors and/or direct suppliers engaged on the Project. At Contractor's sole discretion, Contractor may elect not to enroll certain Subcontractors into the SDI Program and instead such Subcontractor(s) shall be required to provide 100% payment and performance bonds. The cost of Contractor's SDI program and/or Subcontractor bonds for base contract work are included in the Contract Sum.

*(Paragraph deleted)*
### ARTICLE 12   UNCOVERING AND CORRECTION OF WORK
### § 12.1 UNCOVERING OF WORK
§ 12.1.1 If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if requested in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

§ 12.1.2 If a portion of the Work has been covered that the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 08/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                (725119337)

Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, such costs and the cost of correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

## § 12.2 CORRECTION OF WORK
### § 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION
The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

### § 12.2.2 AFTER SUBSTANTIAL COMPLETION
§ 12.2.2.1 In addition to the Contractor's obligations under Section 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Section 2.4.

§ 12.2.2.2 The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual completion of that portion of the Work.

§ 12.2.2.3 The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Section 12.2.

§ 12.2.3 The Contractor shall remove from the site portions of the Work that are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

§ 12.2.4 The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work that is not in accordance with the requirements of the Contract Documents.

§ 12.2.5 Nothing contained in this Section 12.2 shall be construed to establish a period of limitation with respect to other obligations the Contractor has under the Contract Documents. Establishment of the one-year period for correction of Work as described in Section 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## § 12.3 ACCEPTANCE OF NONCONFORMING WORK
If the Owner prefers to accept Work that is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

## ARTICLE 13   MISCELLANEOUS PROVISIONS
### § 13.1 GOVERNING LAW
The Contract shall be governed by the law of the place where the Project is located except that, if the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 15.4.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9316960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                            (725119337)

§ 13.2 SUCCESSORS AND ASSIGNS
§ 13.2.1 The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Section 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

§ 13.2.2 The Owner may, without consent of the Contractor, assign the Contract to a lender providing construction financing for the Project, if the lender assumes the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

§ 13.3 WRITTEN NOTICE
Written notice shall be deemed to have been duly served if delivered in person to the individual, to a member of the firm or entity, or to an officer of the corporation for which it was intended; or if delivered at, or sent by registered or certified mail or by courier service providing proof of delivery to, the last business address known to the party giving notice.

§ 13.4 RIGHTS AND REMEDIES
§ 13.4.1 Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

§ 13.4.2 No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

§ 13.5 TESTS AND INSPECTIONS
§ 13.5.1 Tests, inspections and approvals of portions of the Work shall be made as required by the Contract Documents and by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of public authorities. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and the Owner shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of (1) tests, inspections or approvals that do not become requirements until after bids are received or negotiations concluded, and (2) tests, inspections or approvals where building codes or applicable laws or regulations prohibit the Owner from delegating their cost to the Contractor.

§ 13.5.2 If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Section 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in Section 13.5.3, shall be at the Owner's expense.

§ 13.5.3 If such procedures for testing, inspection or approval under Sections 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of repeated procedures and compensation for the Architect's services and expenses shall be at the Contractor's expense.

§ 13.5.4 Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

§ 13.5.5 If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:34:48 on 09/14/2015 under Order No.9318860751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                    (725119337)

37

§ **13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

§ **13.6 INTEREST**
Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

§ **13.7 TIME LIMITS ON CLAIMS**
The Owner and Contractor shall commence all claims and causes of action, whether in contract, tort, breach of warranty or otherwise, against the other arising out of or related to the Contract in accordance with the requirements of the final dispute resolution method selected in the Agreement within the time period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work. The Owner and Contractor waive all claims and causes of action not commenced in accordance with this Section 13.7.

§ **13.8 SURVIVAL**
The provisions of the Contract which by their nature survive termination of the Contract or Final Completion under Article 9.10, including all warranties, indemnities, payment obligations, and Owner's right to audit Contractor's books and records, shall remain in full force and effect after Final Completion or any termination of the Contract.

**ARTICLE 14   TERMINATION OR SUSPENSION OF THE CONTRACT**
§ **14.1 TERMINATION BY THE CONTRACTOR**
§ **14.1.1** The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:

.1   Issuance of an order of a court or other public authority having jurisdiction that requires all Work to be stopped;

.2   An act of government, such as a declaration of national emergency that requires all Work to be stopped;

.3   Because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Section 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents; or

.4   The Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Section 2.2.1.

§ **14.1.2** The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

§ **14.1.3** If one of the reasons described in Section 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed, including reasonable overhead and profit, costs incurred by reason of such termination, and damages.

§ **14.1.4** If the Work is stopped for a period of 90 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has repeatedly failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

§ **14.2 TERMINATION BY THE OWNER FOR CAUSE**
§ **14.2.1** The Owner may terminate the Contract if the Contractor
.1   repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318900701_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                (735119337)

  .2 fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

  .3 repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority; or

  .4 otherwise is guilty of substantial breach of a provision of the Contract Documents.

**§ 14.2.2** When any of the above reasons exist, the Owner, upon certification by the Initial Decision Maker that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:

  .1 Exclude the Contractor from the site and take possession of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

  .2 Accept assignment of subcontracts pursuant to Section 5.4; and

  .3 Finish the Work by whatever reasonable method the Owner may deem expedient. Upon written request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**§ 14.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**§ 14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Initial Decision Maker, upon application, and this obligation for payment shall survive termination of the Contract.

**§ 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE**

**§ 14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**§ 14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent

  .1 that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

  .2 that an equitable adjustment is made or denied under another provision of the Contract.

**§ 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE**

**§ 14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**§ 14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall

  .1 cease operations as directed by the Owner in the notice;

  .2 take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

  .3 except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**§ 14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

Init.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes: (725119337)

ARTICLE 15   CLAIMS AND DISPUTES
§ 15.1 CLAIMS
§ 15.1.1 DEFINITION
A Claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. The responsibility to substantiate Claims shall rest with the party making the Claim.

§ 15.1.2 NOTICE OF CLAIMS
Claims by either the Owner or Contractor must be initiated by written notice to the other party and to the Initial Decision Maker with a copy sent to the Architect, if the Architect is not serving as the Initial Decision Maker. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.

§ 15.1.3 CONTINUING CONTRACT PERFORMANCE
Pending final resolution of a Claim, except as otherwise agreed in writing or as provided in Section 9.7 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents. The Architect will prepare Change Orders and issue Certificates for Payment in accordance with the decisions of the Initial Decision Maker.

§ 15.1.4 CLAIMS FOR ADDITIONAL COST
If the Contractor wishes to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.4.

§ 15.1.5 CLAIMS FOR ADDITIONAL TIME
§ 15.1.5.1 If the Contractor wishes to make a Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay, only one Claim is necessary.

§ 15.1.5.2 If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions had an adverse effect on the scheduled construction.

§ 15.1.6 CLAIMS FOR CONSEQUENTIAL DAMAGES
The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waive includes:

1. Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

2. Damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 15.1.6 shall be deemed to preclude an award of liquidated damages, when applicable, in accordance with the requirements of the Contract Documents.

§ 15.2 INITIAL DECISION
§ 15.2.1 Claims, excluding those arising under Sections 10.3, 10.4, 11.3.9, and 11.3.10, shall be referred to the Initial Decision Maker for initial decision. The Architect will serve as the Initial Decision Maker, unless otherwise indicated in the Agreement. Except for those Claims excluded by this Section 15.2.1, an initial decision shall be required as a condition precedent to mediation of any Claim arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Initial Decision Maker with no decision having been rendered. Unless the Initial Decision Maker and all affected parties agree, the Initial Decision Maker will not decide disputes between the Contractor and persons or entities other than the Owner.

§ 15.2.2 The Initial Decision Maker will review Claims and within ten days of the receipt of a Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting

Init.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960791_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                          (735419337)

data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Initial Decision Maker is unable to resolve the Claim if the Initial Decision Maker lacks sufficient information to evaluate the merits of the Claim or if the Initial Decision Maker concludes that, in the Initial Decision Maker's sole discretion, it would be inappropriate for the Initial Decision Maker to resolve the Claim.

§ **15.2.3** In evaluating Claims, the Initial Decision Maker may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Initial Decision Maker in rendering a decision. The Initial Decision Maker may request the Owner to authorize retention of such persons at the Owner's expense.

§ **15.2.4** If the Initial Decision Maker requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either (1) provide a response on the requested supporting data, (2) advise the Initial Decision Maker when the response or supporting data will be furnished or (3) advise the Initial Decision Maker that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Initial Decision Maker will either reject or approve the Claim in whole or in part.

§ **15.2.5** The Initial Decision Maker will render an initial decision approving or rejecting the Claim, or indicating that the Initial Decision Maker is unable to resolve the Claim. This initial decision shall (1) be in writing; (2) state the reasons therefor; and (3) notify the parties and the Architect, if the Architect is not serving as the Initial Decision Maker, of any change in the Contract Sum or Contract Time or both. The initial decision shall be final and binding on the parties but subject to mediation and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution.

§ **15.2.6** Either party may file for mediation of an initial decision at any time, subject to the terms of Section 15.2.6.1.

§ **15.2.6.1** Either party may, within 30 days from the date of an initial decision, demand in writing that the other party file for mediation within 60 days of the initial decision. If such a demand is made and the party receiving the demand fails to file for mediation within the time required, then both parties waive their rights to mediate or pursue binding dispute resolution proceedings with respect to the initial decision.

§ **15.2.7** In the event of a Claim against the Contractor, the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

§ **15.2.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines.

§ **15.3 MEDIATION**
§ **15.3.1** Claims, disputes, or other matters in controversy arising out of or related to the Contract except those waived as provided for in Sections 9.10.4, 9.10.5, and 15.1.6 shall be subject to mediation as a condition precedent to binding dispute resolution.

§ **15.3.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration is stayed pursuant to this Section 15.3.2, the parties may nonetheless proceed to the selection of the arbitrator(s) and agree upon a schedule for later proceedings.

Init.

**AIA Document A201™ – 2007.** Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                            (725119337)

41

§ 15.3.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

§ 15.4 ARBITRATION

§ 15.4.1

**Notwithstanding anything in the General Conditions to the contrary, all Claims and other disputes between the parties, if not settled by mediation, shall not be subject to arbitration, but rather shall be litigated in a court of competent jurisdiction. THE OWNER AND THE CONTRACTOR SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS OR STATUTORY CLAIM, COUTERCLAIM OR CROSSCLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THE PROJECT OR THIS CONTRACT BECAUSE THE PARTIES HERETO, BOTH OF WHICH ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE**

§ 15.4.1.1

*(Paragraphs deleted)*
§ 15.4.4 CONSOLIDATION OR JOINDER
§ 15.4.4.1 Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation, (2) the arbitrations to be consolidated substantially involve common questions of law or fact, and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

§ 15.4.4.2 Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent.

§ 15.4.4.3 The Owner and Contractor grant to any person or entity made a party to an arbitration conducted under this Section 15.4, whether by joinder or consolidation, the same rights of joinder and consolidation as the Owner and Contractor under this Agreement.

AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING:** This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                  (725119337)

# Additions and Deletions Report for
## AIA® Document A201™ – 2007

This Additions and Deletions Report, as defined on page 1 of the associated document, reproduces below all text the author has added to the standard form AIA document in order to complete it, as well as any text the author may have added to or deleted from the original AIA text. Added text is shown underlined. Deleted text is indicated with a horizontal line through the original AIA text.

Note: This Additions and Deletions Report is provided for information purposes only and is not incorporated into or constitute any part of the associated AIA document. This Additions and Deletions Report and its associated document were generated simultaneously by AIA software at 13:24:48 on 09/14/2015.

PAGE 1

Gallaudet University – MSSD Residence Hall
800 Florida Avenue
Washington, DC 20002

...

*(Name, legal status and address)*
Gallaudet University
800 Florida Avenue, NE
Washington, DC 20002

...

*(Name, legal status and address)*
Gaudreau, Inc.
810 Light Street
Baltimore, Maryland 21230

PAGE 13

§ 3.2.4 If the Contractor believes that additional cost or time is involved because of clarifications or instructions the Architect issues in response to the Contractor's notices or requests for information pursuant to Sections 3.2.2 or 3.2.3, the Contractor shall make Claims as provided in Article 15. If the Contractor fails to perform the obligations of Sections 3.2.2 or 3.2.3, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. If the Contractor performs those obligations, the Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents, for differences between field measurements or conditions and the Contract Documents, or for nonconformities of the Contract Documents to applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities. *The Contractor will make every effort to notify the owner within 10 working days (two weeks) that additional cost is required due to an RFI response.*

PAGE 14

§ 3.4.4 A wage scale prepared by the U.S. Department of Labor pursuant to the provision of the Davis-Bacon Act is included in the Contract Documents. This wage scale represents the minimum wages that must be paid in each category of labor on the project. The requirements and responsibilities within the Davis-Bacon Act apply to this project and are included in Exhibit "C" of this Contract.

...

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                          (725119337)

1



§ 3.7.1 Unless otherwise provided in the Contract Documents, the ~~Contractor~~ Owner shall secure and pay for the building permit ~~as well as for other~~ and the Contractor shall secure and pay for  trade permits, fees, licenses, and inspections by government agencies necessary for proper execution and completion of the Work that are customarily secured after execution of the Contract and legally required at the time bids are received or negotiations concluded.

...

§ 3.7.4 **Concealed or Unknown Conditions.** If the Contractor encounters conditions at the site that are (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, the Contractor shall promptly provide notice to the Owner and the Architect before conditions are disturbed and in no event later than ~~21 days~~ *10 working days (two weeks)* after first observance of the conditions. The Architect will promptly investigate such conditions and, if the Architect determines that they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall promptly notify the Owner and Contractor in writing, stating the reasons. If either party disputes the Architect's determination or recommendation, that party may proceed as provided in Article 15.

**PAGE 15**

§ 3.8.1 The Contractor shall include in the Contract Sum all allowances stated in the Contract ~~Documents.~~ Documents *and as listed in paragraph 4.4.* Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

**PAGE 22**

§ 7.2.2 The allowance for combined overhead and profit included in the total cost to the Owner for any Change Order shall be based on the following:
.1    For the General Contractor: 5% of the cost of the changed work;
.2    For Subcontractors: (a) when directly performing the work, 10% for overhead and 5% for profit; and (b) when the work is performed by a lower-tier subcontractor, 5% mark-up for the Subcontractor; and
.3    For work performed by lower-tier subcontractors: 10% for overhead and 5% for profit.

**PAGE 23**

*All change proposals to be submitted to the owner within 15 working days (3-weeks) of receipt of the directive or request to perform minor changes in the work. All change proposals must include subcontractor and vendor labor and material cost breakdowns with detailed description of cost sufficient for the Owner and Architect to review for approval of cost adjustments.*

**PAGE 27**

§ 9.8.1 Definition

9.8.1.1 Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

9.8.1.2 The authority having jurisdiction has issued a certificate of occupancy.

9.8.1.3 A temporary certificate of occupancy fulfills this requirement.

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:34:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                                    (725119337)

PAGE 30

### 11.1 General.

Until the Project has been completed in accordance with the approved plans and specifications and accepted by the Owner, the Contractor and all Subcontractors shall, at their own expense, maintain insurance on all operations under the Agreement, whether such operations are undertaken by Contractor, or by any Subcontractor, or by anyone directly or indirectly employed by any of them, or for whose acts any of the foregoing entities may be liable, in full compliance with all of the provisions of this section.   Insurance coverages shall be placed with companies acceptable to Owner, with a minimum "A.M. Best's" Rating of A-VII, and authorized to do business in the jurisdiction where the Project is located.   In the event the Contractor sublets or subcontracts any part of the Work herein described, the Subcontractor shall be bound by the same terms and conditions concerning insurance as outlined herein and this section will be made a part of any such subcontract agreement, except that Contractor shall have the responsibility to establish limits of insurance for each Subcontractor commensurate with each Subcontractor's respective risk.

All Contractor's insurance coverages (other than professional liability) must waive subrogation against the Owner, Project Manager, and at the request of the Owner, any separate contractor performing at the site.

All Subcontractor's insurance coverages must waive subrogation against the Owner, Project Manager, and the Contractor and, at the request of the Owner, any separate contractor performing Work at the Site.

All insurance coverages shall be endorsed to state that the right of cancellation or material change in coverage by the insurance carrier is waived, unless thirty (30) days prior notice is furnished by registered mail to the Owner. In the event an insurance carrier is unable to accommodate this requirement, then the policy holder (Contractor or Subcontractor) must notify Owner in writing with at least thirty (30) days advance written notice of any cancellation of coverage, except ten (10) days for non-payment of premium.

All insurance coverages shall (i) list the Owner, the Owner's lender (if required), the Project Manager, the Architect, and each of their respective directors, officers, agents and employees, and any others (including separate contractors) reasonably requested by the Owner, as additional insureds for ongoing and completed operations, (ii) be endorsed to specify that any insurance or self-insurance maintained by Owner shall not contribute with it, and (iii) be issued by insurers approved by the Owner in its reasonable discretion.   However, nothing in this Section shall require Contractor or its Subcontractors to provide insurance for the Architect for allegation of their professional negligence.

If the Contractor desires to have limits in excess of those required or furnished by the Owner, or desires to carry additional coverages for its own protection, the arrangements therefore and the cost thereof shall be the sole responsibility of the Contractor.

Nothing contained in these insurance requirements is to be construed as limiting the extent of the Contractor's responsibility for payment of damages resulting from Contractor's operations under the Agreement.

### 11.2 Casualty Insurance.

### 11.2.1 Workers' Compensation and Employer's Liability Insurance.

Contractor shall carry Workers' Compensation and Employer's Liability Insurance as required by applicable Codes. Employers Liability Insurance shall be in an amount no less than $2,000,000 each accident for bodily injury, $2,000,000 policy limit for bodily injury by disease and $2,000,000 each employee for bodily injury or disease. These policies will contain waivers of the insured's subrogation rights against Owner and Project Manager.

### 11.2.2 Commercial General Liability and Commercial Automobile Insurance.

(a) Coverage.   Contractor shall carry Occurrence Form per project (not claims made) Commercial General Liability and Commercial Automobile Liability Insurance covering all operations by or on

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9316960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                    (725119337)

3

behalf of Contractor providing insurance for bodily injury liability and property damage liability, with at least the limits of liability stated below.   Coverage shall be at least as broad as that coverage provided in "Insurance Services Office Form CG0001" or equivalent and shall include coverage for (i) premises and operations; (ii) products and completed operations; (iii) contractual liability and automobile contractual liability insuring the obligations assumed by Contractor in this Contract; (iv) broad form property damage (including products and completed operations coverage); (v) explosion, collapse and underground hazards; (vi) personal injury liability; (vii) owned, hired and non-owned automobiles; and (viii) employees covered as insureds; and shall contain a "Cross Liability" or "Severability of Interest" clause.

 **(b) Limits of Liability.**   The limits of liability shall not be less than:

  (i) Commercial General Liability Insurance with a minimum $10,000,000 limit of liability for each of the following:

   (A) Per occurrence and per project, bodily injury and property damage (broad form)

   (B) Per occurrence and per project, personal injury and advertising injury

   (C) General aggregate other than Products & Completed Operations Aggregate

   (D) Products & Completed Operations Aggregate.

  (ii) Commercial Automobile Liability Insurance applicable to all owned, non-owned and hired vehicles, trucks, trailers and semi-trailers, including but not limited to machinery or apparatus attached thereto, with a minimum limit of $10,000,000 for bodily injury and property damage combined single limit per occurrence/annual aggregate. If Contractor or its Subcontractors haul Hazardous Materials, they must carry Automobile Liability insurance with $5,000,000 combined single limit per occurrence for bodily injury and property damage applicable to all Hazardous Materials hauling vehicles and include MCS 90 or CA 9948, or equivalent. Owner and Project Manager must be named as additional insureds on this coverage.

 (c) Products & Competed Operations Insurance shall be maintained for a minimum period of ten (10) years after Final Completion, and Contractor shall continue to furnish evidence of such coverage to Owner on an annual basis during the aforementioned period.

 (d) Coverage is to be written to cover all occurrences during the term of this Agreement or out of any work performed pursuant to the Agreement, regardless of when such claim shall be first made against Owner and/or Contractor.

 (e) Owner, Owner's lender (if required) and Project Manager and each of their respective directors, officers, agents and employees are to be named as additional insureds for Commercial General Liability and Products and Completed Operations using Insurance Services Office (ISO) Forms CG2010 0413 and CG2037 0413 or the equivalent endorsements. Such additional insured status shall not include any special limitations on the scope of protection afforded to Owner or any of the other additional insureds.

 (f) The Owner shall be notified when and if fifty (50%) percent of any aggregate limits is eroded.

 **(g) Other Requirements.**   The policies shall provide that the insurance afforded the additional insureds is primary and that any insurances, deductibles or self-insurance carried by the additional insureds will be excess only and will not contribute to the insurance afforded by the policy.

**11.2.3 Fidelity Coverage.**

Fidelity coverage naming Owner as obligee, insuring loss(es) due to the dishonest acts of Contractor's employees with limits of at least $1,000,000.

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:34:48 on 09/14/2015 under Order No.9318660751_1 which expires on 07/13/2016, and is not for resale.
User Notes: (725419337)

4

**11.2.4 Contractor's Pollution Liability** covering claims for bodily injury, property damage, clean-up costs and legal defense costs resulting from the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, mold, fungus, spores or other microbial matter, or any Hazardous Materials in connection with Contractor's operations or the operations of any party for whom Contractor is legally liable.   Coverage shall include the following:

        (a) Limit of not less than $5,000,000 per claim and an aggregate limit of not less than $5,000,000;

        (b) The policy shall include Owner, Owner's lender (if required) and Project Manager and each of their respective directors, officers, agents and employees as an additional insureds and provide coverage for claims arising out of completed operations; and

        (c) Coverage shall be maintained for the statutory period applying to claims arising out of the Work and, at a minimum, a period of ten (10) years after Final Completion.

**11.2.5 Evidence of Insurance.**

Certificates of Insurance evidencing the Insurance required by this Article 11, shall be furnished by Contractor to Owner and Project Manager before any Work is commenced by Contractor and within five (5) business days of the Commencement Date.   The Certificates of Insurance shall provide that there will be no cancellation or reduction of coverage without thirty (30) days prior written notice to Owner, and Project Manager.   All limiting endorsements of the policies must be declared by carrier/broker on the issued Certificates of Insurance. Failure to so provide such certificates shall be cause for the Owner to terminate the Agreement.

If any insurance coverage is required by this Agreement to remain in force after Final Completion, an additional Certificate of Insurance evidencing continuation of such coverage shall be submitted as a precondition of Final Payment.

**11.2.6 General Insurance Requirements.**   Owner may take such steps as are necessary to assure Contractor's compliance with its obligations under this Article 11.   If Contractor fails to maintain any required insurance coverage, Owner may provide such coverage and charge the cost thereof to Contractor or terminate the Agreement.

The required insurance (including any deductible amounts or self-insured retention) shall be subject to the written approval of Owner, but Owner's non-acceptance of any Certificate of Insurance, shall in no way limit or relieve Contractor of its duties and responsibilities under this Article 11.

Compliance of the Contractor with the herein insurance requirements shall not relieve it of liability under any indemnity or other agreement set forth in the Agreement.   None of the requirements contained herein as to types or limits of coverage to be maintained by Contractor are intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by Contractor under this Agreement.   Contractor may, unless otherwise specified in the Contract Documents, and subject to the review and approval of Owner, utilize reasonable deductibles or self-insured retention in relation to its size and financial stability.   Contractor shall be responsible to pay any loss amount which lies within its deductible up to the maximum amount of the deductible or self-insured retention. Entire amount of any Deductibles and/or Self Insured Retentions under any policy required of, or carried by, Subcontractors shall be the responsibility of, and paid for by, Subcontractors.

**11.3 Subcontractors' Insurance.**

The Contractor shall require each of its Subcontractors to procure and maintain, until the satisfactory completion of that Subcontractor's work, insurances as set forth in Contractor's Subcontract. Policies carried by Subcontractors must provide the following:

        (i)   Name Owner, Project Manager and each of their respective directors, officers, agents and employees as additional insureds (except for Worker's Compensation policy).

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                        (725119337)

5



(ii)  Provide Subcontractor's insurance policies are primary and non-contributory with respect to any coverage maintained by Owner, Project Manager or other additional insureds.

(iii) Provide coverage on an Occurrence Form. Claims Made Forms are not acceptable.

(iv) Provide Waiver of Subrogation endorsements in favor of Owner, Project Manager and their respective directors, officers, agents and employees.

**11.4 Property Insurance.**

The Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance in the amount of the initial GMP, plus value of subsequent modifications to the GMP and the cost of Materials supplied or installed by others, comprising total value for the entire Project at the Site on a replacement cost basis.  Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until Final Payment has been made as provided or until no person or entity other than the Owner has an insurable interest in the property to be covered, whichever is later.   Coverage shall be written in the name of the Owner as first named insured, and shall add the Contractor and Subcontractors as additional named insureds.

Property insurance shall be provided by the Insurance Services Office Forms CP 00 20 "Builders Risk Form" and/or CP 10 30 "Causes of Loss – Special Form," or equivalent form,   and shall include without limitation, insurance against the perils of fire (with extended coverage) and direct physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, water damage, collapse, windstorm, falsework, testing and startup, ensuing losses due to design errors or defective work, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's, Contractor's and Subcontractors' Services and extra and expediting expenses required as a result of such insured loss.   At the Owner's option, coverage may extend to damage caused by earthquake, other earth movement, terrorism or flood; however, in the event Owner chooses not to purchase coverage for damage caused by earthquake or flood, Contractor shall not be required to rebuild the Project at Contractor's expense.

This property insurance shall cover portions of the Work stored off the site (sublimit of $500,000), and also portions of the Work in transit (sublimit of $500,000).   If the Owner provides Materials, furnishings or fixtures to be installed by the Contractor, the builders risk insurance shall be endorsed to provide coverage for such Owner furnished Materials, furnishings or fixtures.

If the property insurance requires deductibles or sub-limits, the Owner shall pay costs not covered because of such deductibles or sub-limits, unless the claim is caused by the negligence of the Contractor or a Subcontractor, or any of their agents, employees or anyone under their control or direction, in which case the deductible shall be paid by the Contractor.

Partial occupancy or use shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise.   The Owner and Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until Final Completion; this insurance shall include interests of the Owner, Contractor and Subcontractors in the Work, and the Owner and Contractor shall be named insureds.

The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other perils.   The Owner waives all rights of action against the Contractor for loss of use of the Owner's property caused by such perils, including consequential losses, to the

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9319960751_1 which expires on 07/13/2016, and is not for resale.**
User Notes:                                                                                                          (725119337)

extent covered by Property or Builder's Risk Insurance obtained pursuant to this Agreement and to the extent not caused by the negligence or willful misconduct of the Contractor, or any Subcontractor, their agents, employees or anyone under their control or direction.

If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the Site by property insurance under policies separate from those insuring the Project, or if after Final Payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of damages caused by fire or other causes of loss covered by this separate property insurance.   All separate policies shall provide this waiver of subrogation by endorsement or otherwise.   If Owner endorses its own property insurance policy to provide coverage for the Project at any point when Contractor has construction activities continuing pursuant to this Agreement, Owner shall cause the policy to have Contractor listed as insured with the above noted waiver of subrogation endorsement.

The Owner, Contractor and Subcontractors of every tier shall waive all rights against each other for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.4, or other property insurance applicable to the Work.   The policies shall provide such waivers of subrogation by endorsement or otherwise.   A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

The Owner shall provide to the Contractor a copy of each policy that includes insurance coverages required by this Section 11.4, if requested in writing.   Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project.   Owner shall notify Contractor in writing with at least thirty (30) days advance written notice of any cancellation of coverage, except ten (10) days for non-payment of premium.

Notwithstanding any Builder's Risk Insurance provided by Owner, Contractor shall secure, pay for, and maintain Property Insurance for protection against loss of owned, borrowed, or rented capital equipment and tools, including any tools owned by employees, and all tools, equipment, staging, temporary office trailers, scaffolding and forms owned, borrowed or rented by the Contractor.   The requirement to secure and maintain such insurance is solely for the benefit of the Contractor.   Failure of the Contractor to secure such insurance or to maintain adequate level of coverage shall not obligate the Owner, or the Project Manager, for any losses, and the Owner and Project Manager shall have no such liability.   The insurance policy for such Contractor Insurance shall include a waiver of subrogation as follows:   "It is agreed that in no event shall this insurance Company have any right of recovery against Owner or Project Manager."

A loss insured under Owner's property insurance shall be adjusted by the Owner as policy holder and made payable to the Owner as policy holder for the insureds, as their interests may appear, subject to requirements of any applicable mortgage clause.   The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

The Owner as policy holder shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved in the manner outlined in Section 15 hereof.

## § 11.4 CONTRACTOR'S LIABILITY INSURANCE

§ 11.4.1 The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations and completed operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by

Additions and Deletions Report for AIA Document A201™ – 2007, Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA®  Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA®  Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                         (725119337)

7



a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1 Claims under workers' compensation, disability benefit and other similar employee benefit acts that are applicable to the Work to be performed;

.2 Claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

.3 Claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

.4 Claims for damages insured by usual personal injury liability coverage;

.5 Claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6 Claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle;

.7 Claims for bodily injury or property damage arising out of completed operations; and

.8 Claims involving contractual liability insurance applicable to the Contractor's obligations under Section 3.18.

§ 11.1.2 The insurance required by Section 11.1.1 shall be written for not less than limits of liability specified in the Contract Documents or required by law, whichever coverage is greater. Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from the date of commencement of the Work until the date of final payment and termination of any coverage required to be maintained after final payment, and, with respect to the Contractor's completed operations coverage, until the expiration of the period for correction of Work or for such other period for maintenance of completed operations coverage as specified in the Contract Documents.

§ 11.1.3 Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Work and thereafter upon renewal or replacement of each required policy of insurance. These certificates and the insurance policies required by this Section 11.1 shall contain a provision that coverages afforded under the policies will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner. An additional certificate evidencing continuation of liability coverage, including coverage for completed operations, shall be submitted with the final Application for Payment as required by Section 9.10.2 and thereafter upon renewal or replacement of such coverage until the expiration of the time required by Section 11.1.2. Information concerning reduction of coverage on account of revised limits or claims paid under the General Aggregate, or both, shall be furnished by the Contractor with reasonable promptness.

§ 11.1.4 The Contractor shall cause the commercial liability coverage required by the Contract Documents to include (1) the Owner, the Architect and the Architect's consultants as additional insureds for claims caused in whole or in part by the Contractor's negligent acts or omissions during the Contractor's operations; and (2) the Owner as an additional insured for claims caused in whole or in part by the Contractor's negligent acts or omissions during the Contractor's completed operations.

§ 11.2 OWNER'S LIABILITY INSURANCE
The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.

§ 11.3 PROPERTY INSURANCE
§ 11.3.1 Unless otherwise provided, the Owner shall purchase and maintain, in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract Modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made as provided in Section 9.10 or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.3 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:34:48 on 09/14/2015 under Order No.9318960731_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                    (725419337)

8

§ 11.3.1.1 Property insurance shall be on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's and Contractor's services and expenses required as a result of such insured loss.

§ 11.3.1.2 If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance that will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor in writing, then the Owner shall bear all reasonable costs properly attributable thereto.

§ 11.3.1.3 If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles.

§ 11.3.1.4 This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

§ 11.3.1.5 Partial occupancy or use in accordance with Section 9.9 shall not commence until the insurance company or companies providing property insurance have consented to such partial occupancy or use by endorsement or otherwise. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, without mutual written consent, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of insurance.

§ 11.3.2 BOILER AND MACHINERY INSURANCE
The Owner shall purchase and maintain boiler and machinery insurance required by the Contract Documents or by law, which shall specifically cover such insured objects during installation and until final acceptance by the Owner; this insurance shall include interests of the Owner, Contractor, Subcontractors and Sub-subcontractors in the Work, and the Owner and Contractor shall be named insureds.

§ 11.3.3 LOSS OF USE INSURANCE
The Owner, at the Owner's option, may purchase and maintain such insurance as will insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

§ 11.3.4 If the Contractor requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Owner shall, if possible, include such insurance, and the cost thereof shall be charged to the Contractor by appropriate Change Order.

§ 11.3.5 If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Section 11.3.7 for damages caused by fire or other causes of loss covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

§ 11.3.6 Before an exposure to loss may occur, the Owner shall file with the Contractor a copy of each policy that includes insurance coverages required by this Section 11.3. Each policy shall contain all generally applicable conditions, definitions, exclusions and endorsements related to this Project. Each policy shall contain a provision that the policy will not be canceled or allowed to expire, and that its limits will not be reduced, until at least 30 days' prior written notice has been given to the Contractor.

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.8318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                          (725119337)

9



## § 11.3.7 WAIVERS OF SUBROGATION

The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Contractor, as appropriate, shall require of the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

§ 11.3.8 A loss insured under the Owner's property insurance shall be adjusted by the Owner as fiduciary and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause and of Section 11.3.10. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

§ 11.3.9 If required in writing by a party in interest, the Owner as fiduciary shall, upon occurrence of an insured loss, give bond for proper performance of the Owner's duties. The cost of required bonds shall be charged against proceeds received as fiduciary. The Owner shall deposit in a separate account proceeds so received, which the Owner shall distribute in accordance with such agreement as the parties in interest may reach, or as determined in accordance with the method of binding dispute resolution selected in the Agreement between the Owner and Contractor. If after such loss no other special agreement is made and unless the Owner terminates the Contract for convenience, replacement of damaged property shall be performed by the Contractor after notification of a Change in the Work in accordance with Article 7.

§ 11.3.10 The Owner as fiduciary shall have power to adjust and settle a loss with insurers unless one of the parties in interest shall object in writing within five days after occurrence of loss to the Owner's exercise of this power; if such objection is made, the dispute shall be resolved in the manner selected by the Owner and Contractor as the method of binding dispute resolution in the Agreement. If the Owner and Contractor have selected arbitration as the method of binding dispute resolution, the Owner as fiduciary shall make settlement with insurers or, in the case of a dispute over distribution of insurance proceeds, in accordance with the directions of the arbitrators.

§ 11.4.1 The Owner shall have the right to require the Contractor to furnish bonds covering faithful performance of the Contract and payment of obligations arising thereunder as stipulated in bidding requirements or specifically required in the Contract Documents on the date of execution of the Contract.Contractor may elect to provide Subcontractor Default Insurance (SDI) for some or all of the subcontractors and/or direct suppliers engaged on the Project.  At Contractor's sole discretion, Contractor may elect not to enroll certain Subcontractors into the SDI Program and instead such Subcontractor(s) shall be required to provide 100% payment and performance bonds. The cost of Contractor's SDI program and/or Subcontractor bonds for base contract work are included in the Contract Sum.

§ 11.4.2 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the Contract, the Contractor shall promptly furnish a copy of the bonds or shall authorize a copy to be furnished.

PAGE 37

§ 13.5.1 Tests, inspections and approvals of portions of the Work shall be made as required by the Contract Documents and by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of public authorities. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9316960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                          (725119337)

10

approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and the Owner shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of (1) tests, inspections or approvals that do not become requirements until after bids are received or negotiations concluded, and (2) tests, inspections or approvals where building codes or applicable laws or regulations prohibit the Owner from delegating their cost to the Contractor.

**PAGE 38**

**§ 13.8 SURVIVAL**
The provisions of the Contract which by their nature survive termination of the Contract or Final Completion under Article 9.10, including all warranties, indemnities, payment obligations, and Owner's right to audit Contractor's books and records, shall remain in full force and effect after Final Completion or any termination of the Contract.

...

§ 14.1.4 If the Work is stopped for a period of 60 90 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has repeatedly failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Section 14.1.3.

**PAGE 40**

§ 15.1.5.2 If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

...

The Contractor and Owner waive Claims against each other for consequential damages damages arising out of or relating to this Contract. This mutual waiver includes waive includes:

.1   damages .1   Damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2   damages .2   Damages incurred by the Contractor for principal office expenses including the compensation of personnel personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

**PAGE 42**

§ 15.4.1 If the parties have selected arbitration as the method for binding dispute resolution in the Agreement, any Claim subject to, but not resolved by, mediation shall be subject to arbitration which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Arbitration Rules in effect on the date of the Agreement. A demand for arbitration shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the arbitration. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**Notwithstanding anything in the General Conditions to the contrary, all Claims and other disputes between the parties, if not settled by mediation, shall not be subject to arbitration, but rather shall be litigated in a court of competent jurisdiction.  THE OWNER AND THE CONTRACTOR SPECIFICALLY WAIVE ANY**

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:46 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                          (725119337)

RIGHT TO A TRIAL BY JURY IN ANY COURT WITH RESPECT TO ANY CONTRACTUAL, TORTIOUS OR STATUTORY CLAIM, COUTERCLAIM OR CROSSCLAIM AGAINST THE OTHER ARISING OUT OF OR CONNECTED IN ANY WAY TO THE PROJECT OR THIS CONTRACT BECAUSE THE PARTIES HERETO, BOTH OF WHICH ARE REPRESENTED BY COUNSEL, BELIEVE THAT THE COMPLEX COMMERCIAL AND PROFESSIONAL ASPECTS OF THEIR DEALINGS WITH ONE ANOTHER MAKE A JURY DETERMINATION NEITHER DESIRABLE NOR APPROPRIATE

§ 15.4.1.1 A demand for arbitration shall be made no earlier than concurrently with the filing of a request for mediation, but in no event shall it be made after the date when the institution of legal or equitable proceedings based on the Claim would be barred by the applicable statute of limitations. For statute of limitations purposes, receipt of a written demand for arbitration by the person or entity administering the arbitration shall constitute the institution of legal or equitable proceedings based on the Claim.

§ 15.4.2 The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

§ 15.4.3 The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

Additions and Deletions Report for AIA Document A201™ – 2007. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987, 1997 and 2007 by The American Institute of Architects. **All rights reserved. WARNING:** This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                                         (725119337)

12

## Certification of Document's Authenticity
*AIA® Document D401™ – 2003*

I, Matthew Weirich, hereby certify, to the best of my knowledge, information and belief, that I created the attached final document simultaneously with its associated Additions and Deletions Report and this certification at 13:24:48 on 09/14/2015 under Order No. 9318960751_1 from AIA Contract Documents software and that in preparing the attached final document I made no changes to the original text of AIA® Document A201™ – 2007, General Conditions of the Contract for Construction, as published by the AIA in its software, other than those additions and deletions shown in the associated Additions and Deletions Report.

_____
(Signed)

_____
(Title)

_____
(Dated)

AIA Document D401™ – 2003. Copyright © 1992 and 2003 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:48 on 09/14/2015 under Order No.9318960751_1 which expires on 07/13/2016, and is not for resale.
User Notes:                                                                                                                         (725119337)

1

MNW

# EXHIBIT D



# Peckar & Abramson

A Professional Corporation • Attorneys & Counselors at Law

www.pecklaw.com

2055 L. Street, N.W.
Suite 750
Washington, D.C. 20036
tel 202.293.8815
fax 202.293.7994

New York, NY
Los Angeles, CA
San Francisco Bay Area, CA
Washington, D.C.
Miami, FL
Chicago, IL
River Edge, NJ
Austin, TX
Dallas, TX
Houston, TX
Devon, PA

International
Alliances

Beijing
Bogota
Buenos Aires
Guatemala City
Lima
London
Managua
Mexico City
Panama City
Port of Spain
San Jose
San Salvador
Santiago
Sao Paulo
Tegucigalpa
Vancouver

November 20, 2018

**VIA ELECTRONIC MAIL:**

Louis E. Dolan, Jr.
Nixon Peabody LLP
799 9th Street, NW, Suite 500
Washington, DC 20001-4501

RE:   **James G. Davis Construction Corporation's Response to Bowman, Foster & Associates, PC's Report regarding MSSD Residence Hall at Gallaudet University in Washington, D.C.**

Dear Le:

James G. Davis Construction Corporation ("DAVIS") has reviewed the report regarding the MSSD Residence Hall at Gallaudet University issued by Bowman, Foster & Associates, PC ("BFA") dated July 26, 2018 (the "BFA Report"). Enclosed for your review is a copy of the BFA Report with DAVIS' responses to each item imbedded in blue text. Photos, reports, and other illustrative documents are also included where relevant.

Pursuant to the BFA Report, it is based on one or more site visits conducted by BFA in or around October and November 2017 – nearly eight months prior to issuance of the BFA Report. DAVIS accompanied BFA on at least one of its site visits in October 2017.

BFA's site visits occurred prior to DAVIS and Gallaudet's global settlement that occurred on January 23, 2018. As part of the global settlement, DAVIS and Gallaudet agreed on a list of specific items of corrective work to be performed by DAVIS. The global settlement was memorialized in a written agreement dated January 31, 2018 (the "Agreement"). Following the global settlement, DAVIS performed all corrective work required by the terms of the Agreement. To date, DAVIS has not received further complaint about such work from Gallaudet. Because the site walk(s) upon which the BFA Report is based pre-dates the Agreement and the work performed by DAVIS pursuant to the Agreement, many of the items raised in the BFA Report do not reflect the current site conditions.




**Peckar & Abramson**
A Professional Corporation • Attorneys & Counselors at Law

Louis E. Dolan, Jr.
November 20, 2018
Page 2

Nothing herein shall be construed as a waiver of any of DAVIS' rights or defenses.  Feel free to call me if you have any questions.

Sincerely,

Stephen M. Seeger
Email: seeger@pecklaw.com

Enclosure

# EXHIBIT E



December 18, 2020

**Stephen M. Seeger**

**Via electronic mail:**
**LDOLAN@nixonpeabody.com**

Direct Phone  202-747-0793
Direct Fax 202-640-5961
sseeger@cozen.com

Louis Dolan, Esq.
Nixon Peabody LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327

Dear Le:

        Thank you for sending the damages matrix – it certainly provides some insight into the Gallaudet claims, but it does not provide a real basis for discussion.  While certain costs are readily understood as directly related to previously identified claims (e.g. bathroom floor drainage), most others are not.  DAVIS cannot realistically engage subcontractors performing the work Gallaudet claims to be defective without understanding the related costs.  In addition, some of the asserted costs are difficult to comprehend (e.g. $2.2+ million to remove and replace backfill around building perimeter; $1.5 million for added consultant services).  Gallaudet needs to provide some additional detail and explanation to make those numbers even modestly digestible.  Some costs DAVIS assumes that Gallaudet asserts against its structural engineer (e.g. repairs due to geotechnical issues of $5.2 million, portions of the DPA oversight and additional fees).  If Gallaudet is now asserting that the repairs due to geotechnical issues are DAVIS's responsibility, please advise me.  And some cost categories DAVIS understood were not being incurred (e.g. brick façade replacement).  Again, if Gallaudet has changed its plans and intends to skin and re-brick the building, please let me know.

        The matrix does not include consequential damages or damages related to any alleged fraud, although your December 3, 2020 settlement letter asserted them.  I trust you appreciate that the Contract waives consequential damages and, beyond its denial of the underlying claims, DAVIS disputes any basis to circumvent the clear Contractual waiver.  If Gallaudet intends to pursue any such damages in any settlement discussion or mediation with DAVIS, DAVIS will need details on those damages also.  That said, and I hope you know this to be true, those types of claims will make settlement of an already hotly disputed claim virtually impossible.

        Contrary to the statements in your letter of December 3, 2020, DAVIS is and has always been prepared to engage in good faith efforts to resolve any point of departure between the parties.  DAVIS sat with Gallaudet repeatedly in 2017 and 2018 to reach an amicable Project close out.  Although the resulting Settlement Agreement was never consummated, in good faith DAVIS's performed the work as it agreed.  Thereafter, Gallaudet did not follow the Contract protocol or the negotiated procedures for handling warranty items.  Instead, Gallaudet embarked in litigation with its design professionals – not advising or involving DAVIS of that action – and then dismissed it with equal secrecy.  Gallaudet then retained consultants to perform destructive testing of work that DAVIS never understood Gallaudet to believe was DAVIS's responsibility or in any way defective, some of which Gallaudet never previously notified DAVIS contained alleged defects.  While it is certainly true that Gallaudet permitted DAVIS to visit the site and observe Gallaudet demolishing its facility, Gallaudet did not consult DAVIS in advance of the de-

Louis Dolan, Esq.
December 18, 2020
Page 2

_____

construction, did not preserve or provide to DAVIS some of the materials it now asserts to be defective, and did not seek DAVIS's assistance in fashioning a fix of the problems it was investigating or those it "found" during its demolition.  Under the circumstances, DAVIS was and remains ham-strung in its ability to fully understand the extent of the alleged problems, the propriety of the proposed fix (including how much is a "betterment" as opposed to a repair), and the fair cost of addressing any actual defect.  When DAVIS cannot appreciate these facts, it cannot persuade its subcontractors (or their insurance carriers) to take on those obligations.

In short, while DAVIS respects Gallaudet's positions and frustration, it disagreed and disagrees with the process and direction that Gallaudet embarked upon to address them.  Gallaudet failed to follow the Contract or other agreed procedures to address asserted defects.  It chose instead to destroy its own facility and seek to impose damages on DAVIS in excess of the cost to construct the MSSD dormitory.  If Gallaudet wants to discuss resolution with realistic expectations based on enumerated costs, DAVIS is prepared to sit down.  If not, or if Gallaudet would rather resolve the disputes as per the Contract, we will certainly abide by the Contract.  Either way, I trust that we will be able to continue to work collaboratively and avoid unnecessary legal fees that result from prideful stubbornness or posturing.

I look forward to receiving a more detailed itemization of Gallaudet's asserted damages.

Best regards,

STEPHEN M. SEEGER

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Gallaudet University
_____
                                    Plaintiff

                    vs.
                                                        Case Number   __2020 CA 005196 B__

James G. Davis Construction Corporation
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Louis E. Dolan, Jr.
_____
Name of Plaintiff's Attorney

Nixon Peabody LLP                                    By _____
_____
Address                                                                                Deputy Clerk
799 9th Street, NW, Suite 500, Washington, DC 20001

(202) 585-8818                                        Date  **01/04/2021**
_____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

_Clerk of the Court_

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Gallaudet University
_____
                                      Demandante
        contra

                                              Número de Caso: _____

James G. Davis Construction Corporation
_____
                                      Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Louis E. Dolan, Jr.                                    _SECRETARIO DEL TRIBUNAL_
_____
Nombre del abogado del Demandante

Nixon Peabody LLP                          Por: _____
_____
Dirección                                              Subsecretario
799 9th Street, NW, Suite 500, Washington, DC 20001
_____

(202) 585-8818                             Fecha December 30, 2020
_____
Teléfono

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

만약 번역이 필요하면 (202) 879-4828 로 연락하십시오     የትርጉም እርዳታ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Gallaudet University

Case Number: __2020 CA 005196 B__

vs

Date: __December 30, 2020__

James G. Davis Construction Corporation

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)*<br>Louis E. Dolan, Jr. | Relationship to Lawsuit |
|---|---|
| Firm Name: Nixon Peabody LLP | ☑ Attorney for Plaintiff |
| | ☐ Self (Pro Se) |
| Telephone No.:               Six digit Unified Bar No.:<br>(202) 585-8818              442881 | ☐ Other: _____ |

TYPE OF CASE:    ☑ Non-Jury        ☐ 6 Person Jury            ☐ 12 Person Jury

Demand: $ 30,000,000.00 _____    Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____    Judge: _____    Calendar #:_____

Case No.:_____    Judge: _____    Calendar#:_____

---

NATURE OF SUIT:    *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☑ 01 Breach of Contract            ☐ 14 Under $25,000 Pltf. Grants Consent    ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty            ☐ 17 OVER $25,000 Pltf. Grants Consent    ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument         ☐ 27 Insurance/Subrogation               ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                  Over $25,000 Pltf. Grants Consent        Over $25,000 Consent Denied
☐ 13 Employment Discrimination     ☐ 07 Insurance/Subrogation               ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees              Under $25,000 Pltf. Grants Consent        Under $25,000 Consent Denied
                                   ☐ 28 Motion to Confirm Arbitration
                                        Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile                    ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion                    ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process              ☐ 10 Invasion of Privacy             ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection       ☐ 11 Libel and Slander                    Not Malpractice)
☐ 03 Assault and Battery           ☐ 12 Malicious Interference           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury   ☐ 13 Malicious Prosecution           ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)    ☐ 14 Malpractice Legal               ☐ 20 Friendly Suit
☐ 06 False Accusation              ☐ 15 Malpractice Medical (Including Wrongful Death)    ☐ 21 Asbestos
☐ 07 False Arrest                  ☑ 16 Negligence- (Not Automobile,    ☐ 22 Toxic/Mass Torts
☑ 08 Fraud                              Not Malpractice)                 ☐ 23 Tobacco
                                                                         ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE        IF USED

# Information Sheet, Continued

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)
- [ ] 10  Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability
- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-I (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

**D.  REAL PROPERTY**

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

___/s/ Louis E. Dolan, Jr.___

Attorney's Signature

___December 30, 2020___

Date



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

GALLAUDET UNIVERSITY
   Vs.                                   C.A. No.      2020 CA 005196 B
JAMES G. DAVIS CONSTRUCTION CORPORATION

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.


                         Chief Judge Anita M. Josey-Herring


Case Assigned to: Judge JASON PARK
Date:       December 31, 2020
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, April 02, 2021
Location:   Courtroom 519
               500 Indiana Avenue N.W.
               WASHINGTON, DC 20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,   "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.   To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

**Civil Remote Hearing Instructions for Participants**

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:** **(AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

- *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise.  If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2:** **(LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page:
https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3:** **(LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address
https://dccourts.webex.com  Select **Join**, enter the Meeting ID from the next page

AUDIO ALTERNATIVE:  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.



**Option 4:** **(Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

|  | 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|---|
|  | 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
|  | 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
|  | 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
|  | 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
|  | 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
|  | JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
|  | A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
|  | B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
|  | B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
|  | B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
|  | B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |